COPY

Joseph J. Tabacco, Jr. (75484)
jtabacco@bermanesq.com
Nicole Lavallee (165755)
nlavallee@bermanesq.com
Julie J. Bai (227047)
jbai@bermanesq.com
**BERMAN DEVALERIO PEASE TABACCO**
**BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, CA 94010
Telephone: (415) 433-3200
Facsimile: (415) 433-6282

**Local Counsel for Plaintiff Bristol County Retirement System**

[Additional Counsel Appear on Signature Page]

ORIGINAL
FILED

JUN - 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

ADR

SC

|  |  |
|---|---|
| BRISTOL COUNTY RETIREMENT SYSTEM, Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> WACHOVIA CORPORATION, G. KENNEDY THOMPSON, THOMAS J. WURTZ, and DONALD K. TRUSLOW, <br><br> Defendants. | Case No. **C08-02844** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Wachovia Corporation ("Wachovia" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.      This is a federal securities class action on behalf of purchasers of the securities of Wachovia between May 8, 2006 and April 11, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Wachovia is one of the nation's largest financial services providers, servicing retail, brokerage, and corporate customers. Over the past few years, Wachovia enjoyed strong growth that was reflected in its stock price, which peaked at $58.77 per share during the Class Period, giving Wachovia a market capitalization of $115.8 billion.

3.      This action alleges that defendants misled investors by falsely representing that Wachovia had strict and selective underwriting and loan origination practices and a conservative lending approach that set it apart from other lenders. Such reassurances were repeated by defendants throughout the Class Period in order to artificially support Wachovia's stock price in the midst of a weakening mortgage market.

4.      In 2006, Wachovia acquired Golden West Financial Corp. ("Golden West"), a Oakland, California-based mortgage lender, for more than $24 billion. Golden West's main product was called "Pick-A-Payment," which was a loan program that allowed customers to choose from multiple payment options each month.

5.      Pick-A-Payment loans come with four monthly payment options: (1) full interest and principal payment that pays off the loan in 30 years; (2) a higher payment that would pay off the loan in 15 years; (3) an interest-only payment; or (4) a minimum payment that does not cover all the necessary interest, with the unpaid interest added to the loan balance.

6.      After the acquisition, Golden West's Pick-A-Payment programs contributed substantially to Wachovia's overall results. As of December 31, 2007, Pick-A-Payment loans represented 46 percent of the Company's consumer loans and 25 percent of the Company's total loans. Properties securing the Company's Pick-a-Payment loans are concentrated primarily in California (59 percent) and Florida (10 percent). No other state concentration is more than 5 percent of total Pick-a-Payment loans.

7.    The mortgage loans, variously called "pick-a-pay", payment-option mortgages, or option adjustable-rate mortgages ("option ARMs"), are very risky because the loan balance and the monthly payments on some loans can **grow** among those who chose options (3) or (4) in ¶ 5 above, as home prices fall across the country.

8.    Borrowers who make the minimum payment on a regular basis under option (4) in ¶ 5 above can see their loan balance grow and their monthly payment more than double when they begin making payments of principal and full interest. This typically happens after five years, but can occur earlier if the amount owed reaches a predetermined level – typically 110% to 125% of the original loan balance. With home prices dropping, a growing number of borrowers with these loans owe more than their homes are worth.

9.    In prior years, the Company had been able to make such loans in large part because real estate prices were rising, which meant that the risk that borrowers would be unable to meet payments was mitigated by increasing home prices, which would allow the borrower to refinance or sell the property and enjoy a profit even after satisfying the debt.

10.    By the beginning of the Class Period, however, many securities analysts and economic commentators expressed growing concern with the direction of real estate prices, growing interest rates and the negative impact that these factors could have on lenders, such as Wachovia, who profited from selling risky loans.

11.    In response to increased market concern with the mortgage lending industry, and Wachovia's option ARMs in particular, Wachovia falsely represented that its loan underwriting practices were much better than at other banks and that this would allow it to prosper while lenders with less exacting standards and procedures would fare much worse. In reality, Wachovia's actual lending practices differed materially from the description of those practices in statements made to investors. The Company's ability to weather the deterioration in the real estate and credit markets was grossly exaggerated by defendants, at precisely the worst time, when analysts began to ask tough questions. The Company, moreover, improperly inflated its reported income by understating its loan loss reserves in SEC filings.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                          - 3 -

12.     In fact, despite assurances of its "conservative underwriting standards," Wachovia eventually admitted that, during the Class Period, it **did not require a minimum credit score from potential borrowers or verify borrowers' assets and employment before making a mortgage loan** it planned to keep on its books.

13.     Wachovia also misled the market about its exposure to subprime loans, which are loans made to borrowers who have poor credit histories and would not qualify for traditional loans.

14.     The representations contained in Wachovia's press releases, SEC filings, conference calls, and presentations during the Class Period, as set out below, were materially false and misleading when made because they failed to disclose the following facts:

(a)     the Company did not follow strict underwriting and loan-origination practices, including in its Pick-A-Payment mortgage portfolio;

(b)     a material portion of the Company's loans were made on a "low documentation" basis, such that it had no way of confirming the credit-worthiness of many loan applicants, thereby rendering the Company's reassurances about its loan-origination and underwriting practices lacking in any reasonable basis;

(c)     the Company placed intense pressure on its loan officers to persuade borrowers to use Pick-A-Payment loans;

(d)     the Company's loan loss provisions were understated and did not properly reflect the risk facing the Company, thereby inflating Wachovia's reported income;

(e)     Wachovia's representation that it was amply capitalized, and its assurance that it would therefore not need to cut its dividend, were lacking in any reasonable basis when made;

(f)     the certifications signed by defendants Thompson and Wurtz, which attested to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were themselves misleading because of the above misstatements and omissions included in the reports, and provided false comfort to the market;  and

(g)     the Company's growth was not due to Wachovia's prudent risk management, as represented by defendants; to the contrary, Wachovia's results were founded on the aggressive

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                          - 4 -

origination of risky loans without regard to its stated origination policies, even in the face of worsening market conditions.

15. Contrary to its Class Period assurances, on April 14, 2008, before the open of ordinary trading, Wachovia announced a surprise increase in its provision against credit losses to $2.83 billion and an approximate $2 billion writedown in assets. This caused it to report a first quarter 2008 loss of $393 million, or $0.20 per share, significantly worse than analysts expected. In addition, Wachovia was in financial trouble. It announced that it would need to raise $7 billion by selling common and preferred stock and it cut its dividend by 41%, to $0.375. In reaction to the news, shares fell 8.13%, from $27.81 to $25.55 on abnormally high volume.

16. The Company's belatedly disclosed troubles severely harmed the credibility of its leadership. On June 2, 2008, Wachovia announced that its board of directors had asked Chief Executive Officer ("CEO") Thompson to resign.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District, and legacy Golden West is headquartered in this District. The Western Region headquarters for Wachovia's General Bank are also located in this District.

20. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

21.     Plaintiff, Bristol County Retirement System, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Wachovia at artificially inflated prices during the Class Period.

22.     Defendant Wachovia is a North Carolina corporation, headquartered at One Wachovia Center, Charlotte, North Carolina 28288.

23.     Defendant G. Kennedy Thompson ("Thompson") served as Wachovia's CEO and President throughout the Class Period.

24.     Defendant Thomas J. Wurtz ("Wurtz") served as Chief Financial Officer ("CFO") and Senior Executive Vice President throughout the Class Period.

25.     Defendant Donald K. Truslow ("Truslow") served as Chief Risk Officer throughout the Class Period

26.     Defendants Thompson, Wurtz, and Truslow are collectively referred to herein as the "Individual Defendants."

27.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements and markets via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

28.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Wachovia, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business,

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1  operations, growth, financial statements, and financial condition, as alleged herein. Said defendants

2  were involved in drafting, producing, reviewing and/or disseminating the false and misleading

3  statements and information alleged herein, were aware, or disregarded with deliberate recklessness,

4  that the false and misleading statements were being issued regarding the Company, and approved or

5  ratified these statements, in violation of the federal securities laws.

6       29.    As officers and controlling persons of a publicly-held company whose common stock

7  was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the

8  New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws,

9  the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information

10  with respect to the Company's financial condition and performance, growth, operations, financial

11  statements, business, markets, management and earnings, and to correct any previously issued

12  statements that had become materially misleading or untrue, so that the market price of the

13  Company's publicly-traded common stock would be based upon truthful and accurate information.

14  The Individual Defendants' misrepresentations and omissions during the Class Period violated these

15  specific requirements and obligations.

16       30.    The Individual Defendants participated in the drafting, preparation, and/or approval

17  of the various public and shareholder and investor reports and other communications complained of

18  herein and were aware of, or disregarded with deliberate recklessness, the misstatements contained

19  therein and omissions therefrom, and were aware of their materially false and misleading nature.

20  Because of their Board membership and/or executive and managerial positions with Wachovia, each

21  of the Individual Defendants had access to the adverse undisclosed information about Wachovia's

22  financial condition and performance as particularized herein and knew (or recklessly disregarded)

23  that these adverse facts rendered the positive representations made by or about Wachovia and its

24  business issued or adopted by the Company materially false and misleading.

25       31.    The Individual Defendants, because of their positions of control and authority as

26  officers and/or directors of the Company, were able to and did control the content of the various SEC

27  filings, press releases and other public statements pertaining to the Company during the Class

28  Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS              - 7 -

1  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

2  their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

3  responsible for the accuracy of the public reports and releases detailed herein and is therefore

4  primarily liable for the representations contained therein.

5       32.    Each of the defendants is liable as a participant in a fraudulent scheme and course of

6  business that operated as a fraud or deceit on purchasers of Wachovia common stock by

7  disseminating materially false and misleading statements and/or concealing material adverse facts.

8  The scheme: (i) deceived the investing public regarding Wachovia's business, operations,

9  management and the intrinsic value of Wachovia common stock; and (ii) caused plaintiff and other

10  members of the Class to purchase Wachovia's common stock at artificially inflated prices.

11  **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

12       33.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

13  Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

14  acquired the common stock of Wachovia between May 8, 2006 and April 11, 2008 inclusive ("the

15  Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and

16  directors of the Company, members of their immediate families and their legal representatives, heirs,

17  successors or assigns and any entity in which defendants have or had a controlling interest.

18       34.    The members of the Class are so numerous that joinder of all members is

19  impracticable. Throughout the Class Period, Wachovia had more than 1.9 billion shares of common

20  stock outstanding that traded on the NYSE. While the exact number of Class members is unknown

21  to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes

22  that there are hundreds or thousands of members in the proposed Class. Record owners and other

23  members of the Class may be identified from records maintained by Wachovia or its transfer agent

24  and may be notified of the pendency of this action by mail, using the form of notice similar to that

25  customarily used in securities class actions.

26       35.    Plaintiff's claims are typical of the claims of the members of the Class as all members

27  of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

28  complained of herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1    36.    Plaintiff will fairly and adequately protect the interests of the members of the Class

2   and has retained counsel competent and experienced in class and securities litigation.

3    37.    Common questions of law and fact exist as to all members of the Class and

4   predominate over any questions solely affecting individual members of the Class.  Among the

5   questions of law and fact common to the Class are:

6        (a)    whether the federal securities laws were violated by defendants' acts as

7   alleged herein;

8        (b)    whether statements made by defendants to the investing public during the

9   Class Period misrepresented material facts about the business, operations and management of

10  Wachovia; and

11       (c)    to what extent the members of the Class have sustained damages and the

12  proper measure of damages.

13   38.    A class action is superior to all other available methods for the fair and efficient

14  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

15  damages suffered by individual Class members may be relatively small, the expense and burden of

16  individual litigation make it impossible for members of the Class to individually redress the wrongs

17  done to them.  There will be no difficulty in the management of this action as a class action.

18                   **SUBSTANTIVE ALLEGATIONS**

19  **The Company's False Statements Regarding
    Underwriting Standards and 2006 Results**

20

21   39.    The Class Period begins on May 8, 2006, when Wachovia held a conference call to

22  discuss its planned acquisition of Golden West, an Oakland, California-based mortgage originator,

23  for total consideration of $24.3 billion.  The acquisition was completed on October 1, 2006.

24   40.    On the May 8, 2006 conference call announcing the Golden West acquisition,

25  Wachovia's CEO, defendant Thompson, was effusive about Golden West's underwriting standards,

26  saying "They are obsessed with conservative underwriting..."  Thompson added: "They have a

27  simpleminded focus as Herb [Sandler, co-CEO of Golden West] described and an elegantly simple

28  option ARM product that is low risk because of, number one, the product features of their option

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                    - 9 -

1 ‖ ARM and two, because of their rigorous underwriting process." Thompson also stated, "They have

2 ‖ no subprime origination at Golden West, so a very conservative portfolio."

3      41.    On May 12, 2006, Wachovia held an informational conference call on the Golden

4 ‖ West merger. The Company's CFO, defendant Wurtz, discussed caps on Pick-A-Payment loans

5 ‖ when the borrower chooses to make a minimum payment that does not cover all the necessary

6 ‖ interest, with the unpaid interest added to the loan balance. He said that on a loan with a loan-to-

7 ‖ value ("LTV") of less than 85%, the amount of negative amortization (or "deferred interest") could

8 ‖ only grow until it represents 125% of the original loan amount; thereafter the loan is recapped such

9 ‖ that it is adjusted to a payment that would pay off over the remaining term of the loan. For loans

10 ‖ with a LTV greater than 85%, that recast occurs when the loan amount reaches 110% of the original

11 ‖ loan amount. In response to an analyst's question, Wurtz said that the average borrower who

12 ‖ chooses the negative amortization option takes "a long time" to reach the aforementioned caps,

13 ‖ probably in "six or seven years":

14           **Gerard Cassidy, RBC** *– Analyst*               75

15              "Very good. Going on getting back to the deferred interest comments that
you made earlier. Can you share with us on the deferred interest how long
16              does it take a typical person who takes out one of these mortgages these
option ARMs if they were to choose the minimum payment from day one?
17              How long does it take them to get to those caps of 110 and 125%?"

18           **Tom Wurtz, Wachovia – CFO**                76

19              "It takes a long time. Probably about at least four or five years, probably in
the average environment six or seven years, something like that."
20

21      42.    On a May 16, 2006, at a UBS Global Financial Services Conference, Thompson

22 ‖ commented on the conservative nature of the Pick-A-Payment loans it planned to originate after the

23 ‖ Golden West merger: "And Wachovia can originate Golden West's conservative option ARM

24 ‖ products on the East Coast."

25      43.    Responding to a question about his lack of concern over the growing amount of

26 ‖ negative amortization in the Golden West portfolio, Thompson dispelled investor worries: "I'm

27 ‖ really not concerned. And I'm not concerned because of the conservative underwriting standards that

28 ‖ the company has."

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                        - 10 -

44.     On November 3, 2006, Wachovia filed its quarterly report on Form 10-Q for the third fiscal quarter of 2006, ending September 30, 2006 ("3Q06 report"). The report was signed by defendant Wurtz. The Company reported revenues for the quarter of $7.04 billion, an increase of five percent from the third quarter of 2005. Diluted earnings per share for the quarter was $1.17.

45.     The Company described its management of credit risk in the following terms: "We continue to mitigate risk and volatility on our balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent."

46.     The Company reported that the allowance for loan losses increased $280 million from year-end 2005 to $3.0 billion at September 30, 2006. This amount is subtracted from revenues and lowers net income.

47.     Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a certification signed by defendants Thompson and Wurtz:

> 1.    I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 of Wachovia Corporation;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>     a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
>     b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

- 11 -

1           c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about

2 the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

3            d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal

4 quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the

5 registrant's internal control over financial reporting; and

6            5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to

7 the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

8

9            a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

10 reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

11            b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal

12 control over financial reporting.

13      48.     In an earnings conference call on January 23, 2007 reporting fourth quarter 2006

14 earnings results, Thompson stated that "we feel really good about credit quality."

15      49.     On February 28, 2007, Wachovia filed its annual report on Form 10-K for the 2006

16 fiscal year, ending December 31, 2006 ("FY06 report"). The report was signed by defendants

17 Thompson and Wurtz. The Company reported revenues for the year of $29.95 billion, compared

18 with revenues of $26.11 billion for fiscal year 2005. Diluted earnings per share for the year were

19 $4.63, an 11% increase over diluted earnings per share for the previous year.

20      50.     The Company described its outlook for credit quality: "We are optimistic about our

21 outlook for credit quality as we enter 2007 given the highly collateralized nature of our loan

22 portfolio. While we expect modest increases in credit costs, we believe overall credit quality will

23 remain strong."

24      51.     The Company reported allowance for loan losses of $3.36 billion at the end of fiscal

25 year 2006, compared to loan loss reserves of $2.72 billion at the end of fiscal year 2005. This

26 amount is subtracted from revenues and lowers nets income.

27      52.     Further assuring investors of the veracity of the information contained in the Form

28 10-K, the report included a certification signed by defendants Thompson and Wurtz:

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                      - 12 -

1.    I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2006 of Wachovia Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1                        b)       any fraud, whether or not material, that involves management
2    or other employees who have a significant role in the registrant's internal
control over financial reporting.

3          53.    The representations contained in Wachovia's press releases and SEC filings,

4    conference calls and presentations regarding its underwriting standards and 2006 financial results, as

5    set out above, were materially false and misleading when made because they failed to disclose the

6    following facts:

7          (a)    the Company did not follow strict underwriting and loan-origination practices,

8    including in its Pick-A-Payment mortgage portfolio;

9          (b)    a material portion of the Company's loans were made on a "low

10    documentation" basis, such that it had no way of confirming the credit-worthiness of many loan

11    applicants, thereby rendering the Company's reassurances about its loan-origination and

12    underwriting practices lacking in any reasonable basis;

13          (c)    the Company placed intense pressure on its loan officers to persuade

14    borrowers to use Pick-A-Payment loans;

15          (d)    the Company's loan loss provisions were understated and did not properly

16    reflect the risk facing the Company, thereby inflating Wachovia's reported income;

17          (e)    the certifications signed by defendants Thompson and Wurtz, which attested

18    to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were

19    themselves misleading because of the above misstatements and omissions included in the reports,

20    and provided false comfort to the market;  and

21          (f)    the Company's growth was not due to Wachovia's prudent risk management,

22    as represented by defendants; to the contrary, Wachovia's results were founded on the aggressive

23    origination of risky loans without regard to its stated origination policies, even in the face of

24    worsening market conditions.

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                 

**The Company's False Statements Regarding**
**Its Underwriting Standards and 2007 Results**

54.     In an earnings conference call for the fist quarter of 2007, on April 16, 2007, CEO Kennedy Thompson said:

> [L]ooking forward with the integration of Golden West on track, we feel confident about the **superior credit quality of our mortgage portfolio**, the prospects for cross-selling our product set in Golden West markets, and originating pick-a-pay mortgages through traditional Wachovia channels.[1]

55.     On the same call, CFO Thomas Wurtz said, "One thing I can tell you is we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices."

56.     Chief Risk Officer Don Truslow stated:

> As we've talked about before, the Golden West loans are **very conservatively underwritten** at low loan to values with particular attention paid to the quality of the appraisals. Most appraisals are completed by in-house appraisers, and the appraisal process, I can tell you it's very robust. Over the last several months as our teams have worked more closely with one another through integration, **our view regarding the quality of the Golden West underwriting practices has just continued to grow stronger.**

57.     By early 2007, the media and politicians began to question the wide availability of unusual mortgage loans that many had identified as responsible for what was being referred to as the real estate bubble that had begun to deflate. Interest groups and lawmakers suggested that tighter mortgage-industry regulations were necessary.  In response to a question about the legislative atmosphere around "exotic instruments" in the mortgage industry and if Wachovia expected to get "caught up" in it, Thompson stated:

> [W]e don't fear it because the guidance that we've seen would impact most people in the -- in the option arm and -- and fixed pick-a-pay kind of business. **But it does not affect us. And I think that goes to the very conservative underwriting standards** and servicing standards that the Sandlers implemented at Golden West. And we are changing none of that. So, if anything, we think that any changes might, in fact, benefit us relative to our competition.

---

[1] All emphasis is added unless otherwise noted.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

- 15 -

58.    Contrasting Wachovia to its competitors, Thompson stated:

> I also think that many competitors were underwriting to the introductory or teaser rate. And Golden West has never done that. We've always underwritten to a fully indexed rate, which we will continue. **I think if you look at the credit history and right up to the current moment, it would be hard for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion under -- other than we are very responsible underwriters and servicers of these -- of these clients.**

59.    In response to a question of whether there were any loans in Golden West's portfolio that would be considered equivalent to an Alt-A type of loan,[2] Truslow stated:

> Well, a very good bit of it would be, as well as the rest of our consumer book. But the difference is those are on balance sheet loans. **And we've got the other underwriting criteria.** So, for instance, in our credit card business, our auto business or -- and our equity line business, it's -- it is very common where you know the customer, have a relationship, not to provide tax returns, and all those kinds of things that you tend to associate with a conforming mortgage loan... .

60.    On May 4, 2007, Wachovia filed its quarterly report on Form 10-Q for the first fiscal quarter of 2007, ending March 31, 2007 ("1Q07 report"). The Company reported revenues for the quarter of $8.24 billion, an increase of 17% from the same quarter in 2006. Diluted earnings per share for the first quarter were $1.20, a 10% increase from the same quarter in 2006.

61.    Commenting on its management of credit risk, the Company stated:

> The low level of net charge-offs reflects a continuing solid credit environment, the highly collateralized nature of our loan portfolio and our **careful management of the inherent credit risk in our loan portfolio.** The Golden West portfolio has a long record of extremely low net charge-offs, including virtually none for the past eight years, reflecting **strong underwriting and credit risk management.**

62.    The Company reported allowance for loan losses of $3.38 billion at the end of the first quarter 2007, increasing its provision for credit losses by $175 million.

63.    Further assuring investors of the veracity of the information contained in the Form 10-K, the report included a certification signed by defendants Thompson and Wurtz:

---

[2] Alt-A is a classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean credit histories, but the mortgage itself will generally have some issues that increase its risk profile. These issues include higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income.

1.    I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 of Wachovia Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1            b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal

2  control over financial reporting.

3      64.     On the Company's July 20, 2007 earnings conference call, defendant Truslow

4  commented on Wachovia's exposure to the credit crunch in the financial markets:

5         I thought I would just make a couple of comments switching gears about the turbulence in the capital markets and the impact on Wachovia. Overall, I feel

6  like we are in very good shape... Probably not appropriate to get too specific around the numbers at Wachovia, but acknowledging there would be a high

7  level of interest in that but for competitive reasons I want to be a little careful of how specific we get but **we view the risk to Wachovia [sic] what's**

8  **currently happening is very modest.**

9      65.     Discussing Wachovia's exposure to subprime mortgages, Truslow said:

10         As for subprime in our Capital Markets businesses, and in our origination businesses, we shied away from diving into this business over the last few

11  years as that market took off really for two reasons. One is given the firm's prior experience in the subprime market in the late '90s and also, importantly,

12  the view of our Capital Markets group that the risk in this arena has been underpriced for quite some time, so we just haven't felt that it has been a

13  business that's made good sense for us and, therefore, **we've actively managed our business to minimize our exposure to the subprime market.**

14  **So as a result there's been little impact to our businesses with the turbulence in the subprime markets and we don't anticipate any**

15  **meaningful potential impact to earnings from subprime going forward.**

16      66.     Adding further commentary on the Company's subprime exposure, Steve Cummings,

17  Wachovia's head of corporate and investment banking, said:

18         But very quickly on a couple key markets, the subprime and CDO businesses, which Don touched on. As he said, we have avoided the origination side of

19  subprime for some time. We don't have that origination platform plus **when we have brought platforms in that did have subprime activities over the**

20  **last 18 to 24 months we have purposely exited that portion of the business.**

21

22      67.     Truslow discussed Wachovia's Pick-A-Payment product:

23         I do want to remind everybody that our pick a pay product, which is our option payment ARM is structured with caps that limit the amount

24  customer's payment may increase in any given year to no more than 7.5% of the payment. So on a $1,000 mortgage payment that would be a $75 increase

25  from one year to the next and therefore, **I just want to point out that payment shock in our option ARMs is just not an issue here at all. It's**

26  **really not an issue with the product.** Given the environment, again, we're not surprised to see the residential non-performs trend up as we noted last

27  quarter, it's what we've been expecting and I would anticipate that we'll continue to see some trend up over the next few quarters as well. **But**

28  **because the way these loans are underwritten, we're not seeing any meaningful increases in losses in the portfolio and we don't expect to see**

1   **any rises and losses as we look forward over the next few quarters and so
    the underwriting process and how these things are booked and what
2   we're ultimately relying upon holding up very well as expected.**

3       68.     Cummings stated that Wachovia is "one of the larger players in the CDO business,

4   and in that market **we've managed that exposure also extremely well**, some indicators of that

5   would include the recent rating agency actions that have been taken."

6       69.     On July 30, 2007, Wachovia filed its quarterly report on Form 10-Q for the second

7   fiscal quarter of 2007, ending June 30, 2007 ("2Q07 report"). The Company reported revenues for

8   the quarter of $8.69 billion, compared with revenues of $7.26 billion for the same period in 2006.

9   Diluted earnings per share for the second quarter were $1.22, an increase of 4% over diluted

10  earnings per share for the second quarter of 2006.

11      70.     The Company commented on its management of credit risk:

12          Consumer net charge-offs were $249 million, up from $112 million in the
            first six months of 2006.... The low level of net charge-offs reflects the
13          highly collateralized nature of our loan portfolio and our **careful
            management of inherent credit risk.** Our consumer real estate portfolio has
14          a long record of relatively low net charge-offs, **reflecting strong
            underwriting and credit risk management.**
15

16      71.     Wachovia reported allowance of loan losses of $3.39 billion at the end of the second

17  quarter of 2007, having increased its provision for credit losses by $168 million during the quarter.

18      72.     Further assuring investors of the veracity of the information contained in the Form

19  10-Q, the report included a certification signed by defendants Thompson and Wurtz:

20          1.      I have reviewed this Quarterly Report on Form 10-Q for the quarter
            ended June 30, 2007 of Wachovia Corporation;
21

22          2.      Based on my knowledge, this report does not contain any untrue
            statement of a material fact or omit to state a material fact necessary to make
            the statements made, in light of the circumstances under which such
23          statements were made, not misleading with respect to the period covered by
            this report;
24

25          3.      Based on my knowledge, the financial statements, and other financial
            information included in this report, fairly present in all material respects the
            financial condition, results of operations and cash flows of the registrant as
26          of, and for, the periods presented in this report;

27          4.      The registrant's other certifying officers and I are responsible for
            establishing and maintaining disclosure controls and procedures (as defined
28          in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                          - 19 -

financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

73.    The statements in ¶¶ 65 and 66 were materially false and misleading because Wachovia in fact did have extensive exposure to subprime mortgages.  On an October 19, 2007 earnings conference call, CEO Thompson admitted the Company's subprime exposure:

I would say that as we looked at results, I think the biggest disappointment for me is that of those $1.3 billion in marks, **we had about $300 million, roughly $300 million in losses on AAA subprime paper that was in trading desks or in inventory.** And the thing that disappoints me about that is we have an institutional bias here against subprime.  We avoided it in our origination efforts and we avoided it in, for the most part, in our securitization efforts.

So, frankly, I think we had a little bit of a break down in having AAA subprime in some of our portfolios that we took losses on. I do think it is really quite amazing that we could take $300 million of losses on AAA paper. We didn't expect that that paper could degenerate that fast, with that kind of swiftness.

74.    Upon the Company's first disclosure of its exposure to subprime mortgages, the stock price fell 3.61% on October 19, 2008.

75.    Notwithstanding his previous assurances to investors, Chief Risk Officer Truslow admitted at a BancAnalysts Association of Boston Conference on November 9, 2007, that the Company failed to minimize its exposure to subprime mortgages:

> **Clearly we could have done a better job around subprime** on -- for the company that has had such a negative bias towards subprime. We didn't leap into the origination side. We stayed away from a lot of the businesses that evolved and grew beginning just a couple of years ago yet we found ourselves in this downdraft with pockets of subprime exposure that, essentially, there were investments or positions taken in various places across the platform. Mostly in the form of what we believe to the very high-quality assets, AAA, Super Senior AAA, and adjunct to that is that **where those decisions were made, they probably didn't involve the expertise and talent of the part of the platform that really had the most experience around residential mortgages and subprime,** probably too reliant on the ratings and taking too much comfort in historical performance around securities with those ratings.

76.    On the same day, Wachovia filed its quarterly report on Form 10-Q for the third fiscal quarter of 2007, ending September 30, 2007 ("3Q07 report"). The Company detailed its exposure to subprime residential mortgage-backed securities ("RMBS"). The Company had total subprime RMBS exposure of $2.05 billion as of October 31, 2007 and September 30, 2007. The Company reported revenues for the quarter of $7.35 billion, compared with revenues of $7.04 billion for the same period in 2006. Diluted earnings per share for the third quarter were $0.85, a 27% decrease over diluted earnings per share for the same period in 2006.

77.    Despite its losses on subprime mortgages, the Company remained positive on its management of credit risk:

> While our outlook indicates a rise in the overall level of charge-offs at this point in the credit cycle, we believe the well collateralized nature of our real estate-secured portfolio, our careful management of inherent credit risk and strong underwriting will position us relatively well in a more uncertain credit environment.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                              - 21 -

78.   The Company reported allowance for loan losses of $3.51 billion at the end of the third quarter of 2007.

79.   Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a certification signed by defendants Thompson and Wurtz:

> 1.   I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 of Wachovia Corporation;
>
> 2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
>
> b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1

       a)     all significant deficiencies and material weaknesses in the
2    design or operation of internal control over financial reporting which are
reasonably likely to adversely affect the registrant's ability to record, process,
3    summarize and report financial information; and

4       b)     any fraud, whether or not material, that involves management
or other employees who have a significant role in the registrant's internal
5    control over financial reporting.

6      80.    The Company held a conference call to discuss its full-year 2007 results on January

7  22, 2008. Thompson, responding to a number of anxious investors' questions, stated:

8    Nevertheless, based on recent action in our stock price, I'm certain that
investors are anxious about several questions on Wachovia which I want to
9    address now . . . does Wachovia have enough capital? After our December
preferred offering, Wachovia's capital levels were higher at year end than at
10    the end of the third quarter, in spite of the marks, and in spite of the reserve
build that we did in the fourth quarter. And we're confident that those capital
11    levels will increase as we go through 2008. And the third question, will
Wachovia cut its dividend? And the answer to that question is **we have no**
12    **plans to cut the dividend, because we do not need to cut the dividend**.
We're confident in our ability to meet our 2008 business plan, and that plan
13    as we have said before, will generate cash earnings that will cover our
dividend payments, continue to build necessary credit reserves, improve our
14    capital ratios, and support growth in our business lines.

15      81.    On February 28, 2008, the Company filed its annual report on Form 10-K for the

16  fiscal year 2007, ending December 31, 2007 ("FY07 report"). The report was signed by defendants

17  Thompson and Wurtz. The Company reported revenues for the year of $31.58 billion, compared

18  with revenues of $30.07 billion for fiscal year 2006. Diluted earnings per share for the year were

19  $3.26, compared with diluted earnings per share of $4.63 for fiscal year 2006.

20      82.    Discussing its credit risk management in the FY07 report, the Company stated:

21  "While our outlook indicates a rise in the level of charge-offs at this point in the credit cycle, we

22  believe the well-collateralized nature of our real estate-secured portfolio, our **careful management**

23  **of credit risk** and **strong underwriting position** us relatively well in this credit environment."

24      83.    In the FY07 report, the Company reported allowance for loan losses of $4.51 billion

25  at the end of fiscal year 2007, compared with allowance for loan losses of $3.36 billion at the end of

26  fiscal year 2006. Wachovia disclosed that the loan loss "provision expense in the first half of 2008 is

27  likely to **exceed** 75 basis points of average net loans on an annualized basis." This is compared to

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS               

1 sentiment in mid-January when the Company believed "provision expense in the first half of 2008 is

2 expected to remain **below** 75 basis points of average net loans on an annualized basis."

3      84.      On this news, Wachovia's stock fell 10.2% over the next two days, from a close of

4 $34.10 per share on February 27, 2008 to a close of $30.62 per share on February 29, 2008.  The

5 truth about Wachovia's underwriting practices and its weakening financial condition, however,

6 remained undisclosed.

7      85.      Further assuring investors of the veracity of the information contained in the Form

8 10-K, the report included a certification signed by defendants Thompson and Wurtz:

9          1.      I have reviewed this Annual Report on Form 10-K for the year ended
         December 31, 2007 of Wachovia Corporation;

10

11         2.      Based on my knowledge, this report does not contain any untrue
         statement of a material fact or omit to state a material fact necessary to make
12         the statements made, in light of the circumstances under which such
         statements were made, not misleading with respect to the period covered by
13         this report;

14         3.      Based on my knowledge, the financial statements, and other financial
         information included in this report, fairly present in all material respects the
15         financial condition, results of operations and cash flows of the registrant as
         of, and for, the periods presented in this report;

16         4.      The registrant's other certifying officers and I are responsible for
         establishing and maintaining disclosure controls and procedures (as defined
17         in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over
         financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-
18         15(f)) for the registrant and have:

19             a)      Designed such disclosure controls and procedures, or caused
         such disclosure controls and procedures to be designed under our
20         supervision, to ensure that material information relating to the registrant,
         including its consolidated subsidiaries, is made known to us by others within
21         those entities, particularly during the period in which this annual report is
         being prepared;

22

23             b)      Designed such internal control over financial reporting, or
         caused such internal control over financial reporting to be designed under our
24         supervision, to provide reasonable assurance regarding the reliability of
         financial reporting and the preparation of financial statements for external
25         purposes in accordance with generally accepted accounting principles;

26             c)      Evaluated the effectiveness of the registrant's disclosure
         controls and procedures and presented in this report our conclusions about
27         the effectiveness of the disclosure controls and procedures, as of the end of
         the period covered by this report based on such evaluation; and

28             d)      Disclosed in this report any change in the registrant's internal
         control over financial reporting that occurred during the registrant's most

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                      - 24 -

1    recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an
2    annual report) that has materially affected, or is reasonably likely to
     materially affect, the registrant's internal control over financial reporting; and

3    5.    The registrant's other certifying officer(s) and I have disclosed, based
     on our most recent evaluation of internal control over financial reporting, to
4    the registrant's auditors and the audit committee of the registrant's board of
     directors (or persons performing the equivalent functions):
5         a)    all significant deficiencies and material weaknesses in the
     design or operation of internal control over financial reporting which are
6    reasonably likely to adversely affect the registrant's ability to record, process,
     summarize and report financial information; and
7
          b)    any fraud, whether or not material, that involves management
8    or other employees who have a significant role in the registrant's internal
     control over financial reporting.
9

10    86.    Defendant Truslow, speaking on a Deutsche Bank conference call on March 12, 2008,

11    continued to tout Wachovia's Pick-A-Payment loan portfolio:

12    The Pick-A-Pay non-accrual loan levels are up, but compared with some
     recently reported results by some other option ARM lenders in the industry,
13    **we believe our levels sit at relatively attractive levels**, or levels pretty
     significantly below what we have seen some others report. I think that is
14    probably due very heavily to the way Pick-A-Pay product is designed, and
     **we are somewhat insulated from the recast pressure that some other**
15    **option ARMs lenders are facing right now.**

16    87.    The representations contained in Wachovia's press releases and SEC filings,

17    conference calls and presentations regarding its underwriting standards and 2007 financial results, as

18    set out above in ¶¶ 54-86, were materially false and misleading when made because they failed to

19    disclose the following facts:

20         (a)    the Company did not follow strict underwriting and loan-origination practices,

21    including in its Pick-A-Payment mortgage portfolio;

22         (b)    a material portion of the Company's loans were made on a "low

23    documentation" basis, such that it had no way of confirming the credit-worthiness of many loan

24    applicants, thereby rendering the Company's reassurances about its loan-origination and

25    underwriting practices lacking in any reasonable basis;

26         (c)    the Company placed intense pressure on its loan officers to persuade

27    borrowers to use Pick-A-Payment loans;

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                          - 25 -

1    (d)    the Company's loan loss provisions were understated and did not properly

2    reflect the risk facing the Company, thereby inflating Wachovia's reported income;

3    (e)    Wachovia's representation that it was amply capitalized, and its assurance that

4    it would therefore not need to cut its dividend, were lacking in any reasonable basis when made;

5    (f)    the certifications signed by defendants Thompson and Wurtz, which attested

6    to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were

7    themselves misleading because of the above misstatements and omissions included in the reports,

8    and provided false comfort to the market; and

9    (g)    the Company's growth was not due to Wachovia's prudent risk management,

10    as represented by defendants; to the contrary, Wachovia's results were founded on the aggressive

11    origination of risky loans without regard to its stated origination policies, even in the face of

12    worsening market conditions.

13    **THE TRUTH IS DISCLOSED**

14    88.    Three months after assuring the market of its liquidity, the strength of its underwriting

15    practices, and the adequacy of its reserves, Wachovia reported a surprise loss and undertook

16    emergency measures to increase capital.

17    89.    On April 14, 2008, before the open of ordinary trading, Wachovia shocked the market

18    when it reported a loss of $350 million, or $0.20 per share, for the first quarter of 2008.  The

19    Company attributed the results to: (1) a $2.8 billion increase credit loss reserves, including $1.1

20    billion specifically for "Pick-A-Pay" reserve build, the lending program highly touted by the

21    Company during the Class Period. The need to increase Pick-A-Pay reserves was attributed to

22    Wachovia's adoption of a "refined reserve modeling" that resulted in "higher than expected loss

23    factors on Pick-a-Pay"; and (2) $2 billion in mark-to-market losses for mortgage backed securities,

24    including a "$729 million loss on **unfunded** leveraged finance commitments." The Company said

25    that it expects to experience additional net charge-offs and reserve building in its Pick-A-Payment

26    portfolio of $3.2-$3.8 billion in 2008 and $2.4-$2.8 billion in 2009.

27    90.    In order to shore-up its capital, Wachovia announced the following steps: (1) **reduce**

28    **the dividend 41%** to $0.375; and (2) plan to raise capital by $7-8 billion through public offerings.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                                - 26 -

91.    Commenting on the financial results, an analyst from RBC Capital Markets said: "[I]nvestors will be skeptical of what they hear from management after the optimism expressed about the Pick-A-Pay losses and quarterly dividend in the last 60-90 days. We believe management should have been more aggressive in attacking its problems."

92.    These terrible results and emergency capital raising measures conflicted dramatically with the Company's assurances during the Class Period. In reaction to the news, shares fell from $27.81 to $25.55 on abnormally high volume. The one-day stock drop of 8.13% that resulted from this disclosure erased over $6 billion of Wachovia's market capitalization.

### Post-Class Period Developments

93.    On June 2, 2008, Wachovia's board of directors forced Thompson to retire from the Company. He was replaced as CEO by director Lanty L. Smith.

### ADDITIONAL SCIENTER ALLEGATIONS

94.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Wachovia, their control over, and/or receipt and/or modification of Wachovia's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wachovia, participated in the fraudulent scheme alleged herein.

95.    Because of their position with the Company, defendants at all times had the opportunity to, and did, commit the wrongdoing alleged herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**Applicability Of Presumption Of Reliance:**
**Fraud On The Market Doctrine**

96.     At all relevant times, the market for Wachovia's common stock was an efficient market for the following reasons, among others:

(a)     Wachovia's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Wachovia filed periodic public reports with the SEC and the NYSE;

(c)     Wachovia regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Wachovia was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

97.     As a result of the foregoing, the market for Wachovia's common stock promptly digested current information regarding Wachovia from all publicly available sources and reflected such information in Wachovia's stock price. Under these circumstances, all purchasers of Wachovia's common stock during the Class Period suffered similar injury through their purchase of Wachovia's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

98.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                                      - 28 -

1    from those in the purportedly forward-looking statements. Alternatively, to the extent that the

2    statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

3    liable for those false forward-looking statements because at the time each of those forward-looking

4    statements was made, the particular speaker knew that the particular forward-looking statement was

5    false, and/or the forward-looking statement was authorized and/or approved by an executive officer

6    of Wachovia who knew that those statements were false when made.

7    **LOSS CAUSATION/ECONOMIC LOSS**

8         99.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

9    damages suffered by plaintiff and the Class.

10         100.    During the Class Period, plaintiff and the Class purchased securities of Wachovia at

11    artificially inflated prices. The price of Wachovia common stock declined when the

12    misrepresentations made to the market, and/or the information alleged herein to have been concealed

13    from the market, and/or the effects thereof, were revealed, causing investors' losses, as alleged

14    above.

15    **Violation Of Section 10(b) Of**
16    **The Exchange Act Against And Rule 10b-5**<br>**Promulgated Thereunder Against All Defendants**

17         101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

18    forth herein.

19         102.    During the Class Period, defendants carried out a plan, scheme and course of conduct

20    which was intended to and, throughout the Class Period, did: (i) deceive the investing public

21    regarding Wachovia's business, operations, management and the intrinsic value of Wachovia

22    common stock; and (ii) cause plaintiff and other members of the Class to purchase Wachovia's

23    common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course

24    of conduct, defendants, and each of them, took the actions set forth herein.

25         103.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue

26    statements of material fact and/or omitted to state material facts necessary to make the statements not

27    misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

28    and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1   high market prices for Wachovia's common stock in violation of Section 10(b) of the Exchange Act

2   and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal

3   conduct charged herein or as controlling persons as alleged below.

4         104.    Defendants, individually and in concert, directly and indirectly, by the use, means or

5   instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

6   continuous course of conduct to conceal adverse material information about the business and

7   operations of Wachovia as specified herein.

8         105.    These defendants employed devices, schemes and artifices to defraud, while in

9   possession of material adverse non-public information, and engaged in acts, practices, and a course

10  of conduct as alleged herein in an effort to assure investors of Wachovia's value and performance

11  and continued substantial growth, which included the making of, or the participation in the making

12  of, untrue statements of material facts and omitting to state material facts necessary in order to make

13  the statements made about Wachovia and its business operations in the light of the circumstances

14  under which they were made, not misleading, as set forth more particularly herein, and engaged in

15  transactions, practices and a course of business which operated as a fraud and deceit upon the

16  purchasers of Wachovia common stock during the Class Period.

17        106.    Each of the Individual Defendants' primary liability, and controlling person liability,

18  arises from the following facts: (i) the Individual Defendants were high-level executives and/or

19  directors at the Company during the Class Period and members of the Company's management team

20  or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as

21  a senior officer and/or director of the Company was privy to and participated in the creation,

22  development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii)

23  each of these defendants enjoyed significant personal contact and familiarity with the other

24  defendants and was advised of and had access to other members of the Company's management

25  team, internal reports and other data and information about the Company's finances, operations, and

26  sales at all relevant times; and (iv) each of these defendants was aware of the Company's

27  dissemination of information to the investing public which they knew or recklessly disregarded was

28  materially false and misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                           - 30 -

1    107.    The defendants had actual knowledge of the misrepresentations and omissions of

2 material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

3 ascertain and to disclose such facts, even though such facts were available to them.    Such

4 defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for

5 the purpose and effect of concealing Wachovia's operating condition from the investing public and

6 supporting the artificially inflated price of its common stock.    As demonstrated by defendants'

7 overstatements and misstatements of the Company's business, operations and earnings throughout

8 the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and

9 omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from

10 taking those steps necessary to discover whether those statements were false or misleading.

11    108.    As a result of the dissemination of the materially false and misleading information

12 and failure to disclose material facts, as set forth above, the market price of Wachovia's common

13 stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of

14 Wachovia's publicly-traded common stock were artificially inflated, and relying directly or

15 indirectly on the false and misleading statements made by defendants, or upon the integrity of the

16 market in which the common stock trades, and/or on the absence of material adverse information

17 that was known to or recklessly disregarded by defendants but not disclosed in public statements by

18 defendants during the Class Period, plaintiff and the other members of the Class acquired Wachovia

19 common stock during the Class Period at artificially high prices and were damaged thereby.

20    109.    At the time of said misrepresentations and omissions, plaintiff and other members of

21 the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other

22 members of the Class and the marketplace known the truth regarding Wachovia's financial results,

23 which were not disclosed by defendants, plaintiff and other members of the Class would not have

24 purchased or otherwise acquired their Wachovia common stock, or, if they had acquired such

25 common stock during the Class Period, they would not have done so at the artificially inflated prices

26 which they paid.

27    110.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

28 Act, and Rule 10b-5 promulgated thereunder.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                    - 31 -

111.   As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**Violation Of Section 20(a) Of
The Exchange Act Against the Individual Defendants**

112.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.   The Individual Defendants acted as controlling persons of Wachovia within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

114.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

115.   As set forth above, Wachovia and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other

1  members of the Class suffered damages in connection with their purchases of the Company's

2  common stock during the Class Period.

3        **WHEREFORE**, plaintiff prays for relief and judgment, as follows:

4            (a)    Determining that this action is a proper class action, designating plaintiff as

5  Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of

6  Civil Procedure and Labaton Sucharow LLP as Lead Counsel;

7            (b)    Awarding compensatory damages in favor of plaintiff and the other Class

8  members against all defendants, jointly and severally, for all damages sustained as a result of

9  defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

10            (c)    Awarding plaintiff and the Class their reasonable costs and expenses incurred

11  in this action, including counsel fees and expert fees; and

12            (d)    Such other and further relief as the Court may deem just and proper.

13  **JURY TRIAL DEMANDED**

14     Plaintiff hereby demands a trial by jury.

15  DATED:  June 6, 2008

           **BERMAN DEVALERIO PEASE TABACCO**
           **BURT & PUCILLO**

By;
           Nicole Lavallee

Joseph J. Tabacco, Jr.
Nicole Lavallee
Julie J. Bai
425 California Street, Suite 2100
San Francisco, CA  94104
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6282

**Local Counsel for Plaintiff Bristol County
Retirement System**

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LABATON SUCHAROW LLP**
Christopher J. Keller
ckeller@labaton.com
Andrei V. Rado
arado@labaton.com
Alan I. Ellman
aellman@labaton.com
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

**Counsel for Plaintiff Bristol County
Retirement System**

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION

I, John Walsh as Director of Operations of Bristol County Retirement System ("Bristol County"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Bristol County. I have reviewed a complaint filed against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws and I authorized the filing of this complaint;

2.      Bristol County did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Bristol County is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.      Bristol County's transactions in Wachovia during the class period are reflected in Exhibit A, attached hereto;

5.      Bristol County has not sought to serve as a lead plaintiff in a class action under the federal securities laws during the last three years, except for the following:

*In re HCC Insurance Holdings, Inc. Sec. Litig.*, No. 4:07-cv-00801 (S.D. Tex.) (Appointed)

*Reese v. Bahash*, No.1:07-cv-01530-CKK (D.D.C.) (not appointed)

6.      Beyond its pro rata share of any recovery, Bristol County will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court

## EXHIBIT A

### TRANSACTIONS IN
### WACHOVIA CORPORATION

| Transaction Type | Trade Date | Shares | Price Per Share | | Cost/ Proceeds |
|---|---|---|---|---|---|
| Sale | 05/19/06 | -1,100.00 | $ | 53.14 | $58,419.20 |
| Sale | 01/03/07 | -1,300.00 | $ | 57.12 | $74,214.72 |
| Sale | 02/26/07 | -230.00 | $ | 56.73 | $13,036.98 |
| Sale | 02/26/07 | -670.00 | $ | 56.73 | $37,977.31 |
| Sale | 03/14/07 | -2,760.00 | $ | 54.00 | $148,916.74 |
| Sale | 03/27/07 | -2,600.00 | $ | 55.76 | $144,947.78 |
| Sale | 04/25/07 | -350.00 | $ | 55.32 | $19,345.95 |
| Sale | 09/13/07 | -1,770.00 | $ | 50.00 | $88,469.79 |
| Sale | 09/13/07 | -1,400.00 | $ | 50.14 | $70,196.00 |
| Purchase* | 10/01/07 | 1,378.16 | $ | 50.92 | ($70,175.91) |
| Sale | 10/05/07 | -0.16 | $ | 51.22 | $8.20 |
| Purchase | 02/11/08 | 4,522.00 | $ | 34.13 | ($154,397.81) |
| Purchase | 02/12/08 | 3,300.00 | $ | 35.10 | ($115,873.56) |



*Shares acquired through AG Edwards merger, used closing price for Wachovia on the date of the merger.