SUSAN G. KUPFER (#141724)
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, California 94111
Telephone:    (415) 972-8160
Facsimile:    (415) 972-8166
Email: skupfer@glancylaw.com

MICHAEL GOLDBERG (#188669)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Liaison Attorney for Proposed Lead Plaintiffs,*
*the New York City Pension Funds*

*Liaison Attorney for Proposed Lead*
*Plaintiffs, the New York City Pension Funds*

ROGER W. KIRBY
IRA M. PRESS
KIRBY MCINERNEY LLP
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone:    (212) 317-2300
Facsimile:    (212) 751-2540
Email: ipress@kmllp.com

*Attorneys for Proposed Lead Plaintiffs,*
*the New York City Pension Funds*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| BRISTOL COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>vs.<br><br>WACHOVIA CORPORATION; G. KENNEDY THOMPSON; THOMAS J. WURTZ, and DONALD K. TRUSLOW,<br><br>                              Defendants. | Civil Action No. 3:08-cv-02844-SC<br><br>CLASS ACTION<br><br>**DECLARATION OF IRA M. PRESS IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD AND LIAISON COUNSEL**<br><br>Date: September 19, 2008<br>Time: 10:00 a.m.<br>Courtroom 1, 17th Floor<br><br>Hon. Samuel Conti |

*(Additional Caption on the Following Page)*

DECLARATION OF IRA M. PRESS IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL

1

1

2 JERRY L. WEEKS, Individually and on          Civil Action No. To Be Assigned
  Behalf of All Others Similarly Situated,     Case Filed August 8, 2008
3
                                Plaintiff,     CLASS ACTION
4

5 vs.

6 WACHOVIA CORPORATION; G.
  KENNEDY THOMPSON; THOMAS J.
7 WURTZ, and DONALD K. TRUSLOW,

8                             Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF IRA M. PRESS IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL

2

I, Ira M. Press, hereby declare as follows:

1.      I am a member of the law firm of Kirby McInerney LLP, counsel for the New York City Pension Funds (the "NYC Funds"[1] or "Movants").

2.      The NYC Funds seek appointment as Lead Plaintiff pursuant to Section 21D of the Securities Exchange Act of 1934 in the above-captioned action.

3.      I submit this Declaration, together with the attached exhibits, in support of the NYC Funds' motion for consolidation, appointment of the NYC Funds as Lead Plaintiff on behalf of the class in the consolidated actions, and approval of the NYC Funds' selection of Kirby McInerney LLP as Lead Counsel and Glancy Binkow & Goldberg LLP as Liaison Counsel.  I am fully familiar with the facts set forth herein.

4.      Attached hereto as the exhibits indicated are true and correct copies of the following:

Exhibit A:      Press release published on June 9, 2008, on *PrimeNewswire,* a widely-circulated, national, business-oriented wire service, announcing pendency of this lawsuit.

Exhibit B:      Sworn PSLRA certifications of the NYC Funds.

Exhibit C:      Tables reflecting the calculated losses incurred by the NYC Funds as a result of their class period transactions in Wachovia Corporation securities.

Exhibit D:      Declaration of Ilyse Sisolak in Support of the New York City Pension

---

[1]      Specifically: the New York City Board of Education Retirement System ("NYC BERS"); the New York City Employees' Retirement System ("NYCERS"); the New York City Police Pension Fund ("NYC Police"); the New York City Police Officers' Variable Supplements Fund ("POVSF"); the New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"); the New York City Fire Department Pension Fund ("NYC Fire"); the New York City Firefighters' Variable Supplements Fund ("FFVSF"); the New York City Fire Officers' Variable Supplements Fund ("FOVSF"); the New York City Teachers' Retirement System ("NYC TRS"); and the New York City Teachers' Retirement System Variable Annuity Program ("Teachers Variable A").

DECLARATION OF IRA M. PRESS IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL

3

Funds Motion For Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel.

Exhibit E:    Firm resumés of the law firms of Kirby McInerney LLP and Glancy Binkow & Goldberg LLP.

Exhibit F:    The July 7, 2008 complaint filed in the United States District Court for the Southern District of New York in *Lipetz v. Wachovia Corp. et al*., Civ. No. 08-6171-RJS (the "New York Action").

Exhibit G:    Press release published on July 8, 2008, on *Marketwire*, a widely-circulated, national, business-oriented wire service, announcing pendency of the New York Action.

Exhibit H:    Court order in *Pappas v. Countrywide Financial Corp.*, No. 07-cv-5295 (C.D. Cal. Nov. 28, 2007).

I declare under penalty of perjury under the laws of the State of California that the foregoing facts are true and correct.  Executed this 8th day of August, 2008.

            /s/ Ira M. Press
            Ira M. Press

DECLARATION OF IRA M. PRESS IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL

4

# EXHIBIT A

PZM          Labaton Sucharow LLP Announces Filing of Securities Class Action
             Jun 9 2008  15:35:47


*T
        Labaton Sucharow LLP Announces Filing of Securities Class
            Action Lawsuit Against Wachovia Corp. -- WB
*T
NEW YORK, June 9, 2008 (PRIME NEWSWIRE) -- Labaton Sucharow LLP filed a
class action lawsuit on June 6, 2008 in the United States District
Court for the Northern District of California, on behalf of persons who
purchased the securities of Wachovia Corp. (NYSE:WB) ("Wachovia" or the
"Company") between May 8, 2006 and April 11, 2008, inclusive (the
"Class Period"). The complaint names Wachovia, G. Kennedy Thomson
(former CEO), Thomas J. Wurtz (CFO) and Donald K. Truslow (Chief Risk
Officer) as defendants (collectively, "Defendants"). The complaint
alleges that during the Class Period Defendants violated Sections 10(b)
and 20(a) of the Securities Exchange Act of 1934 by issuing various
materially false and misleading statements about Wachovia's financial
results and business operations, which had the effect of artificially
inflating the market price of the Company's securities.

You can view a copy of the complaint online at
http://www.labaton.com/en/cases/Newly-Filed-Cases.cfm or obtain it from
the Court. The case number is C-08-02844 SC, and the Judge presiding
over the case is the Honorable Samuel Conti.

In summary, the complaint alleges that Defendants misled investors by
falsely representing that Wachovia had strict and selective
underwriting and loan origination practices and a conservative lending
approach that set it apart from other lenders. Such reassurances were
repeated by defendants throughout the Class Period in order to
artificially support Wachovia's stock price in the midst of a weakening
mortgage market. In response to increased market concern with the
mortgage lending industry, and Wachovia's option ARMs in particular,
Wachovia falsely represented that its loan underwriting practices were
much better than at other banks and that this would allow it to prosper
while lenders with less exacting standards and procedures would fare
much worse. In reality, Wachovia's actual lending practices differed
materially from the description of those practices in statements made
to investors. The Company's ability to weather the deterioration in the
real estate and credit markets was grossly exaggerated by Defendants,
at precisely the worst time, when analysts began to ask tough
questions. The Company, moreover, had inadequate loan loss reserves and
falsely represented that its capital position was sufficient to fund
its dividend.

.Shortly after last assuring the market of its liquidity, the strength
of its underwriting practices, and the adequacy of its reserves,
Wachovia reported a surprise quarterly loss, undertook emergency
measures to increase capital, and cut its dividend. On April 14, 2008,
before the open of ordinary trading, Wachovia reported a loss of $350
million, or $0.20 per share, for the first quarter of 2008. The Company
attributed the results to: (1) a $2.8 billion increase credit loss
reserves, including $1.1 billion specifically for "Pick-A-Pay" reserve
build, the lending program highly touted by the Company during the
Class Period. The need to increase Pick-A-Pay reserves was attributed

Copyright (c) 2008

PZM          Labaton Sucharow LLP Announces Filing of Securities Class Action
             Jun 9 2008  15:35:47
to Wachovia's adoption of a "refined reserve modeling" that resulted in
"higher than expected loss factors on Pick-a-Pay"; and (2) $2 billion
in mark-to-market losses for mortgage backed securities, including a
"$729 million loss on unfunded leveraged finance commitments." In order
to shore-up its capital, Wachovia announced the following steps: (1)
reduce the dividend 41% to $0.375; and (2) plan to raise capital by
$7-8 billion through public offerings.

In reaction to the news, shares fell from $27.81 to $25.55 (8.13%) on
abnormally high volume.

Plaintiff is represented by the law firm of Labaton Sucharow LLP, which
has been representing plaintiffs in securities class actions for over
40 years.

If you bought Wachovia securities between May 8, 2006 and April 11,
2008, inclusive, you may qualify to serve as Lead Plaintiff. Lead
Plaintiff papers must be filed with the court no later than August 8,
2008. If you would like to consider serving as lead plaintiff or have
any questions about the lawsuit, please contact one of our
representatives or Andrei V. Rado, Esq. of Labaton Sucharow, at
800-321-0476. A lead plaintiff is a court-appointed representative
party that acts on behalf of absent class members. You do not need to
be a lead plaintiff in order to share in any recovery that may result
from this litigation. You can share in a recovery as an absent class
member by filing out claim forms that will be made available at the
appropriate time.

More information on this and other class actions can be found on the
Class Action Newsline at www.primenewswire.com/ca

*T
-0-
CONTACT: Labaton Sucharow LLP
         Andrei V. Rado, Esq.
         800-321-0476
*T


Provider ID: 00144330
-0- Jun/09/2008 19:35 GMT


Copyright (c) 2008

# EXHIBIT B

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Teachers' Retirement System ("NYC TRS"), and hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of NYC TRS. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.      NYC TRS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      NYC TRS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC TRS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.      NYC TRS' transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.      NYC TRS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.      Beyond its pro rata share of any recovery, NYC TRS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day

of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC TRS Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337478 | 1,167,077 shares | 5/19/2006 | Buy | 6,022 | 53.14 |
| | | 10/4/2006** | Buy | 198,523 | 56.72 |
| | | 11/17/2006 | Buy | 1,850 | 55.01 |
| | | 11/17/2006 | Buy | 1,587 | 55.01 |
| | | 12/1/2006 | Buy | 5,685 | 54.10 |
| | | 1/29/2007 | Buy | 4,115 | 56.03 |
| | | 2/5/2007 | Buy | 766 | 57.06 |
| | | 2/9/2007 | Buy | 3,799 | 57.12 |
| | | 2/15/2007 | Buy | 1,262 | 57.89 |
| | | 2/28/2007 | Buy | 4,110 | 55.37 |
| | | 3/1/2007 | Buy | 592 | 55.38 |
| | | 3/19/2007 | Buy | 4,588 | 55.70 |
| | | 3/19/2007 | Buy | 63 | 55.70 |
| | | 3/28/2007 | Buy | 3,087 | 55.08 |
| | | 3/28/2007 | Buy | 2,435 | 55.08 |
| | | 4/20/2007 | Buy | 7,709 | 55.85 |
| | | 5/31/2007 | Buy | 3,995 | 54.19 |
| | | 6/7/2007 | Buy | 11,290 | 52.85 |
| | | 6/22/2007 | Sell | 25,202 | 51.87 |
| | | 6/22/2007 | Sell | 12,202 | 51.84 |
| | | 6/27/2007 | Sell | 13,932 | 52.06 |
| | | 6/27/2007 | Sell | 27 | 52.06 |
| | | 8/31/2007 | Buy | 1,558 | 48.79 |
| | | 8/31/2007 | Buy | 3,858 | 48.98 |
| | | 9/24/2007 | Buy | 4,344 | 50.39 |
| | | 9/26/2007 | Buy | 3,648 | 50.64 |
| | | 10/3/2007** | Buy | 56,254 | 51.37 |
| | | 10/9/2007 | Buy | 3,974 | 51.42 |
| | | 10/24/2007 | Buy | 369 | 45.40 |
| | | 10/24/2007 | Buy | 7,283 | 45.40 |
| | | 10/26/2007 | Buy | 3,295 | 46.54 |
| | | 10/30/2007 | Sell | 10,172 | 45.97 |
| | | 12/12/2007 | Buy | 2,766 | 40.54 |
| | | 12/19/2007 | Buy | 3,569 | 38.99 |
| | | 1/31/2008 | Buy | 2,421 | 35.47 |
| | | 2/5/2008 | Buy | 29,755 | 34.03 |
| | | 2/26/2008 | Sell | 7,091 | 34.81 |
| | | 2/26/2008 | Sell | 3,963 | 34.80 |
| | | 3/27/2008 | Buy | 1,071 | 27.07 |
| | | 3/31/2008 | Buy | 4,360 | 27.00 |
| | | 3/31/2008 | Buy | 711 | 27.00 |
| | | 4/30/2008 | Buy | 129,495 | 29.14 |
| | | 4/30/2008 | Buy | 340 | 29.15 |
| 337479 | 392,399 shares | 5/15/2006 | Buy | 2,500 | 54.71 |
| | | 6/8/2006 | Buy | 1,750 | 54.44 |
| | | 6/30/2006 | Sell | 1,400 | 54.08 |

|  |  | 6/30/2006 | Sell | 3,570 | 54.08 |
|  |  | 10/4/2006** | Buy | 67,403 | 56.72 |
|  |  | 10/26/2006 | Buy | 1,200 | 55.62 |
|  |  | 10/31/2006 | Buy | 3,100 | 55.50 |
|  |  | 11/27/2006 | Buy | 3,510 | 53.91 |
|  |  | 12/27/2006 | Sell | 3,740 | 57.46 |
|  |  | 2/1/2007 | Buy | 2,480 | 56.50 |
|  |  | 2/28/2007 | Buy | 1,900 | 55.37 |
|  |  | 3/21/2007 | Buy | 2,155 | 55.74 |
|  |  | 5/15/2007 | Buy | 2,542 | 56.58 |
|  |  | 5/25/2007 | Sell | 7,200 | 55.08 |
|  |  | 6/7/2007 | Buy | 4,560 | 53.16 |
|  |  | 6/22/2007 | Sell | 6,700 | 51.84 |
|  |  | 6/27/2007 | Sell | 3,360 | 51.74 |
|  |  | 8/30/2007 | Buy | 3,431 | 47.94 |
|  |  | 10/2/2007 | Buy | 2,000 | 50.83 |
|  |  | 10/3/2007** | Buy | 18,631 | 51.37 |
|  |  | 10/12/2007 | Buy | 2,640 | 51.00 |
|  |  | 10/30/2007 | Sell | 5,648 | 45.97 |
|  |  | 11/15/2007 | Buy | 3,231 | 41.20 |
|  |  | 12/14/2007 | Buy | 2,900 | 39.03 |
|  |  | 2/26/2008 | Buy | 3,588 | 34.46 |
|  |  | 4/30/2008 | Buy | 33,265 | 29.15 |
|  |  | 5/5/2008 | Buy | 13,901 | 29.60 |
| 337480 | 60,612 shares | 10/4/2006** | Buy | 10,405 | 56.72 |
|  |  | 10/4/2006 | Buy | 39,100 | 56.38 |
|  |  | 11/7/2006 | Sell | 7,400 | 55.68 |
|  |  | 12/5/2006 | Sell | 27,700 | 54.98 |
|  |  | 1/9/2007 | Buy | 200 | 56.51 |
|  |  | 2/13/2007 | Buy | 300 | 57.70 |
|  |  | 3/20/2007 | Buy | 14,700 | 55.97 |
|  |  | 6/12/2007 | Buy | 4,200 | 53.59 |
|  |  | 7/10/2007 | Buy | 24,100 | 50.42 |
|  |  | 8/9/2007 | Sell | 18,400 | 47.46 |
|  |  | 10/9/2007 | Buy | 13,600 | 51.21 |
|  |  | 10/25/2007 | Buy | 500 | 45.85 |
|  |  | 4/24/2008 | Sell | 19,300 | 27.44 |
| 337481 | 49,500 shares | 8/3/2006 | Buy | 15,900 | 54.20 |
|  |  | 10/4/2006** | Buy | 9,669 | 56.72 |
|  |  | 11/3/2006 | Sell | 4,500 | 54.39 |
|  |  | 1/4/2007 | Sell | 24,000 | 57.17 |
|  |  | 8/3/2007 | Sell | 29,600 | 46.28 |
|  |  | 4/3/2008 | Sell | 16,969 | 28.23 |
| 337485 | 0 shares | 10/1/2007 | Sell | 22,247 | 50.38 |
|  |  | 10/3/2007** | Buy | 22,247 | 51.37 |
| 363220 | 0 shares | 11/20/2007 | Buy | 710 | 38.11 |
| 363221 | 0 shares | 11/20/2007 | Buy | 116 | 38.34 |

|        |          | 3/14/2008  | Sell | 116 | 26.63 |
|--------|----------|------------|------|-----|-------|
| 363242 | 0 shares | 11/26/2007 | Buy  | 500 | 40.24 |
|        |          | 3/4/2008   | Sell | 100 | 28.92 |
|        |          | 3/25/2008  | Sell | 100 | 29.95 |
|        |          | 5/28/2008  | Sell | 100 | 23.46 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 and A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Marc Katz, Deputy Director of Investment Administration for the Teachers' Retirement System of the City of New York, provide the following certification on behalf of the New York City Teachers' Retirement System Variable Annuity Program ("Teachers' Variable A"), and hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of Teachers' Variable A.  I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.     Teachers' Variable A did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     Teachers' Variable A understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. Teachers' Variable A maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.     Teachers' Variable A's transactions in the securities of Wachovia, as prepared by the NYC Teachers' Retirement System accounting staff, are reflected in Exhibit A, attached hereto.

5.     Teachers' Variable A has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)

6.     Beyond its pro rata share of any recovery, Teachers' Variable A will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of

such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury on this __7__ day of August, 2008 that the foregoing

is true and correct to the best of my knowledge.

MARC KATZ
Deputy Director of Investment Administration
for the Teachers' Retirement System of the City of
New York

2

**Exhibit A**
NYC Teachers' Variable A Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| Enhanced | 109,933 shares | 05/12/06 | Sell | 6601 | 54.94 |
| | | 07/17/06 | Sell | 1803 | 53.01 |
| | | 09/05/06 | Buy | 6900 | 55.27 |
| | | 10/2/2006 | Buy | 11036 | 55.80 |
| | | 11/17/06 | Sell | 2999 | 55.01 |
| | | 11/30/06 | Buy | 9500 | 53.71 |
| | | 02/12/07 | Sell | 15201 | 57.48 |
| | | 02/13/07 | Sell | 1298 | 57.49 |
| | | 05/01/07 | Sell | 11199 | 55.20 |
| | | 05/16/07 | Sell | 1199 | 56.11 |
| | | 08/22/07 | Sell | 10100 | 49.50 |
| | | 11/07/07 | Buy | 4900 | 41.37 |
| | | 12/14/07 | Sell | 1803 | 40.19 |
| | | 01/22/08 | Buy | 8800 | 30.38 |
| | | 01/30/08 | Sell | 18198 | 37.51 |
| | | 02/14/08 | Sell | 1500 | 33.66 |
| | | 03/05/08 | Buy | 15000 | 30.00 |
| | | 04/17/08 | Buy | 14100 | 25.70 |
| Wellington | 0 shares | 10/02/06 | Buy | 20390 | 55.80 |
| | | 01/23/07 | Sell | 900 | 56.38 |
| | | 01/24/07 | Sell | 700 | 56.47 |
| | | 01/26/07 | Sell | 900 | 56.05 |
| | | 03/02/07 | Sell | 5400 | 55.01 |
| | | 03/14/07 | Sell | 900 | 53.92 |
| | | 03/16/07 | Sell | 1100 | 55.02 |
| | | 04/05/07 | Sell | 1100 | 54.49 |
| | | 04/10/07 | Sell | 2800 | 54.13 |
| | | 04/11/07 | Sell | 900 | 53.70 |
| | | 04/12/07 | Sell | 1200 | 53.58 |
| | | 04/16/07 | Sell | 1300 | 55.13 |
| | | 05/29/07 | Sell | 3190 | 54.57 |
| MCM | 0 shares | 11/13/06 | Buy | 401164 | 55.49 |
| | | 11/17/06 | Sell | 9400 | 55.01 |
| | | 12/18/06 | Sell | 3800 | 57.49 |
| | | 12/19/06 | Buy | 474430 | 57.30 |
| | | 01/19/07 | Sell | 4650 | 56.70 |
| | | 02/13/07 | Sell | 7410 | 57.48 |
| | | 06/18/07 | Sell | 7700 | 54.05 |
| | | 06/22/07 | Sell | 11700 | 51.84 |
| | | 06/27/07 | Sell | 4030 | 51.74 |
| | | 09/17/07 | Sell | 3400 | 49.91 |
| | | 10/01/07 | Buy | 32374 | 49.42 |
| | | 10/18/07 | Sell | 1 | 48.91 |
| | | 02/15/08 | Sell | 6201 | 33.66 |
| | | 04/30/08 | Buy | 54759 | 29.15 |

|         |          | 05/05/08 | Buy  | 22845  | 29.60 |
|---------|----------|----------|------|--------|-------|
|         |          | 05/16/08 | Sell | 6700   | 27.60 |
| Goldman | 0 shares | 06/13/07 | Buy  | 39700  | 53.16 |
|         |          | 09/24/07 | Buy  | 55400  | 50.68 |
|         |          | 10/09/07 | Buy  | 5100   | 51.17 |
|         |          | 12/03/07 | Sell | 100200 | 42.47 |
|         |          | 02/25/08 | Buy  | 6700   | 34.15 |
|         |          | 03/05/08 | Buy  | 14595  | 29.28 |
|         |          | 03/07/08 | Buy  | 305    | 27.48 |
|         |          | 03/13/08 | Buy  | 12800  | 26.98 |
|         |          | 03/24/08 | Buy  | 100400 | 31.35 |
|         |          | 04/01/08 | Buy  | 36200  | 28.66 |
|         |          | 04/18/08 | Sell | 131700 | 27.27 |
|         |          | 04/23/08 | Sell | 39300  | 26.14 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 and A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Employees' Retirement System ("NYCERS"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYCERS. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYCERS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYCERS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYCERS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYCERS's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYCERS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*Vogel v. Jobs*, No. C-06-05208-JF (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.    Beyond its pro rata share of any recovery, NYCERS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this *7th* day of August, 2008.

_Lewis Fin_

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYCERS Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337545 | 20,117 shares | 5/24/2006 | Buy | 3,300 | 53.36 |
| | | 5/25/2006 | Buy | 2,500 | 53.41 |
| | | 8/18/2006 | Buy | 2,290 | 55.58 |
| | | 10/4/2006** | Buy | 630 | 56.72 |
| | | 12/26/2006 | Buy | 100 | 57.18 |
| | | 3/27/2007 | Sell | 1,200 | 55.83 |
| | | 4/5/2007 | Sell | 4,553 | 54.24 |
| | | 5/3/2007 | Buy | 200 | 55.61 |
| | | 5/16/2007 | Sell | 1,500 | 56.63 |
| | | 6/25/2007 | Buy | 300 | 52.25 |
| | | 9/24/2007 | Sell | 1,930 | 50.86 |
| | | 9/24/2007 | Sell | 2,800 | 50.86 |
| | | 10/3/2007** | Buy | 98 | 51.37 |
| | | 10/22/2007 | Sell | 2,340 | 46.2 |
| | | 10/23/2007 | Sell | 1,595 | 45.84 |
| | | 11/26/2007 | Sell | 12,317 | 39.98 |
| | | 11/27/2007 | Sell | 200 | 39.67 |
| | | 12/27/2007 | Sell | 100 | 38.48 |
| | | 3/4/2008 | Sell | 200 | 28.92 |
| | | 3/25/2008 | Sell | 300 | 29.95 |
| | | 5/28/2008 | Sell | 200 | 23.46 |
| 337548 | 882,333 shares | 5/19/2006 | Buy | 3,911 | 53.14 |
| | | 6/27/2006 | Sell | 7,009 | 52.84 |
| | | 6/30/2006 | Sell | 3,434 | 54.08 |
| | | 6/30/2006 | Sell | 8,457 | 54.08 |
| | | 8/29/2006 | Buy | 1,256 | 55.23 |
| | | 9/25/2006 | Sell | 19,755 | 55.5 |
| | | 10/4/2006** | Buy | 150,804 | 56.72 |
| | | 10/31/2006 | Buy | 167 | 55.5 |
| | | 10/31/2006 | Buy | 407 | 55.5 |
| | | 12/1/2006 | Buy | 3,342 | 54.1 |
| | | 12/27/2006 | Sell | 97 | 57.46 |
| | | 12/27/2006 | Sell | 6,000 | 57.46 |
| | | 2/15/2007 | Buy | 566 | 57.89 |
| | | 2/28/2007 | Buy | 2,899 | 55.37 |
| | | 2/28/2007 | Buy | 417 | 55.38 |
| | | 3/19/2007 | Buy | 49 | 55.7 |
| | | 3/19/2007 | Buy | 3,591 | 55.7 |
| | | 3/28/2007 | Buy | 1,650 | 55.08 |
| | | 3/28/2007 | Buy | 1,301 | 55.08 |
| | | 4/20/2007 | Buy | 3,984 | 55.85 |
| | | 4/30/2007 | Buy | 5,945 | 55.54 |
| | | 4/30/2007 | Buy | 427 | 55.54 |
| | | 6/27/2007 | Sell | 38,493 | 52.06 |
| | | 6/27/2007 | Sell | 74 | 52.05 |
| | | 7/12/2007 | Sell | 2,908 | 52.28 |

|         |               | 9/24/2007    | Buy  | 4,756   | 50.39 |
|         |               | 10/3/2007**  | Buy  | 38,142  | 51.37 |
|         |               | 10/9/2007    | Buy  | 3,976   | 51.42 |
|         |               | 10/24/2007   | Buy  | 263     | 45.4  |
|         |               | 10/24/2007   | Buy  | 5,187   | 45.4  |
|         |               | 11/27/2007   | Sell | 7,604   | 40.12 |
|         |               | 11/27/2007   | Sell | 10,920  | 40.12 |
|         |               | 12/19/2007   | Buy  | 2,910   | 38.99 |
|         |               | 12/26/2007   | Sell | 4,937   | 39.07 |
|         |               | 2/8/2008     | Buy  | 5,043   | 34.04 |
|         |               | 2/26/2008    | Sell | 1,913   | 34.8  |
|         |               | 2/26/2008    | Sell | 1,070   | 34.8  |
|         |               | 3/7/2008     | Buy  | 1,858   | 27.22 |
|         |               | 3/27/2008    | Buy  | 2,704   | 27.07 |
|         |               | 3/31/2008    | Buy  | 2,341   | 27    |
|         |               | 3/31/2008    | Buy  | 382     | 27    |
|         |               | 4/25/2008    | Sell | 6,495   | 28.81 |
|         |               | 4/25/2008    | Sell | 2,366   | 28.81 |
|         |               | 4/30/2008    | Buy  | 219     | 29.15 |
|         |               | 4/30/2008    | Buy  | 83,392  | 29.14 |
| 337549  | 894,871 shares | 6/7/2006    | Buy  | 22,300  | 54.76 |
|         |               | 6/7/2006     | Buy  | 3,600   | 54.47 |
|         |               | 6/16/2006    | Buy  | 1,500   | 52.82 |
|         |               | 6/21/2006    | Buy  | 4,400   | 53.33 |
|         |               | 6/22/2006    | Buy  | 7,500   | 53.08 |
|         |               | 6/30/2006    | Sell | 31,200  | 54.15 |
|         |               | 6/30/2006    | Sell | 6,400   | 54.08 |
|         |               | 7/25/2006    | Sell | 10,000  | 53.46 |
|         |               | 8/3/2006     | Buy  | 4,000   | 54.2  |
|         |               | 9/6/2006     | Buy  | 1,100   | 55.44 |
|         |               | 9/6/2006     | Buy  | 300     | 55.19 |
|         |               | 9/26/2006    | Sell | 26,300  | 55.5  |
|         |               | 9/26/2006    | Sell | 14,800  | 55.14 |
|         |               | 9/26/2006    | Sell | 400     | 55.5  |
|         |               | 10/2/2006    | Buy  | 900     | 55.67 |
|         |               | 10/4/2006**  | Buy  | 140,315 | 56.72 |
|         |               | 10/4/2006**  | Buy  | 6,831   | 56.72 |
|         |               | 10/4/2006**  | Buy  | 2,312   | 56.72 |
|         |               | 10/13/2006   | Sell | 15,400  | 56.49 |
|         |               | 10/13/2006   | Sell | 76      | 56.49 |
|         |               | 10/13/2006   | Buy  | 23,900  | 56.45 |
|         |               | 11/3/2006    | Buy  | 3,600   | 54.62 |
|         |               | 1/25/2007    | Sell | 1,000   | 55.76 |
|         |               | 4/12/2007    | Buy  | 10,100  | 53.34 |
|         |               | 5/31/2007    | Buy  | 7,500   | 54.22 |
|         |               | 6/22/2007    | Sell | 45,300  | 51.86 |
|         |               | 6/22/2007    | Sell | 3,900   | 51.84 |
|         |               | 6/26/2007    | Sell | 11,700  | 51.98 |
|         |               | 9/12/2007    | Buy  | 44,900  | 48.84 |
|         |               | 9/26/2007    | Sell | 15,100  | 50.64 |
|         |               | 10/3/2007**  | Buy  | 38,293  | 51.37 |

| | | | | | |
|---|---|---|---|---|---|
| | | 10/18/2007 | Buy | 2,400 | 47.81 |
| | | 11/26/2007 | Sell | 31,900 | 40.25 |
| | | 12/6/2007 | Buy | 5,300 | 43.18 |
| | | 12/21/2007 | Sell | 8,900 | 38.65 |
| | | 1/9/2008 | Buy | 14,700 | 35.07 |
| | | 2/25/2008 | Sell | 13,100 | 33.62 |
| | | 3/6/2008 | Buy | 14,400 | 28.35 |
| | | 3/31/2008 | Buy | 7,500 | 27 |
| | | 4/30/2008 | Buy | 89,200 | 29.15 |
| | | 5/27/2008 | Sell | 22,600 | 24.61 |
| 337568 | 0 shares | 10/1/2007 | Sell | 5,020 | 50.38 |
| | | 10/3/2007** | Buy | 5,020 | 51.37 |
| 337570 | 0 shares | 10/3/2007** | Buy | 3,839 | 51.37 |
| | | 10/11/2007 | Sell | 300 | 51.14 |
| | | 10/22/2007 | Sell | 3,539 | 46.26 |
| 337816 | 34,800 shares | 11/30/07 | Sell | 34,800 | 43.26 |
| 337818 | 14,090 shares | 5/8/2006 | Buy | 2,480 | 55.43 |
| | | 12/1/2006 | Sell | 5,250 | 53.95 |
| | | 6/26/2007 | Sell | 11,320 | 51.86 |
| 349445 | 0 shares | 11/20/2007 | Buy | 990 | 38.11 |
| 349446 | 0 shares | 11/20/2007 | Buy | 161 | 38.34 |
| | | 3/14/2008 | Sell | 161 | 26.63 |
| 349466 | 0 shares | 11/30/2007 | Buy | 14,526 | 43 |
| | | 11/30/2007 | Sell | 14,526 | 43.27 |
| 337551 | 196,619 shares | 6/15/2006 | Buy | 100 | 52.39 |
| | | 6/16/2006 | Sell | 900 | 52.76 |
| | | 6/27/2006 | Buy | 100 | 52.79 |
| | | 6/28/2006 | Buy | 80 | 53 |
| | | 6/29/2006 | Buy | 105 | 53.86 |
| | | 6/30/2006 | Buy | 53 | 54.44 |
| | | 7/5/2006 | Buy | 137 | 53.56 |
| | | 7/6/2006 | Buy | 25 | 53.77 |
| | | 8/23/2006 | Buy | 75 | 55.85 |
| | | 8/24/2006 | Buy | 45 | 56.32 |
| | | 8/25/2006 | Buy | 81 | 56.22 |
| | | 8/29/2006 | Buy | 49 | 55.08 |
| | | 8/31/2006 | Buy | 50 | 54.67 |
| | | 9/15/2006 | Sell | 1,200 | 55.12 |
| | | 9/22/2006 | Buy | 63 | 54.68 |
| | | 9/25/2006 | Buy | 414 | 55.17 |
| | | 9/29/2006 | Buy | 5,900 | 55.78 |
| | | 10/4/2006** | Buy | 34,431 | 56.72 |
| | | 12/18/2006 | Buy | 43 | 57.32 |
| | | 12/19/2006 | Buy | 31 | 57.49 |

| | | | |
|---|---|---|---|
| 12/20/2006 | Buy | 25 | 57.2 |
| 12/21/2006 | Buy | 33 | 57.21 |
| 12/22/2006 | Buy | 68 | 57.03 |
| 2/1/2007 | Buy | 20 | 56.45 |
| 2/2/2007 | Buy | 45 | 56.42 |
| 2/6/2007 | Buy | 135 | 57.26 |
| 2/12/2007 | Buy | 245 | 57.52 |
| 2/13/2007 | Buy | 91 | 57.7 |
| 2/14/2007 | Buy | 72 | 57.94 |
| 2/15/2007 | Buy | 73 | 57.97 |
| 2/16/2007 | Buy | 87 | 58.24 |
| 2/20/2007 | Buy | 26 | 58.07 |
| 2/22/2007 | Buy | 31 | 58.69 |
| 2/23/2007 | Sell | 17,800 | 57.74 |
| 3/16/2007 | Buy | 900 | 55.14 |
| 4/5/2007 | Buy | 150 | 54.28 |
| 4/9/2007 | Buy | 22 | 54.03 |
| 4/11/2007 | Buy | 128 | 53.68 |
| 4/19/2007 | Buy | 200 | 55.34 |
| 4/26/2007 | Buy | 50 | 55.66 |
| 4/27/2007 | Buy | 50 | 55.65 |
| 5/4/2007 | Buy | 20 | 55.91 |
| 5/8/2007 | Buy | 80 | 56.37 |
| 5/25/2007 | Sell | 7,100 | 55.08 |
| 6/11/2007 | Buy | 120 | 53.65 |
| 6/13/2007 | Buy | 211 | 53.12 |
| 6/15/2007 | Buy | 2,500 | 54.04 |
| 7/10/2007 | Buy | 100 | 50.74 |
| 8/28/2007 | Buy | 125 | 49.16 |
| 8/30/2007 | Buy | 243 | 47.76 |
| 8/31/2007 | Buy | 79 | 48.95 |
| 9/4/2007 | Buy | 53 | 49.16 |
| 9/11/2007 | Buy | 50 | 48.14 |
| 9/12/2007 | Buy | 36 | 48.89 |
| 9/13/2007 | Buy | 14 | 49.98 |
| 9/21/2007 | Buy | 100 | 51.36 |
| 10/2/2007 | Buy | 60 | 51.28 |
| 10/3/2007 | Buy | 125 | 51.36 |
| 10/4/2007 | Buy | 129 | 51.45 |
| 10/8/2007 | Buy | 86 | 51.49 |
| 10/10/2007 | Buy | 210 | 50.88 |
| 10/11/2007 | Buy | 320 | 50.98 |
| 10/16/2007 | Buy | 80 | 49.25 |
| 11/5/2007 | Buy | 132 | 41.93 |
| 11/7/2007 | Buy | 174 | 41.81 |
| 11/8/2007 | Buy | 94 | 39.5 |
| 12/5/2007 | Buy | 50 | 42.47 |
| 12/6/2007 | Buy | 90 | 44.1 |
| 12/7/2007 | Buy | 138 | 43.63 |
| 12/10/2007 | Buy | 122 | 44.45 |
| 12/11/2007 | Buy | 100 | 44.47 |
| 12/21/2007 | Buy | 9,700 | 39.5 |

| | | | |
|---|---|---|---|
| 1/7/2008 | Buy | 66 | 35.27 |
| 1/8/2008 | Buy | 76 | 35.1 |
| 1/9/2008 | Buy | 46 | 33.52 |
| 1/10/2008 | Buy | 12 | 34.7 |
| 1/16/2008 | Buy | 200 | 34.85 |
| 1/23/2008 | Buy | 55 | 33.85 |
| 1/24/2008 | Buy | 45 | 35.97 |
| 1/29/2008 | Buy | 224 | 37.53 |
| 1/30/2008 | Buy | 76 | 37.47 |
| 3/11/2008 | Buy | 120 | 28.89 |
| 3/12/2008 | Buy | 54 | 28.66 |
| 3/13/2008 | Buy | 63 | 26.55 |
| 3/14/2008 | Buy | 63 | 26.93 |
| 3/20/2008 | Buy | 2,300 | 30.72 |
| 4/2/2008 | Buy | 120 | 29.14 |
| 4/3/2008 | Buy | 92 | 28.02 |
| 4/7/2008 | Buy | 75 | 27.71 |
| 4/8/2008 | Buy | 11 | 27.59 |
| 4/9/2008 | Buy | 55 | 26.88 |
| 4/10/2008 | Buy | 23 | 26.68 |
| 4/11/2008 | Buy | 114 | 27.81 |
| 4/14/2008 | Buy | 17,100 | 25.54 |
| 4/14/2008 | Buy | 43 | 24.96 |
| 5/6/2008 | Buy | 66 | 29.75 |
| 5/7/2008 | Buy | 120 | 29.56 |
| 5/8/2008 | Buy | 14 | 27.85 |
| 5/13/2008 | Sell | 200 | 27.79 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Pension Fund ("NYC Police"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYC Police. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYC Police did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYC Police understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC Police maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYC Police's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYC Police has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, NYC Police will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such

reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC Police Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337627 | 15,400 shares | 1/8/2007 | Sell | 15,400 | 56.34 |
| 337629 | 334,040 shares | 6/7/2006 | Buy | 15,100 | 54.74 |
| | | 6/7/2006 | Buy | 2,400 | 54.47 |
| | | 6/30/2006 | Sell | 8,800 | 54.15 |
| | | 6/30/2006 | Sell | 1,800 | 54.08 |
| | | 10/4/2006** | Buy | 58,438 | 56.72 |
| | | 12/11/2006 | Buy | 2,300 | 56.28 |
| | | 1/25/2007 | Buy | 800 | 55.76 |
| | | 4/12/2007 | Buy | 4,900 | 53.33 |
| | | 5/31/2007 | Buy | 15,500 | 54.23 |
| | | 6/22/2007 | Sell | 1,700 | 51.84 |
| | | 6/22/2007 | Sell | 18,600 | 51.86 |
| | | 6/26/2007 | Sell | 11,600 | 51.98 |
| | | 9/12/2007 | Buy | 18,200 | 48.84 |
| | | 10/3/2007** | Buy | 16,845 | 51.37 |
| | | 12/6/2007 | Sell | 3,200 | 43.17 |
| | | 3/12/2008 | Buy | 300 | 29.69 |
| | | 3/31/2008 | Buy | 7,000 | 27 |
| | | 4/30/2008 | Buy | 37,300 | 29.15 |
| 337635 | 0 shares | 10/1/2007 | Sell | 23,527 | 50.38 |
| | | 10/3/2007** | Buy | 23,527 | 51.37 |
| 337642 | 71,500 shares | 4/22/2008 | Sell | 26,900 | 26.14 |
| | | 4/23/2008 | Sell | 24,400 | 26.15 |
| | | 4/24/2008 | Sell | 20,200 | 27.06 |
| 337643 | 0 shares | 8/29/2007 | Buy | 1,670 | 48.1 |
| | | 8/29/2007 | Buy | 76,090 | 48.15 |
| | | 8/31/2007 | Buy | 12,610 | 48.45 |
| | | 9/7/2007 | Buy | 6,330 | 48.12 |
| | | 9/12/2007 | Buy | 30,360 | 48.95 |
| | | 9/19/2007 | Buy | 12,240 | 52.64 |
| | | 9/26/2007 | Sell | 36,920 | 50.51 |
| | | 10/1/2007 | Sell | 15,920 | 50.88 |
| | | 10/18/2007 | Sell | 42,990 | 48 |
| | | 10/18/2007 | Sell | 43,470 | 47.96 |
| | | 2/1/2008 | Buy | 76,160 | 38.48 |
| | | 2/25/2008 | Buy | 9,920 | 33.91 |
| | | 3/3/2008 | Sell | 86,080 | 29.99 |
| 337821 | 323,519 shares | 5/31/2006 | Buy | 12,500 | 53.41 |
| | | 7/3/2006 | Buy | 4,900 | 54.14 |
| | | 8/4/2006 | Buy | 5,500 | 55.82 |
| | | 10/4/2006** | Buy | 56,546 | 56.72 |
| | | 5/16/2007 | Buy | 3,100 | 56.64 |
| | | 6/7/2007 | Buy | 15,400 | 53.09 |

| | | | | | |
|---|---|---|---|---|---|
| | | 6/22/2007 | Sell | 30,000 | 51.87 |
| | | 8/23/2007 | Buy | 13,100 | 49.56 |
| | | 10/3/2007** | Buy | 15,763 | 51.37 |
| | | 4/30/2008 | Buy | 41,600 | 29.15 |
| 363057 | 0 shares | 11/20/2007 | Buy | 630 | 38.11 |
| 363058 | 0 shares | 11/20/2007 | Buy | 103 | 38.34 |
| | | 3/14/2008 | Sell | 103 | 26.63 |
| 363081 | 0 shares | 11/26/2007 | Buy | 200 | 40.24 |
| | | 3/4/2008 | Sell | 50 | 28.92 |
| | | 3/25/2008 | Sell | 50 | 29.95 |
| | | 5/28/2008 | Sell | 50 | 23.46 |
| 337644 | 0 shares | 6/9/2006 | Buy | 7,900 | 54.47 |
| | | 10/10/2006 | Buy | 100 | 55.87 |
| | | 11/6/2006 | Sell | 8,000 | 54.49 |
| | | 1/9/2007 | Buy | 800 | 56.12 |
| | | 1/9/2007 | Buy | 2,100 | 55.98 |
| | | 3/21/2007 | Buy | 2,200 | 57.1 |
| | | 3/21/2007 | Buy | 1,300 | 57.21 |
| | | 3/22/2007 | Buy | 3,000 | 57.02 |
| | | 3/23/2007 | Buy | 1,000 | 56.92 |
| | | 3/23/2007 | Buy | 1,100 | 56.74 |
| | | 3/23/2007 | Buy | 500 | 56.92 |
| | | 3/27/2007 | Buy | 10,100 | 55.88 |
| | | 3/27/2007 | Buy | 10,200 | 55.8 |
| | | 5/23/2007 | Sell | 32,300 | 56.08 |
| | | 11/21/2007 | Buy | 9,200 | 37.99 |
| | | 12/12/2007 | Sell | 9,200 | 40.87 |
| | | 1/9/2008 | Buy | 52,200 | 33.58 |
| | | 1/16/2008 | Buy | 13,000 | 35.48 |
| | | 1/22/2008 | Buy | 5,700 | 30.21 |
| | | 1/25/2008 | Sell | 8,400 | 37.9 |
| | | 1/25/2008 | Sell | 3,100 | 36.56 |
| | | 1/25/2008 | Sell | 59,400 | 37.87 |
| | | 2/11/2008 | Buy | 12,300 | 33.69 |
| | | 2/14/2008 | Buy | 52,100 | 33.64 |
| | | 3/3/2008 | Buy | 1,600 | 30.04 |
| | | 3/27/2008 | Buy | 6,400 | 27.85 |
| | | 3/27/2008 | Buy | 14,800 | 27.56 |
| | | 3/27/2008 | Buy | 2,700 | 27.94 |
| | | 4/10/2008 | Sell | 5,900 | 27.46 |
| | | 4/14/2008 | Buy | 118,500 | 24 |
| | | 4/18/2008 | Sell | 9,600 | 27.31 |
| | | 4/30/2008 | Sell | 17,500 | 29.38 |
| | | 6/2/2008 | Buy | 15,400 | 23.39 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Fire Department Pension Fund ("NYC Fire"), and hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of NYC Fire. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.     NYC Fire did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     NYC Fire understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC Fire maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.     NYC Fire's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.     NYC Fire has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6:     Beyond its pro rata share of any recovery, NYC Fire will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this _7th_ day of August, 2008.

_Lewis Finkel_

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC Fire Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|---|
| 337665 | 5,600 shares | 1/8/2007 | Sell | 5,600 | 56.34 |
| 337673 | 83,090 shares | 6/7/2006 | Buy | 2,000 | 54.47 |
| | | 6/7/2006 | Buy | 2,300 | 54.72 |
| | | 6/30/2006 | Sell | 2,200 | 54.15 |
| | | 6/30/2006 | Sell | 400 | 54.08 |
| | | 8/17/2006 | Buy | 300 | 55.67 |
| | | 10/4/2006** | Buy | 14,504 | 56.72 |
| | | 11/3/2006 | Buy | 2,400 | 54.62 |
| | | 5/31/2007 | Buy | 1,900 | 54.25 |
| | | 6/22/2007 | Sell | 300 | 51.84 |
| | | 6/22/2007 | Sell | 3,500 | 51.86 |
| | | 6/26/2007 | Sell | 2,900 | 51.99 |
| | | 9/12/2007 | Buy | 4,500 | 48.84 |
| | | 10/3/2007** | Buy | 4,619 | 51.37 |
| | | 11/21/2007 | Sell | 200 | 38.22 |
| | | 12/6/2007 | Sell | 900 | 43.17 |
| | | 2/8/2008 | Buy | 1,800 | 34.03 |
| | | 2/29/2008 | Buy | 2,200 | 30.62 |
| | | 3/31/2008 | Buy | 900 | 27 |
| | | 4/30/2008 | Buy | 9,600 | 29.15 |
| 337675 | 26,400 shares | 8/3/2006 | Buy | 6,200 | 54.2 |
| | | 9/6/2006 | Buy | 1,700 | 55.44 |
| | | 9/6/2006 | Buy | 800 | 55.19 |
| | | 10/4/2006** | Buy | 4,414 | 56.72 |
| | | 1/4/2007 | Sell | 13,700 | 57.17 |
| | | 5/4/2007 | Sell | 25,814 | 55.9 |
| | | 2/5/2008 | Buy | 20,000 | 34.43 |
| 337678 | 0 shares | 10/1/2007 | Sell | 5,512 | 50.38 |
| | | 10/3/2007** | Buy | 5,512 | 51.37 |
| 337681 | 0 shares | 10/3/2007** | Buy | 4,331 | 51.37 |
| | | 10/11/2007 | Sell | 400 | 51.14 |
| | | 10/22/2007 | Sell | 3,931 | 46.26 |
| 337687 | 9,100 shares | 5/8/2006 | Buy | 1,700 | 56.21 |
| | | 10/16/2006 | Buy | 1,200 | 54.82 |
| | | 11/13/2007 | Sell | 12,000 | 43.42 |
| 337688 | 0 shares | 8/29/2007 | Buy | 620 | 48.1 |
| | | 8/29/2007 | Buy | 28,110 | 48.15 |
| | | 8/31/2007 | Buy | 4,660 | 48.45 |
| | | 9/7/2007 | Buy | 2,340 | 48.12 |
| | | 9/12/2007 | Buy | 11,220 | 48.95 |
| | | 9/19/2007 | Buy | 4,520 | 52.64 |

| | | | | | |
|---|---|---|---|---|---|
| | | 9/26/2007 | Sell | 13,635 | 50.51 |
| | | 10/1/2007 | Sell | 5,880 | 50.88 |
| | | 10/18/2007 | Sell | 16,065 | 47.96 |
| | | 10/18/2007 | Sell | 15,890 | 48 |
| | | 2/1/2008 | Buy | 28,140 | 38.48 |
| | | 2/25/2008 | Buy | 3,680 | 33.91 |
| | | 3/3/2008 | Sell | 31,820 | 29.99 |
| 337690 | 0 shares | 6/9/2006 | Buy | 1,900 | 54.47 |
| | | 11/6/2006 | Sell | 1,900 | 54.49 |
| | | 1/9/2007 | Buy | 200 | 56.12 |
| | | 1/9/2007 | Buy | 500 | 55.98 |
| | | 3/21/2007 | Buy | 500 | 57.1 |
| | | 3/21/2007 | Buy | 300 | 57.21 |
| | | 3/22/2007 | Buy | 800 | 57.02 |
| | | 3/23/2007 | Buy | 200 | 56.92 |
| | | 3/23/2007 | Buy | 300 | 56.74 |
| | | 3/23/2007 | Buy | 100 | 56.92 |
| | | 3/27/2007 | Buy | 2,500 | 55.88 |
| | | 3/27/2007 | Buy | 2,400 | 55.8 |
| | | 5/23/2007 | Sell | 7,800 | 56.08 |
| | | 11/21/2007 | Buy | 2,200 | 37.99 |
| | | 12/12/2007 | Sell | 2,200 | 40.87 |
| | | 1/9/2008 | Buy | 12,700 | 33.58 |
| | | 1/16/2008 | Buy | 3,100 | 35.48 |
| | | 1/22/2008 | Buy | 1,400 | 30.21 |
| | | 1/25/2008 | Sell | 2,000 | 37.9 |
| | | 1/25/2008 | Sell | 800 | 36.56 |
| | | 1/25/2008 | Sell | 14,400 | 37.87 |
| | | 2/11/2008 | Buy | 3,000 | 33.69 |
| | | 2/14/2008 | Buy | 12,600 | 33.64 |
| | | 3/3/2008 | Buy | 400 | 30.04 |
| | | 3/27/2008 | Buy | 1,600 | 27.85 |
| | | 3/27/2008 | Buy | 3,600 | 27.56 |
| | | 3/27/2008 | Buy | 600 | 27.94 |
| | | 4/10/2008 | Sell | 1,400 | 27.46 |
| | | 4/14/2008 | Buy | 28,700 | 24 |
| | | 4/18/2008 | Sell | 2,400 | 27.31 |
| | | 4/30/2008 | Sell | 4,200 | 29.38 |
| | | 6/2/2008 | Buy | 3,700 | 23.39 |
| 337806 | 6,200 shares | 11/30/2007 | Sell | 6,200 | 44.49 |
| 337807 | 2,520 shares | 5/8/2006 | Buy | 440 | 55.43 |
| | | 12/1/2006 | Sell | 940 | 53.95 |
| | | 6/26/2007 | Sell | 2,020 | 51.86 |
| 337849 | 84,781 shares | 5/31/2006 | Buy | 1,000 | 53.5 |
| | | 6/30/2006 | Sell | 3,500 | 54.12 |
| | | 10/4/2006** | Buy | 13,663 | 56.72 |
| | | 10/17/2006 | Buy | 4,200 | 55.02 |
| | | 2/7/2007 | Buy | 900 | 57.36 |

|        |               | 3/2/2007    | Buy  | 900   | 54.99 |
|--------|---------------|-------------|------|-------|-------|
|        |               | 5/31/2007   | Buy  | 1,400 | 54.18 |
|        |               | 6/22/2007   | Sell | 2,700 | 51.87 |
|        |               | 6/27/2007   | Sell | 3,400 | 52.06 |
|        |               | 10/1/2007   | Buy  | 3,700 | 50.98 |
|        |               | 10/3/2007** | Buy  | 3,833 | 51.37 |
|        |               | 1/7/2008    | Buy  | 3,200 | 35.84 |
|        |               | 2/26/2008   | Sell | 5,200 | 34.8  |
|        |               | 4/4/2008    | Buy  | 1,900 | 27.88 |
|        |               | 4/30/2008   | Buy  | 8,200 | 29.15 |
| 348872 | 0 shares      | 11/20/2007  | Buy  | 510   | 38.11 |
| 348873 | 0 shares      | 11/20/2007  | Buy  | 84    | 38.34 |
|        |               | 3/14/2008   | Sell | 84    | 26.63 |
| 362868 | 0 shares      | 11/30/2007  | Buy  | 1,614 | 43.27 |
|        |               | 11/30/2007  | Sell | 1,614 | 43.27 |
| 337689 | 19,800 shares | 4/22/2008   | Sell | 7,500 | 26.14 |
|        |               | 4/23/2008   | Sell | 6,700 | 26.15 |
|        |               | 4/24/2008   | Sell | 5,600 | 27.06 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Board of Education Retirement System ("NYC BERS"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYC BERS. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYC BERS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYC BERS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC BERS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYC BERS' transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYC BERS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.    Beyond its pro rata share of any recovery, NYC BERS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such

reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this **7th** day of August, 2008.

_Lewis F_____

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC BERS Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337500 | 2,300 shares | 1/8/2007 | Sell | 2,300 | 56.34 |
| 337504 | 78,222 shares | 6/7/2006 | Buy | 2,100 | 54.72 |
| | | 6/7/2006 | Buy | 2,000 | 54.47 |
| | | 6/30/2006 | Sell | 1,900 | 54.15 |
| | | 6/30/2006 | Sell | 600 | 54.08 |
| | | 10/4/2006** | Buy | 13,663 | 56.72 |
| | | 12/11/2006 | Buy | 600 | 56.28 |
| | | 1/25/2007 | Buy | 100 | 55.76 |
| | | 4/12/2007 | Buy | 3,000 | 53.35 |
| | | 5/31/2007 | Buy | 700 | 54.29 |
| | | 6/22/2007 | Sell | 300 | 51.84 |
| | | 6/22/2007 | Sell | 3,300 | 51.86 |
| | | 9/12/2007 | Buy | 2,300 | 48.84 |
| | | 10/3/2007** | Buy | 4,102 | 51.37 |
| | | 10/18/2007 | Buy | 900 | 47.81 |
| | | 12/27/2007 | Buy | 600 | 38.52 |
| | | 2/29/2008 | Buy | 900 | 30.62 |
| | | 3/31/2008 | Buy | 900 | 27 |
| | | 4/30/2008 | Buy | 9,000 | 29.15 |
| 337801 | 8,800 shares | 11/30/2007 | Sell | 8,800 | 44.54 |
| 337802 | 3,600 shares | 5/8/2006 | Buy | 630 | 55.43 |
| | | 12/1/2006 | Sell | 1,340 | 53.95 |
| | | 6/26/2007 | Sell | 2,890 | 51.86 |
| 348618 | 30,700 shares | 9/6/2006 | Sell | 900 | 55.14 |
| | | 9/6/2006 | Sell | 8,700 | 55.21 |
| | | 4/22/2008 | Sell | 7,900 | 26.14 |
| | | 4/23/2008 | Sell | 7,200 | 26.15 |
| | | 4/24/2008 | Sell | 6,000 | 27.06 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Firefighters' Variable Supplements Fund ("FFVSF"), and hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of FFVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2. FFVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. FFVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. FFVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4. FFVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5. FFVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6. Beyond its pro rata share of any recovery, FFVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs

and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day of August, 2008.

_Lewis Fin_
LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC FFVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 29,682 shares | 5/31/2006 | Buy | 1,100 | 53.5 |
| | 6/30/2006 | Sell | 1,100 | 54.12 |
| | 8/24/2006 | Buy | 200 | 56.63 |
| | 10/4/2006** | Buy | 5,360 | 56.72 |
| | 11/13/2006 | Buy | 400 | 55.65 |
| | 11/21/2006 | Buy | 600 | 54.67 |
| | 2/7/2007 | Buy | 400 | 57.23 |
| | 6/22/2007 | Sell | 500 | 51.87 |
| | 8/10/2007 | Buy | 600 | 46.79 |
| | 10/3/2007** | Buy | 1,328 | 51.37 |
| | 10/3/2007 | Buy | 1,800 | 51.26 |
| | 12/11/2007 | Sell | 4,000 | 41.95 |
| | 12/12/2007 | Sell | 100 | 40.81 |
| | 4/2/2008 | Buy | 900 | 28.82 |
| | 4/30/2008 | Buy | 2,800 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of FOVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    FOVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    FOVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. FOVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    FOVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    FOVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919 (W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, FOVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this $7^{h}$ day of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC FOVSF Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 21,414 shares | 9/15/2006 | Buy | 200 | 55.1 |
| | 9/29/2006 | Buy | 459 | 55.78 |
| | 10/4/2006** | Buy | 3,542 | 56.72 |
| | 10/6/2006 | Buy | 500 | 56.43 |
| | 10/6/2006 | Buy | 500 | 56.54 |
| | 10/6/2006 | Sell | 500 | 56.34 |
| | 1/26/2007 | Sell | 100 | 56.26 |
| | 6/15/2007 | Buy | 500 | 54.04 |
| | 12/21/2007 | Buy | 1,300 | 39.5 |
| | 1/28/2008 | Sell | 2,700 | 37.6 |
| | 3/20/2008 | Buy | 800 | 30.72 |
| | 4/14/2008 | Buy | 100 | 25.01 |
| | 4/14/2008 | Buy | 1,300 | 25.54 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07.  The share price shown is the closing price on the day of the acquisition.

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Officers' Variable Supplements Fund ("POVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of POVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    POVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    POVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. POVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    POVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    POVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) *(Appointed)*
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919 (W.D. Wash.) *(Motion withdrawn)*

6.    Beyond its pro rata share of any recovery, POVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC POVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 54,734 shares | 6/7/2006 | Buy | 1,600 | 54.47 |
| | 6/30/2006 | Sell | 2,100 | 54.15 |
| | 6/30/2006 | Sell | 400 | 54.08 |
| | 9/26/2006 | Buy | 200 | 55.5 |
| | 10/20/2006 | Buy | 9,354 | 55.11 |
| | 12/11/2006 | Sell | 300 | 56.28 |
| | 5/31/2007 | Buy | 2,600 | 54.23 |
| | 6/22/2007 | Sell | 2,800 | 51.86 |
| | 6/22/2007 | Sell | 300 | 51.84 |
| | 9/12/2007 | Buy | 1,800 | 48.9 |
| | 10/3/2007** | Buy | 2,461 | 51.37 |
| | 10/5/2007 | Buy | 300 | 51.94 |
| | 10/18/2007 | Buy | 400 | 47.81 |
| | 11/6/2007 | Buy | 400 | 42.68 |
| | 12/10/2007 | Sell | 7,600 | 44.46 |
| | 12/27/2007 | Buy | 300 | 38.52 |
| | 1/15/2008 | Buy | 200 | 35.03 |
| | 1/31/2008 | Buy | 100 | 38.93 |
| | 2/29/2008 | Buy | 700 | 30.62 |
| | 3/31/2008 | Buy | 600 | 27 |
| | 4/30/2008 | Buy | 5,400 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), and hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of PSOVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2. PSOVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. PSOVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. PSOVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4. PSOVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5. PSOVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919 (W.D. Wash.) (*Motion withdrawn*)

6. Beyond its pro rata share of any recovery, PSOVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this __7th__ day

of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC PSOVSF Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 56,177 shares | 6/7/2006 | Buy | 1,500 | 54.47 |
| | 6/30/2006 | Sell | 2,100 | 54.15 |
| | 6/30/2006 | Sell | 400 | 54.08 |
| | 9/26/2006 | Buy | 200 | 55.5 |
| | 10/4/2006** | Buy | 9,564 | 56.72 |
| | 11/3/2006 | Buy | 1,800 | 54.62 |
| | 12/11/2006 | Sell | 700 | 56.11 |
| | 12/11/2006 | Sell | 2,600 | 56.28 |
| | 1/25/2007 | Buy | 100 | 55.76 |
| | 5/31/2007 | Buy | 3,300 | 54.23 |
| | 6/22/2007 | Sell | 300 | 51.84 |
| | 6/22/2007 | Sell | 2,900 | 51.86 |
| | 9/12/2007 | Buy | 2,900 | 48.84 |
| | 10/3/2007** | Buy | 2,534 | 51.37 |
| | 12/10/2007 | Sell | 10,900 | 44.46 |
| | 12/27/2007 | Buy | 400 | 38.52 |
| | 1/15/2008 | Buy | 100 | 35.03 |
| | 1/31/2008 | Buy | 200 | 38.93 |
| | 2/29/2008 | Buy | 700 | 30.62 |
| | 3/31/2008 | Buy | 500 | 27 |
| | 4/30/2008 | Buy | 5,200 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

# EXHIBIT C

# NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- LIFO

| Fund | Manager | Acct. # | Shares Purchased, Class Period | Expenditure | Shares Sold, Class Period | Proceeds | LIFO Recognized Sales** | LIFO Recognized Proceeds** | Shares Retained (LIFO)** | Valuation | (Damages) / Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NYC Board of Education Retirement System | Fidelity Management - LCG | 337500 | 411,495 | $ 1,974,536 | 52,130 | $ 2,152,824 | 6,730 | $ 356,012 | 34,765 | $ 548,154 | $ (1,070,370) |
| | Blackrock Russell 3000 | 337504 | 40,865 | $ 1,939,615 | 2,300 | $ 129,582 | 6,100 | $ 322,023 | | $ 548,154 | $ (1,069,438) |
| | PIM Denali | 337801 | 0 | $ - | 8,800 | $ 391,952 | | | | | |
| | PIM Piedmont | 337802 | 630 | $ 34,921 | 4,230 | $ 222,168 | 630 | $ 33,989 | | | $ (932) |
| | Aronson Johnson | 348618 | 0 | $ - | 30,700 | $ 1,087,099 | | | | | |
| NYC Employees' Retirement System | PIM Affinity | 337816 | 905,983 | $ 42,754,434 | 510,962 | $ 23,763,880 | 363,165 | $ 16,141,798 | 542,818 | $ 8,558,829 | $ (18,053,808) |
| | Blackrock Russell 3000 | 337549 | 0 | $ 1,505,448 | 34,800 | $ 1,505,448 | | | | | $ (8,802,873) |
| | FIS - Transition | 337545 | 456,851 | $ 21,672,169 | 258,077 | $ 12,346,495 | 213,676 | $ 9,035,059 | 243,175 | $ 3,834,237 | $ (1,623) |
| | BGI Russell 3000 | 337548 | 9,418 | $ 510,174 | 29,235 | $ 523,677 | | $ 508,551 | | | $ (7,805,945) |
| | Amalgated Bank | 337551 | 331,890 | $ 15,576,677 | 121,533 | $ 5,915,510 | 88,045 | $ 3,925,810 | 243,846 | $ 3,844,817 | $ (1,396,470) |
| | Chicago Equity | 337568 | 80,807 | $ 3,734,424 | 27,200 | $ 1,538,026 | 26,000 | $ 1,473,790 | 54,807 | $ 864,164 | $ (4,992) |
| | CP Twin | 337580 | 5,020 | $ 257,900 | 5,020 | $ 252,908 | 5,020 | $ 252,908 | | | $ (22,119) |
| | CP Ten | 349445 | 990 | $ 37,729 | | | | | 990 | $ 15,610 | $ (1,885) |
| | Attucks Transition | 349446 | 161 | $ 6,173 | 161 | $ 4,287 | 161 | $ 4,287 | | | 3,922 |
| | Franklin Port | 349466 | 14,526 | $ 624,618 | 14,526 | $ 628,540 | 14,526 | $ 628,540 | | | $ 3,922 |
| | Altucks Transition | 337570 | 3,839 | $ 197,209 | 3,839 | $ 179,056 | 3,839 | $ 179,056 | | | $ (18,153) |
| | PIM-Piedmont | 337818 | 2,480 | $ 137,466 | 16,570 | $ 870,293 | 2,480 | $ 133,796 | | | $ (3,670) |
| NYC Fire Dept Pension Fund | Northern Trust | 337849 | 305,015 | $ 12,817,515 | 243,206 | $ 10,775,460 | 171,086 | $ 7,522,668 | 133,929 | $ 2,111,712 | $ (3,183,135) |
| | | 337655 | 42,896 | $ 2,028,734 | 14,800 | $ 687,433 | 12,300 | $ 552,133 | 30,596 | $ 482,419 | $ (994,182) |
| | PIM Affinity | 337665 | 0 | | 5,600 | $ 315,504 | | | | | $ (11,395) |
| | | 348872 | 510 | $ 19,436 | 0 | | 440 | $ 23,738 | 510 | $ 8,041 | $ (651) |
| | PIM Atlanta Life | 348807 | 440 | $ 24,389 | 2,960 | $ 155,470 | 440 | $ 23,738 | | $ 8,041 | |
| | Blackrock Russell 3000 | 337673 | 47,023 | $ 2,198,141 | 10,400 | $ 535,092 | 10,400 | $ 535,092 | 36,623 | $ 577,449 | $ (1,085,602) |
| | Lord Abbett | 337676 | 83,300 | $ 2,676,913 | 37,100 | $ 1,508,629 | 37,100 | $ 1,508,629 | 46,200 | $ 728,454 | $ (439,830) |
| | Westpeak | 337675 | 33,114 | $ 1,413,402 | 39,514 | $ 2,226,232 | 13,114 | $ 749,727 | 20,000 | $ 315,348 | $ (348,327) |
| | | 337678 | 5,513 | $ 283,151 | 5,513 | $ 277,695 | 5,513 | $ 277,695 | | $ (5,456) | $ (5,456) |
| | | 337681 | 4,331 | $ 222,483 | 4,331 | $ 202,304 | 4,331 | $ 202,304 | | | $ (20,179) |
| | | 337687 | 2,900 | $ 161,341 | 12,000 | $ 521,040 | 2,900 | $ 125,918 | | | $ (35,423) |
| | Iridian Asset Mgmt | 348873 | 84 | $ 3,221 | 84 | $ 2,237 | 84 | $ 2,237 | | | $ (984) |
| | Aronson Johnson | 363868 | 1,614 | $ 69,838 | 1,614 | $ 69,838 | 1,614 | $ 69,838 | | | |
| | PIM Rasara Strategies | 337688 | 83,290 | $ 3,716,464 | 83,290 | $ 3,475,357 | 83,290 | $ 3,475,357 | | | $ (241,107) |
| | | 337689 | 0 | | 19,800 | $ 522,791 | | | | | |
| | | 337806 | 0 | $ - | 6,200 | $ 275,838 | | | | | |
| NYC Police Pension Fund | Northern Trust | 337821 | 941,532 | $ 39,068,357 | 565,160 | $ 23,518,965 | 478,260 | $ 20,763,491 | 463,272 | $ 7,304,595 | $ (11,000,271) |
| | Northern Trust | 337627 | 168,409 | $ 8,112,001 | 30,000 | $ 1,556,100 | 30,000 | $ 1,556,100 | 138,409 | $ 2,182,350 | $ (4,373,551) |
| | | | 0 | $ 867,636 | 15,400 | $ 867,636 | | | | | |
| | Blackrock Russell 3000 | 337629 | 179,083 | $ 8,587,257 | 45,700 | $ 2,367,700 | 45,700 | $ 2,367,700 | 133,383 | $ 2,103,103 | $ (4,116,454) |
| | | 337635 | 23,527 | $ 1,208,582 | 23,527 | $ 1,185,290 | 23,527 | $ 1,185,290 | 0 | $ - | $ (23,292) |
| | Aronson Johnson | 337642 | 0 | $ - | 71,500 | $ 1,887,838 | 0 | $ - | 0 | $ - | $ - |

## NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- LIFO

| Name | ID | Shares | $ | Shares | $ | Shares | $ | Shares | $ | $ Damages |
|---|---|---|---|---|---|---|---|---|---|---|
| **NYC Teachers Retirement System** | | | | | | | | | | |
| Iridian Asset Mgmt | 363057 | 630 | 24,009 | 0 | - | 0 | - | 630 | 9,933 | (14,076) |
| | 363068 | 103 | 3,949 | 103 | 2,743 | 103 | 2,743 | 0 | - | (1,206) |
| | 363081 | 200 | 8,048 | 150 | 4,117 | 150 | 4,117 | 50 | 788 | (3,143) |
| Mellon Russell 3000 | 337643 | 225,380 | 10,057,074 | 225,380 | 9,404,719 | 225,380 | 9,404,719 | 0 | - | (652,355) |
| Lord Abbett | 337644 | 344,200 | 11,067,437 | 153,400 | 6,242,822 | 153,400 | 6,242,822 | 190,800 | 3,008,420 | (1,816,195) |
| **NYC Teachers Retirement System** | | **853,483** | **41,024,998** | **274,739** | **13,115,627** | **224,519** | **11,060,201** | **628,964** | **9,917,127** | **(20,047,670)** |
| BGI | 337478 | 520,549 | 24,270,969 | 72,589 | 3,518,842 | 72,589 | 3,518,842 | 447,960 | 7,063,165 | (13,688,962) |
| | 337479 | 176,667 | 8,343,788 | 31,618 | 1,661,067 | 30,898 | 1,622,129 | 145,789 | 2,298,713 | (4,422,946) |
| ING (fmrly AELTUS) | 337480 | 107,105 | 5,805,582 | 72,800 | 3,337,834 | 72,800 | 3,337,834 | 34,305 | 540,901 | (1,926,847) |
| | 337485 | 22,247 | 1,142,828 | 22,247 | 1,120,804 | 22,247 | 1,120,804 | 0 | - | (22,024) |
| | 363220 | 710 | 27,058 | 0 | - | 0 | - | 710 | 11,195 | (15,863) |
| | 363221 | 116 | 4,447 | 116 | 3,089 | 116 | 3,089 | 0 | - | (1,358) |
| | 363242 | 500 | 20,120 | 300 | 8,233 | 300 | 8,233 | 200 | 3,153 | (8,734) |
| Westpeak | 337481 | 25,569 | 1,410,206 | 75,069 | 3,465,758 | 25,569 | 1,449,270 | 0 | - | 39,064 |
| **NYC TRS Variable Annuity** | | **1,347,398** | **67,619,390** | **428,483** | **16,773,260** | **397,718** | **15,280,960** | **949,680** | **14,973,984** | **(37,364,456)** |
| Enhanced VAR A | | 70,236 | 2,789,844 | 71,901 | 3,562,557 | 41,136 | 2,070,247 | 29,100 | 458,831 | (260,766) |
| Goldman | | 271,200 | 10,373,995 | 271,200 | 8,874,255 | 271,200 | 8,874,255 | 0 | - | (1,499,740) |
| Wellington | | 20,390 | 1,137,762 | 20,390 | 1,116,696 | 20,390 | 1,116,696 | 0 | - | (21,066) |
| MCM | | 985,572 | 53,317,789 | 64,992 | 3,219,752 | 64,992 | 3,219,752 | 920,580 | 14,515,153 | (35,582,884) |
| **NYC FOVSF (Northern Trust)** | 337852 | 9,201 | 432,662 | 3,300 | 135,316 | 3,300 | 135,316 | 5,901 | 93,043 | (204,303) |
| **NYC FFVSF (Northern Trust)** | 337846 | 15,488 | 748,269 | 5,700 | 257,348 | 5,700 | 257,348 | 9,788 | 154,331 | (336,590) |
| **NYC POVSF (Blackrock Northern Trust)** | 337860 | 26,415 | 1,238,487 | 13,500 | 650,887 | 12,600 | 602,180 | 13,815 | 217,827 | (418,480) |
| **NYC PSOVSF (Blackrock Russell 3000)** | 337835 | 28,998 | 1,403,145 | 19,900 | 971,512 | 18,900 | 917,390 | 10,098 | 169,219 | (326,536) |
| **TOTAL NYC FUNDS** | | **4,475,008** | **209,081,793** | **2,117,080** | **92,115,079** | **1,681,978** | **73,037,354** | **2,793,030** | **44,038,821** | **(92,005,618)** |

Pursuant to the PSLRA, shares held at the end of the Class Period were valued at their average closing price during the 90 days following the close of the class period. As 90 days have not yet passed, the shares were valued at the average closing price between 6/7/08 and 8/1/08 -- $15.7674

# NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- FIFO

| Fund | Manager | Acct. # | Shares Purchased, Class Period | Expenditure | Shares Sold, Class Period | Proceeds | FIFO Recognized Sales** | FIFO Recognized Proceeds** | Shares Retained (FIFO)** | Valuation | (Damages) / Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NYC Board of Education Retirement System | | | 41,495 | $ 1,974,536 | 52,130 | $ 2,152,824 | 630 | $ 32,672 | 40,865 | $ 644,335 | $ (1,297,529) |
| | Fidelity Management - LCG | 337500 | 0 | $ - | 30,700 | $ 1,087,099 | 0 | $ - | 0 | $ - | $ - |
| | Blackrock Russell 3000 | 337504 | 0 | $ - | 2,300 | $ 129,582 | 0 | $ - | 0 | $ - | $ - |
| | PIM Denali | 337801 | 40,865 | $ 1,939,615 | 6,100 | $ 322,023 | 0 | $ - | 40,865 | $ 644,335 | $ (1,295,280) |
| | PIM Piedmont | 337802 | 0 | $ - | 8,800 | $ 391,952 | 0 | $ - | 0 | $ - | $ - |
| | Aronson Johnson | 348618 | 630 | $ 34,921 | 4,230 | $ 222,168 | 630 | $ 32,672 | 0 | $ - | $ (2,249) |
| NYC Employees' Retirement System | | | 905,983 | $ 42,754,434 | 510,962 | $ 23,763,880 | 35,146 | $ 1,549,256 | 870,837 | $ 13,730,835 | $ (27,474,343) |
| | PIM Affinity | 337816 | 0 | $ - | 34,800 | $ 1,505,448 | 0 | $ - | 0 | $ - | $ - |
| | Blackrock Russell 3000 | 337549 | 456,851 | $ 21,672,169 | 258,077 | $ 12,346,495 | 0 | $ - | 456,851 | $ 7,203,352 | $ (14,468,817) |
| | FIS - Transition | 337545 | 9,418 | $ 510,174 | 29,235 | $ 523,677 | 9,119 | $ 355,851 | 299 | $ 4,714 | $ (149,609) |
| | BGI Russell 3000 | 337548 | 331,890 | $ 15,576,572 | 121,533 | $ 5,915,150 | 0 | $ - | 331,890 | $ 5,233,042 | $ (10,343,530) |
| | Amalgated Bank | 337551 | 80,807 | $ 3,734,424 | 27,200 | $ 1,538,026 | 0 | $ - | 80,807 | $ 1,274,116 | $ (2,460,308) |
| | Chicago Equity | 337568 | 5,020 | $ 257,900 | 5,020 | $ 252,908 | 5,020 | $ 252,908 | 0 | $ - | $ (4,992) |
| | CP Twin | 349445 | 990 | $ 37,729 | 0 | $ - | 0 | $ - | 990 | $ 15,610 | $ (22,119) |
| | CP Ten | 349446 | 161 | $ 6,173 | 161 | $ 4,287 | 161 | $ 4,287 | 0 | $ - | $ (1,886) |
| | Attucks Transition | 349466 | 14,526 | $ 624,618 | 14,526 | $ 628,540 | 14,526 | $ 628,540 | 0 | $ - | $ 3,922 |
| | Franklin Port | 337570 | 3,839 | $ 197,209 | 3,839 | $ 179,056 | 3,839 | $ 179,056 | 0 | $ - | $ (18,153) |
| | PIM-Piedmont | 337818 | 2,480 | $ 137,466 | 16,570 | $ 870,293 | 2,480 | $ 128,613 | 0 | $ - | $ (8,853) |
| NYC Fire Dept'l Pension Fund | | | 305,015 | $ 12,817,515 | 243,206 | $ 10,775,460 | 143,386 | $ 6,417,869 | 156,629 | $ 2,469,632 | $ (3,930,014) |
| | Northern Trust | 337849 | 42,896 | $ 2,028,734 | 14,800 | $ 687,433 | 0 | $ - | 42,896 | $ 676,358 | $ (1,352,376) |
| | | 337665 | 0 | $ - | 5,600 | $ 315,504 | 0 | $ - | 0 | $ - | $ - |
| | | 348872 | 510 | $ 19,436 | 0 | $ - | 0 | $ - | 510 | $ 8,041 | $ (11,395) |
| | PIM Affinity | 337807 | 440 | $ 24,389 | 2,960 | $ 155,470 | 440 | $ 22,818 | 0 | $ - | $ (1,571) |
| | PIM Atlanta Life | 337673 | 47,023 | $ 2,198,143 | 10,400 | $ 535,092 | 0 | $ - | 47,023 | $ 741,430 | $ (1,456,713) |
| | Blackrock Russell 3000 | 337690 | 83,300 | $ 2,676,913 | 37,100 | $ 1,508,629 | 37,100 | $ 1,508,629 | 46,200 | $ 728,454 | $ (439,830) |
| | Lord Abbett | 337675 | 33,114 | $ 1,413,402 | 39,514 | $ 2,226,232 | 13,114 | $ 733,073 | 20,000 | $ 315,348 | $ (364,981) |
| | Westpeak | 337678 | 5,513 | $ 283,151 | 5,513 | $ 277,695 | 5,513 | $ 277,695 | 0 | $ - | $ (5,456) |
| | | 337681 | 4,331 | $ 222,483 | 4,331 | $ 202,304 | 4,331 | $ 202,304 | 0 | $ - | $ (20,179) |
| | | 337687 | 2,900 | $ 161,341 | 12,000 | $ 521,040 | 2,900 | $ 125,918 | 0 | $ - | $ (35,423) |
| | | 337688 | 84 | $ 3,221 | 84 | $ 2,237 | 84 | $ 2,237 | 0 | $ - | $ (984) |
| | | 363868 | 1,614 | $ 69,838 | 1,614 | $ 69,838 | 1,614 | $ 69,838 | 0 | $ - | $ - |
| | Iridian Asset Mgmt | 348873 | 83,290 | $ 3,716,464 | 83,290 | $ 3,475,357 | 83,290 | $ 3,475,357 | 0 | $ - | $ (241,107) |
| | Aronson Johnson | 337689 | 0 | $ - | 19,800 | $ 522,791 | 0 | $ - | 0 | $ - | $ - |
| | PIM Rasara Strategies | 337806 | 0 | $ - | 6,200 | $ 275,838 | 0 | $ - | 0 | $ - | $ - |
| NYC Police Pension Fund | | | 941,532 | $ 39,068,357 | 565,160 | $ 23,518,965 | 402,560 | $ 16,839,691 | 538,972 | $ 8,498,187 | $ (13,730,479) |
| | Northern Trust | 337821 | 168,409 | $ 8,112,001 | 30,000 | $ 1,556,100 | 0 | $ - | 168,409 | $ 2,655,372 | $ (5,456,629) |
| | | 337627 | 0 | $ - | 15,400 | $ 867,636 | 0 | $ - | 0 | $ - | $ - |
| | Blackrock Russell 3000 | 337629 | 179,083 | $ 8,587,257 | 45,700 | $ 2,367,700 | 0 | $ - | 179,083 | $ 2,823,673 | $ (5,763,584) |
| | | 337635 | 23,527 | $ 1,208,562 | 23,527 | $ 1,185,290 | 23,527 | $ 1,185,290 | 0 | $ - | $ (23,292) |

# NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- FIFO

| Entity | Account # | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Damages |
|---|---|---|---|---|---|---|---|---|---|---|
| Aronson Johnson | 337642 | 0 | $ - | 71,500 | $ 1,887,838 | 0 | $ - | 0 | $ - | $ - |
|  | 363057 | 630 | $ 24,009 | 0 | $ - | 0 | $ - | 630 | $ 9,933 | $ (14,076) |
|  | 363058 | 103 | $ 3,949 | 103 | $ 2,743 | 103 | $ 2,743 | 0 | $ - | $ (1,206) |
|  | 363081 | 200 | $ 8,048 | 150 | $ 4,117 | 150 | $ 4,117 | 50 | $ 788 | $ (3,143) |
| Indian Asset Mgmt | 337643 | 225,380 | $ 10,057,074 | 225,380 | $ 9,404,719 | 225,380 | $ 9,404,719 | 0 | $ - | $ (652,355) |
| Lord Abbett | 337644 | 344,200 | $ 11,067,437 | 153,400 | $ 6,242,822 | 153,400 | $ 6,242,822 | 190,800 | $ 3,008,420 | $ (1,816,195) |
| NYC Teachers Retirement System | | 853,483 | $ 41,024,998 | 274,739 | $ 13,115,627 | 60,420 | $ 2,343,608 | 793,063 | $ 12,504,542 | $ (26,176,848) |
| BGI | 337478 | 520,549 | $ 24,270,969 | 72,589 | $ 3,518,842 | 0 | $ - | 520,549 | $ 8,207,704 | $ (16,063,265) |
| Mellon Russell 3000 | 337479 | 176,687 | $ 8,343,788 | 31,618 | $ 1,661,067 | 0 | $ - | 176,687 | $ 2,785,895 | $ (5,557,893) |
| ING (fmrly AEL/TIUS) | 337480 | 107,105 | $ 5,805,582 | 72,800 | $ 3,337,834 | 12,188 | $ 334,439 | 94,917 | $ 1,496,594 | $ (3,974,549) |
|  | 337485 | 22,247 | $ 1,142,828 | 22,247 | $ 1,120,804 | 22,247 | $ 1,120,804 | 0 | $ - | $ (22,024) |
|  | 363220 | 710 | $ 27,058 | 0 | $ - | 0 | $ - | 710 | $ 11,195 | $ (15,863) |
|  | 363221 | 116 | $ 4,447 | 116 | $ 3,089 | 116 | $ 3,089 | 0 | $ - | $ (1,358) |
|  | 363242 | 500 | $ 20,120 | 300 | $ 8,233 | 300 | $ 8,233 | 200 | $ 3,153 | $ (8,734) |
| Westpeak | 337481 | 25,569 | $ 1,410,206 | 75,069 | $ 3,465,758 | 25,569 | $ 877,043 | 0 | $ - | $ (533,163) |
| NYC TRS Variable Annuity | | 1,347,398 | $ 67,619,390 | 428,483 | $ 16,773,260 | 356,582 | $ 13,210,703 | 990,816 | $ 15,622,592 | $ (38,786,095) |
| Enhanced VAR A | | 70,236 | $ 2,789,844 | 71,901 | $ 3,562,557 | 0 | $ - | 70,236 | $ 1,107,439 | $ (1,682,405) |
| Goldman | | 271,200 | $ 10,373,995 | 271,200 | $ 8,874,255 | 271,200 | $ 8,874,255 | 0 | $ - | $ (1,499,740) |
| Wellington | | 20,390 | $ 1,137,762 | 20,390 | $ 1,116,696 | 20,390 | $ 1,116,696 | 0 | $ - | $ (21,006) |
| MCM | | 985,572 | $ 53,317,789 | 64,992 | $ 3,219,752 | 64,992 | $ 3,219,752 | 920,580 | $ 14,515,153 | $ (35,582,884) |
| NYC FOVSF (Northern Trust) | 337852 | 9,201 | $ 432,662 | 3,300 | $ 135,316 | 0 | $ - | 9,201 | $ 145,076 | $ (287,586) |
| NYC FFVSF (Northern Trust) | 337846 | 15,488 | $ 748,269 | 5,700 | $ 257,348 | 0 | $ - | 15,488 | $ 244,205 | $ (504,064) |
| NYC POVSF (Blackrock Russell 3000) | 337860 | 26,415 | $ 1,238,487 | 13,500 | $ 650,887 | 0 | $ - | 26,415 | $ 416,496 | $ (821,991) |
| NYC PSOVSF (Blackrock Russell 3000) | 337835 | 28,998 | $ 1,403,145 | 19,900 | $ 971,512 | 0 | $ - | 28,998 | $ 457,223 | $ (945,922) |
| TOTAL NYC FUNDS | | 4,475,008 | $ 209,081,793 | 2,117,080 | $ 92,115,079 | 1,003,724 | $ 40,393,799 | 3,471,284 | $ 54,733,123 | $ (113,954,871) |

Pursuant to FIFO methodology, proceeds from class period sales of shares that were purchased pre-class period are disregarded in the calculation.

Pursuant to the PSLRA, shares held at the end of the Class Period were valued at their average closing price during the 90 days following the close of the class period. As 90 days have not yet passed, the shares were valued at the average closing price between 6/7/08 and 8/1/08 -- $15.7674

Only when all pre-class period positions have been closed by subsequent sales do we begin to match sales against class period purchases, and offset the proceeds of the sales against the class period expenditures.

# EXHIBIT D

## DECLARATION OF ILYSE SISOLAK IN SUPPORT OF THE NEW YORK CITY PENSION FUNDS FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL

ILYSE SISOLAK hereby declares, pursuant to 28 U.S.C. § 1746:

1.      I am an Assistant Corporation Counsel at the New York City Law Department ("Law Department").

2.      I submit this declaration in support of the application made by certain New York City Pension Funds described below (collectively, the "NYC Pension Funds") for appointment as Lead Plaintiff and approval of their selection of Lead Counsel in this action.

3.      The NYC Pension Funds consist of the actuarial pension systems of the New York City Employees' Retirement System ("NYCERS"), the New York City Police and Fire Department Pension Funds ("NYC Police" and "NYC Fire"), the New York City Teachers' Retirement System ("NYC TRS"), the New York City Board of Education Retirement System ("NYC BERS"), and certain other funds and programs, including the New York City Police Officers' Variable Supplements Fund ("POVSF"), New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), New York City Firefighters' Variable Supplements Fund ("FFVSF"), New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and the New York City Teachers' Variable Annuity Program ("Teachers' Variable A"). The NYC Funds had over $106 billion in assets as of March 31, 2008.

4.      NYCERS, established under Section 13-102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who join the Pension Plan and are not eligible to participate in separate NYC Fire, NYC Police, NYC TRS, or NYC BERS pension funds. NYCERS holds over $39 billion in assets with over 200,000 active members and approximately 125,000 retirees and beneficiaries.

5.    NYC Police, created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department. NYC Police holds over $21 billion in assets with more than 36,000 active members and 42,000 retired members.

6.    NYC Fire, established pursuant to Section 13-301 of the Administrative Code of the City of New York, provides pension benefits for full-time uniformed employees of the New York City Fire Department.  NYC Fire holds approximately $6.9 billion in assets, and has approximately 12,000 active members and 18,000 retired members.

7.    NYC TRS maintains two separate retirement programs, the Qualified Pension Plan ("QPP") and the Tax-Deferred Annuity ("TDA").[1]  The QPP, established pursuant to Section 13-502 of the Administrative Code of the City of New York, provides pension benefits to those with regular appointments to the pedagogical staff of the Department of Education. The TDA, established pursuant to Internal Revenue Code Section 403(b), provides a means of deferring income tax payments on voluntary tax-deferred contributions.  NYC TRS has approximately $36 billion in assets, and approximately 65,000 retirees and over 109,000 active members, and Teachers' Variable A has a further $12 billion in assets.

8.    NYC BERS provides pension benefits to, among others, non-pedagogical employees of the Department of Education.  NYC BERS has approximately $2.4 billion in assets and approximately 12,000 retirees and 38,000 active members.

9.    POVSF, PSOVSF, FFVSF and FOVSF were enacted, pursuant to enabling

---

[1]    The Teachers' Variable A program is included in NYC TRS Tax-Deferred Annuity program.

State legislation, to provide certain retirees of the New York City Police Department and the New York City Fire Department with fixed supplement benefits from variable supplement funds. As of March 31, 2008, POVSF had over $1 billion in assets, PSOVSF had over $998 million in assets, FFVSF had approximately $546 million in assets, and FOVSF had approximately $317 million in assets.

10.    For all of the NYC Funds (other than TRS' Variable A), the New York City Comptroller serves as Chief Investment Advisor, pursuant to resolutions by the Funds, and also serves as Custodian of Assets, pursuant to Statute.

11.    In general, the NYC Pension Funds have invested in domestic equities, international equities, and U.S. fixed income investments.

12.    The Law Department is the legal arm of the City of New York. Pursuant to the powers and duties granted to it under Section 394 of the New York City Charter, the Law Department represents all City agencies and the NYC Pension Funds, as well as the offices of elected officials such as the Comptroller and the Public Advocate. In the matters in which outside counsel is retained to represent New York City, its agencies and its pension funds, the Law Department has the sole authority and responsibility to select which firms to retain and to negotiate the terms of retention.

13.    The Law Department has over 650 attorneys with exceptional depth in all areas of litigation, including class action litigation, at both the trial and appellate levels. The Law Department's expertise extends to the areas of bankruptcy, financial transactions and other related fields. Since 1992, the Law Department has been involved in a number of cases involving securities laws, both securities fraud class action litigation and cases involving the issue of whether companies

3

were required to include NYC Pension Funds' shareholder proposals in their proxy materials (*see,*

*e.g., The NYC Funds v. Brunswick Corp.,* 789 F.Supp. 144 (S.D.N.Y. 1992).

14.     The Law Department serves as counsel to the NYC Pension Funds, and is thus

able to provide direction and monitoring of this litigation on behalf of the NYC Pension Funds. The

Law Department has both the experience and resources to perform this function. In this regard, the

Law Department appointed outside counsel for the NYC Pension Funds, and monitored the activity

of said counsel, in *In re Cendant Corp. Litigation,* 264 F.3d 201 (3d Cir. 2001) and in *In re Orbital*

*Sciences Corporation Securities Litigation,* 188 F.R.D. 237 (E.D. Va. 1999), securities class actions

in which the NYC Pension Funds were designated as lead plaintiffs, as well as in significant non-

class securities litigation. *See In re WorldCom, Inc. Securities Litigation,* 2004 WL 254682

(S.D.N.Y. Nov. 10, 2004). The Law Department also retained outside counsel for certain of the

NYC Pension Funds in *In re Take-Two Securities Litigation,* Civil Action No. 1:06-cv-00803-SWK

(S.D.N.Y.); *In re Juniper Networks, Inc. Securities Litigation,* Civil Action No. 3:06-cv-4327-MJJ

(N.D. Cal.); *Vogel v. Jobs,* Civil Action No. C-06-05208-JF (N.D. Cal.); and *In re Countrywide*

*Financial Corp. Securities Litigation,* 07 cv 5295 (C.D. Cal.), in which those NYC Pension Funds

have been appointed lead plaintiff.

15.     The NYC Pension Funds represent an ideal plaintiff to lead this litigation.

The NYC Pension Funds have proven themselves to be precisely the type of institutional investor

Congress was trying to attract to securities litigation when it enacted the Private Securities Litigation

Reform Act of 1995 ("PSLRA").

16.     The PSLRA sought to "empower investors so that they, not their lawyers,

control private securities litigation..." Conference Report on Securities Litigation Reform, H.R. Rep.

No. 369, 104th Cong., 1st Sess. 31, reprinted in 1955 U.S.C.C.A.N. 679, 730-34 ("Conf. Rep."). *In re Cendant Corporation Litigation,* 98-1664 (WNW) (D.N.J.), a case in which NYC Pension Funds served as Co-Lead Plaintiff, is one of the best examples of client driven rather than lawyer driven securities class actions.

17.    The NYC Pension Funds have been highly selective in choosing cases they feel are appropriate for public pension fund involvement.

18.    As a result of this selectivity in choosing cases, the NYC Pension Funds are in full compliance with 15 U.S.C. § 78u-4 limiting service as a lead plaintiff to 5 securities class actions during any 3-year period.

19.    The NYC Pension Funds have decided to seek to Lead Plaintiff appointment in this litigation because of the important public policy considerations at stake and the obvious need for a strong independent entity to vigorously prosecute all claims and to conscientiously monitor the actions of Lead Counsel. As evidenced by its prior history as Lead Plaintiff in *Cendant* and *Orbital,* the NYC Pension Funds are qualified to represent this class and to ensure that the interests of the class are never overshadowed by the concerns of class counsel.

20.    The NYC Pension Funds have selected the firm of Kirby McInerney LLP to serve as the NYC Pension Funds' selection as Lead Counsel. The Law Department will receive, review, and approve all significant pleadings (*e.g.,* consolidated complaint, motion for class certification and significant discovery motions) *before* they are filed with the Court.

21.    The Law Department will be apprised of court appearances, settlement discussions, and other important meetings and will attend such meetings at their discretion.

22.    The Law Department will also participate in periodic meetings and conference

calls with Kirby McInerney in order to discuss developments and strategies in the prosecution of the case, including but not limited to settlement discussions.

23.    The Law Department will also receive and review, on a periodic basis, time and expense reports of Kirby McInerney.

24.    The NYC Pension Funds and Kirby McInerney have negotiated a schedule for the payment of attorneys' fees which provides for contingent fee payments that are significantly less than fees typically awarded in securities fraud class action litigation. Kirby McInerney has agreed that they will not submit any fee application to the Court without the prior approval of the NYC Pension Funds. (Any fee application will, of course, be subject to final approval of the Court).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7TH day of August, 2008.

_____
ILYSE SISOLAK

6

# EXHIBIT E



**At Kirby McInerney LLP,** we bring experience, intelligence, creativity and dedication to bear in defending our clients' interests against losses in cases of corporate malfeasance. Unfortunately, on the heels of the exposure of colossal corporate frauds – Enron, Worldcom and others – public and private investors, consumers, payors and employees today participate in an uncertain marketplace, and they need protection. We utilize cutting-edge strategies that bring high – and have even brought unprecedented – recoveries for our clients: governmental entities, Taft-Hartley funds, hedge funds, and other aggrieved institutions and individuals. We have achieved and are pursuing landmark results in the fields of securities fraud, corporate governance, consumer, antitrust, health care and ERISA litigation, representing our clients in class actions or, if appropriate, individual litigation.

We make our clients' interests our own, and are constantly looking for ways in which to help them manage the now amplified risks associated with their participation in the marketplace. As part of our focus on risk management, our *Institutional Monitoring Program* monitors our clients' investment history in order to ensure crucial, immediate awareness of possible fraud. When evidence of fraud surfaces, we partner with our clients to identify and execute a legal strategy that best defends their interests in light of their losses. Our *Institutional Monitoring Program* is cost and commitment free.

We offer our litigation services on a contingency basis, and are paid only if successful in recovering losses in the event of a fraud. This policy allows our clients to access legal rights and remedies that might otherwise be uneconomical. We carefully review the merits of all litigation proceedings, weighing our clients' losses against their chance for recovery, before moving forward with litigation.

We pride ourselves on our proven ability to protect our clients using the entire range of tools for recourse offered by the legal system, whether it be through settlement or, if needed, trial. Throughout the history of our firm we have recovered billions of dollars for our clients, and the average recoveries that we procure in each individual case are among the very best in the field:

> **In 2007, Institutional Shareholder Services, a top industry publication, lauded KM for procuring, on average, the third largest recoveries for shareholders of all plaintiffs' firms in the United States.**

**KIRBY McINERNEY LLP**

# CURRICULA VITAE

**Roger W. Kirby** is managing partner of the firm. He has written several articles on litigation, the Federal Rules of Civil Procedure and Federal Rules of Evidence that have been published by various reporters and journals, and has been on the board of editors of Class Action Reports. He has also lectured on aspects of securities litigation to various professional organizations in the United States and abroad.

Mr. Kirby has enjoyed considerable success as a trial attorney, and cases for which he has had primary responsibility have produced landmark decisions in the fields of securities law, corporate governance, and deceptive advertising.

Recent activities include:

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Mr. Kirby and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Mr. Kirby and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Representation, as lead counsel, of a class of investors in *Gerber v. Computer Associates International, Inc.*, a securities class action that resulted in a multimillion dollar recovery jury verdict that was upheld on appeal; and

- Representation, as lead counsel, of a certified class of purchasers of PRIDES securities in connection with the Cendant Corporation accounting fraud in *In re Cendant Corporation PRIDES Litigation*. Mr. Kirby was instrumental in securing an approximate $350 million settlement for the certified class – an unprecedented 100 percent recovery.

Mr. Kirby is admitted to the New York State Bar, the United States District Courts for the Southern, Northern and Eastern Districts of New York, the United States Courts of Appeals for the Second, Third, Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits and the United States Supreme Court. He attended Stanford University & Columbia College (B.A., 1969) and Columbia University School of Law (J.D., 1972) where he was an International Fellow. He also attended The Hague Academy of International Law (Cert. D'Att.). Thereafter, he was law clerk to the late Honorable Hugh H. Bownes, United States District Court for New Hampshire, and the United States Court of Appeals for the First Circuit.



**Alice McInerney** is a partner in our New York office focusing on antitrust and consumer matters, and who also handles securities class actions. Ms. McInerney joined the firm in 1995 and has over 30 years of experience as an attorney.

Prior to joining KM, Ms. McInerney was Chief of the Investor Protection Bureau and Deputy Chief of the Antitrust Bureau of the New York Attorney General's office. While there, she chaired the Enforcement Section of the North American Securities Administrators Association and also chaired the Multi-State Task Force on Investigations for the National Association of Attorneys General.

Some of Ms. McInerney's relevant work includes:

- Representation, as lead and co-lead counsel, of consumer classes in antitrust cases against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota;

- Representation of a class of retailers in *In re Visa Check/Master Money Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class;

- Representation of public entities in connection with ongoing Medicaid fraud and false claims act litigations arising from health expenditures of these state and local governmental entities; and

- Representation of California homeowners in litigation arising from mortgage repayment irregularities. Litigation resulted in settlements that afforded millions of California homeowners clear title to their property. The cases resulted in the notable decision *Bartold v. Glendale Federal Bank*.

Ms. McInerney is admitted to the New York State Bar, all United States District Courts for the State of New York, the United States Court of Appeals for the Second Circuit and the United States Supreme Court. She graduated from Smith College (B.A. 1970) and Hofstra School of Law (J.D. 1976).



**Randall K. Berger** is a partner in our New York office focusing on antitrust, whistleblower and unclaimed property litigation. Mr. Berger joined the firm in 1994 and leads the firm's whistleblower practice. In whistleblower cases, fraud against Federal and State governments is exposed by persons having unique knowledge of the circumstances surrounding the fraud. These cases are generally litigated under seal.

Mr. Berger is a certified arbitrator for the National Association of Securities Dealers. The arbitration panels where Mr. Berger serves are used to resolve disputes between NASD member firms and customers, and to resolve intra-industry conflicts.

Some of Mr. Berger's relevant work includes:

- Representation, as co-lead counsel, of investors in Ponzi scheme instruments issued by the now-bankrupt Bennett Funding Group in a class action which resulted in a recovery of $169.5 million for the class;

- Representation of State Treasurers in litigation against the Federal government to recover unclaimed U.S. savings bond proceeds;

- Representation of companies that offered IPO securities in antitrust litigation against the 27 largest investment banks in the United States. Plaintiffs allege that the banks conspired to price fix underwriting fees in the mid-sized IPO market.

Mr. Berger is admitted to the New York State Bar, the United States District Courts for the Southern, Eastern and Northern Districts of New York and the District of Colorado. He has been a member of the New York City Bar Association since 1995. He graduated from Iowa State University (B.S., 1985) and from the University of Chicago (J.D., 1992).

Prior to attending law school and joining KM, Mr. Berger utilized his undergraduate (engineering) degree working for four years with the management information consulting division of Arthur Anderson & Co.

 **Joanne Cicala** is a partner in our Texas office who specializes in health care fraud and consumer litigation. Ms. Cicala has been with the firm since 1997 and serves as Special Assistant Attorney General to the States of Michigan and Iowa, and counsel to the City of New York and forty two New York County governments in connection with ongoing Medicaid fraud litigations and other matters arising out of the health expenditures of these state and local governmental entities. Ms. Cicala also represents and advises numerous public employee health benefit funds and Taft Hartley funds on an array of issues related to their health care expenditures and relationships with Pharmacy Benefit Managers.

Ms. Cicala is a member of the National Association of Public Pension Fund Attorneys and the County Attorneys Association of the State of New York.

Some of Ms. Cicala's recent, relevant experience includes:

- Representation of the City of New York in federal antitrust proceedings against GlaxoSmithKline for defrauding the U.S. Patent and Trademark Office in order to unlawfully extend patents for certain drugs;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the U.S. Northern District Court for the District of Illinois. Ms. Cicala and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Ms. Cicala and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Representation, as lead and co-lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, Tennessee, West Virginia and Minnesota; and

- Representation, as lead counsel, of a class of investors in *Gerber v. Computer Associates International, Inc.*, a securities class action which succeeded in trial and resulted in a multimillion dollar recovery for the class.

Ms. Cicala is admitted to practice in the states of New York, New Jersey and Texas. She is also admitted to the all U.S. District Courts in New York, the Western District of Texas and the United States Court of Appeals for the Second, Seventh and Eighth Circuits. She graduated from Georgetown University (B.S.F.S., 1987) and Fordham University Law School (J.D., 1994).

Prior to joining KM, Ms. Cicala was a litigator with Lane & Mittendorf LLP (now Windels Marx Lane & Mittendorf, LLP). Prior to attending law school, she worked for a US-AID funded organization in Washington, DC on legislative development projects in Central America. Ms Cicala also has extensive experience managing municipal welfare reform activities.

**Daniel Hume** is a partner in our New York office focusing on antitrust and securities litigation. Mr. Hume joined the firm in 1995 and currently leads our antitrust litigation practice. He has advised clients in connection with significant antitrust litigation and has helped to recover billions of dollars for corporate consumers, individual consumers, and institutional investors throughout the course of his career.

Mr. Hume has rendered compliance advice to broker-dealers and has contributed to The Compliance Reporter's securities question and answer column. He has also authored articles on securities and class action matters.

Some of Mr. Hume's relevant work includes:

• Representation, as a lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota, where the litigation proceeded to trial;

• Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

• Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

• Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in a recovery of $150 million for the class; and

• Representation, as one of the firms with primary responsibility for the case, of a class of retailers in *In re Visa Check/MasterMoney Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class.

Mr. Hume is admitted to the New York State Bar, the United States District Courts for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit and the United States Supreme Court. He graduated from the State University of New York at Albany *magna cum laude* (B.A., 1988) and from Columbia Law School, where he served as Notes Editor for the Columbia Journal of Environmental Law (J.D., 1991).

Prior to joining KM, Mr. Hume practiced at Tenzer Greenblatt (now Blank Rome Tenzer Greenblatt) and Herzog Calimari & Gleason where he focused on securities and securities regulatory litigation.



**Peter S. Linden** is a partner in our New York office focusing on securities and commercial fraud litigation. Mr. Linden joined the firm in 1990 and focuses on providing advisory services to government pension funds and other institutional investors as well as to corporate and individual consumers. He has been appointed a Special Assistant Attorney General for the State of Michigan and is a member of the National Association of Public Pension Plan Attorneys.

Mr. Linden has obtained numerous outstanding recoveries for investors and consumers during his career. His advocacy has also resulted in many notable decisions, including *In re Matsushita Securities Litigation*, which granted partial summary judgment under § 14(d)(7) of the Securities Exchange Act and, more recently, *In re Ebay Inc. Shareholder's Litigation*, which found that corporate insiders' acceptance of IPO allocations through "spinning" states a claim for breach of a fiduciary duty and that investment banking advisors could be held liable for aiding and abetting such a breach. Mr. Linden has been quoted or featured in articles in *The New York Times* and *The American Lawyer*.

Some of Mr. Linden's relevant experience includes:

- Representation, as lead counsel, of two major insurance companies and a class of bondholders in *In re Laidlaw Bondholder Litigation*, a securities class action which resulted in a $42.275 million recovery for the class;

- Representation, as co-lead counsel, of an investor class and an institutional plaintiff in *In re BISYS Securities Litigation*, a class action arising out of alleged accounting improprieties and which resulted in a $65 million recovery for the class;

- Serving as Chairman of the Plaintiffs' Steering Committee in *In re MCI Non-Subscriber Litigation*, a consumer class action which resulted in an approximately $90 million recovery for the class;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Mr. Linden and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Mr. Linden and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Current representation in class actions on behalf of investors includes *Dot Hill Systems Corporation* and, on behalf of retirement plan participants, in *In re JPMorgan Cash Balance Litigation*.

Mr. Linden is admitted to the New York State Bar, the United States Courts of Appeals for the Third, Sixth, Eighth, and Eleventh Circuits, and the United States District Courts for the Eastern and Southern Districts of New York, the Eastern District of Michigan and the District of Colorado. He graduated from the State University of New York at Stony Brook (B.A., 1980) and from Boston University School of Law (J.D., 1984). Prior to joining KM, Mr. Linden worked as an assistant district attorney in the Kings County District Attorney's Office from 1984 through October, 1990 where he served as a supervising attorney of the Office's Economic Crimes Bureau.

 **Ira M. Press** is a partner in our New York office focusing in securities and consumer litigation. Mr. Press joined the firm in 1993, and currently leads the firm's *Institutional Monitoring Program*. In this capacity, he has provided advisory services to numerous government pension funds and other institutional investors. He has authored articles on securities law topics and has lectured to audiences of attorneys, experts and institutional investor fiduciaries.

Mr. Press' advocacy has resulted in several landmark appellate decisions including, *Rothman v. Gregor*, the first ever appellate reversal of a lower court's dismissal of a securities class action suit pursuant to the 1995 private securities litigation reform act, and more recently, *Pinker v. Roche Holdings*.

Some of Mr. Press' relevant experience includes:

- Representation of the NY State Common Retirement Fund as lead plaintiff in *Robert Casey, et al. v. National City Corporation*, et al, a securities class action arising from National City's issue of alleged materially false and misleading statements regarding the Company's business, including the extent of its exposure to subprime mortgage related losses. During the class period, the company's stock fell from approximately $30 to less than $16.

- Representation of a union pension fund as lead plaintiff in *Nach v. Huber* in securities class action arising from Moody's misrepresentation about and in the course of its rating of mortgage-related securities. Classwide losses are estimated to be in the billions;

- Representation of a public pension fund as lead plaintiff in *Stanley Kurzweil et al. vs. Medtronic, Inc. et al.*, a securities class action in which classwide losses are estimated to be approximately $2 billion;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in recovery of $150 million for the class;

- Representation of numerous institutional investors who have opted out of securities class actions to pursue individual claims.

Mr. Press is admitted to the New York State Bar, the United States Court of Appeals for the Second, Third and Eleventh Circuits, and the United States District Courts for the Eastern, Northern and Southern Districts of New York. He graduated from Yeshiva University *magna cum laude* (B.A., 1986) and from New York University Law School (J.D., 1989).

Prior to joining KM, Mr. Press practiced at Warshaw Burstein Cohen Schlesinger & Kuh, LLP, where he focused on commercial litigation.



**Mark Strauss** is a partner in our New York office focusing in securities class actions and class action cases involving defrauded investors and consumers. Mr. Strauss joined the firm in 1999. He has broad experience litigating auditor liability and Ponzi scheme cases. He also litigates claims on behalf of shareholders in mergers and acquisitions.

Some of Mr. Strauss' relevant work includes significant roles in the following litigations:

- Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re: Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

- Representation, as co-lead counsel, of a class of hedge fund investors in *Cromer Finance v. Berger, et al.*, a securities class action which resulted in a total recovery of US$65 million, and one of the largest ever recoveries against a non-auditor third party service provider;

- Representation, as lead counsel, of brokerage customers of Refco Capital Markets in *In re: Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, an action alleging a Ponzi scheme. This litigation is ongoing;

- Representation, as lead counsel, of a class of investors in a hedge fund, Lipper Convertibles, L.P., which fraudulently overstated its investment performance, in *In re: Serino v. Lipper, et al.* This litigation is ongoing; and

- Representation, as lead counsel, of a class of bond investors in Amazon.com in *Argent Classic Convertible Arbitrage Fund v. Amazon.com*, a securities class action which resulted in a total recovery of $20 million for the class;

Mr. Strauss is admitted to the New York State Bar, the United States District Courts for the Eastern and Southern Districts of New York, the State of California and the Northern, Southern and Central Districts of California. He graduated from Cornell University (B.A., 1987) and from Fordham University School of Law, where he was Associate Editor of the Law Review (J.D., 1993).

Prior to joining KM, Mr. Strauss practiced at Christy & Viener, LLP and Cahill Gordon & Reindel LLP where he focused on commercial litigation and class action defense.

**Publications:**
**Are Class Actions Against Broker/Dealers Dead?**
*Securities Regulation and Law Report*, Vol. 36, No. 2, 01/12/2004, pp. 68-72.

Note, **Public Employees Freedom of Association—Should Connick's Free-Speech Based Public-Concern Rule Apply?**
*61 Fordham L. Rev. 473* (1992)



**David Bishop** is of counsel to the firm and practices out of our New York office. Mr. Bishop joined the firm in 2006 following a distinguished career in local government. Mr. Bishop was elected to the Suffolk County Legislature in 1993 while still attending Fordham Law School. There he served in several leadership capacities, including Democratic Party Leader, Chairman of Public Safety and Chairman of Environment. His legislative record earned him recognition from the Nature Conservancy, the Child Care Council and the Long Island Federation of Labor.

As an attorney in private practice, Mr. Bishop has litigated numerous NASD arbitrations on behalf of claimants. In addition to his work in connection with securities matters, Mr. Bishop helps to coordinate the firm's client relations activities.

Recent cases in which Mr. Bishop has been involved include:

- Representation of a union pension fund as lead plaintiff in *Nach v. Huber* in securities class action arising from Moody's misrepresentation about and in the course of its rating of mortgage-related securities. Classwide losses are estimated to be in the billions;

- Representation, as co-lead counsel, of an investor class led by an individual investor in *Lapin v. Goldman Sachs*, a securities class action against Goldman Sachs; and

- Representation, as lead counsel, of a class of investors led by a hedge fund against Herley Industries in *In re Herley Industries Inc. Securities Litigation.*

Mr. Bishop is admitted to the New York State Bar and the United States District Court for the Eastern District of New York. He is a member of the Public Investors Arbitration Bar Association and of the New York City Bar Association. He graduated from American University (B.A., 1987) and from Fordham University (J.D., 1993).Fiske Stone Scholar and Editor of the Columbia Law Review.



**Richard L. Stone** is of counsel to the firm and focuses on securities and consumer fraud litigation. Mr. Stone joined the firm in 1997.  In addition to his robust legal practice, Mr. Stone currently teaches as an Adjunct Professor of Financial Services Law at Florida State University.

Some of Mr. Stone's relevant experience includes:

·    Representation, as co-lead counsel, of investors in Ponzi scheme instruments issued by the now-bankrupt Bennett Funding Group in a class action which resulted in a recovery of $169.5 million for the class;

·    Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

·    Representation, as lead counsel, of a class of investors in Amazon.com in *Argent Classic Convertible Arbitrage Fund v. Amazon.com*, a securities class action which resulted in a total recovery of $20 million for the class;

·    Representation, as lead counsel, of two major insurance companies and a class of bondholders in *In re Laidlaw Bondholder Litigation*, a securities class action which resulted in a $42.275 million recovery for the class; and

·    Representation, as co-lead counsel, of a class of institutional investors in Manhattan Investment Fund (a Bermuda hedge fund) in *Cromer Finance v. Berger et al.*, a securities class action which resulted in a total recovery of US$65 million for the class. The case involved complex jurisdictional and choice-of-law issues because of the offshore nature of the fund, and represents one of the largest ever recoveries against a non-auditor third party service provider in a securities class action.

Mr. Stone is admitted to the New York State Bar as well as United States District Courts for the Eastern and Southern Districts of New York. He graduated from Colgate University *magna cum laude* and Phi Beta Kappa (B.A., 1981), and from Columbia University School of Law (J.D., 1983), where he was a Harlan Fiske Stone Scholar and Editor of the Columbia Law Review.

Prior to joining KM, Mr. Stone was a Partner at Cadwalader, Wickersham & Taft in their Market Regulation and Financial Institutions Practice Groups.  Immediately after law school, Mr. Stone clerked for the Honorable Charles P. Sifton, United States District Judge in the Eastern District of New York.



**Henry Telias** is of-counsel to the firm and practices out of our New York office, focusing in accountants' liability and securities litigation. Mr. Telias joined the firm in 1997.

In addition to his legal work, Mr. Telias is also the firm's chief forensic accountant. He received his CPA license from New York State in 1982. Prior to practicing as an attorney, he practiced exclusively as a certified public accountant from 1982 to 1989, including 3 years in the audit and tax departments of Deloitte Haskins & Sells' New York office.

Mr. Telias is a member of the American Institute of Certified Public Accountants, the Association of Certified Fraud Examiners, and the American Finance Association.

Some of Mr. Telias' relevant experience includes:

- Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

- Representation, as lead counsel, of a certified class of purchasers of PRIDES securities in connection with the Cendant Corporation accounting fraud in *In re Cendant Corporation PRIDES Litigation*. This litigation resulted in an approximate $350 million settlement for the certified class – an unprecedented 100 percent recovery.

- Representation, as co-lead counsel, of a class of investors in *In re Waste Management, Inc. Securities Litigation,* a securities class action which resulted in a recovery of $220 million for the class;

- Representation, as co-lead counsel, of an investor class and an institutional plaintiff in I*n re BISYS Securities Litigation*, a class action arising out of alleged accounting improprieties and which resulted in a $65 million recovery for the class; and

- Representation, as co-lead counsel, of an international bond fund as lead plaintiff in *Muzinich & Co., Inc. v. Raytheon Corp*., a securities class action which resulted in a recovery of $39 million for the class;

Mr. Telias is admitted to the New York State Bar and the United States District Court for the Southern District of New York. He graduated from Brooklyn College cum laude (B.S., 1980) and from Hofstra University School of Law (J.D., 1989).



**Kenneth G. Walsh** is of counsel to the firm and practices out of our New York office. Mr. Walsh joined the firm in 2007 and concentrates primarily on antitrust litigation, representing direct purchasers of medical devices and pharmaceuticals in federal courts. In addition, he has significant involvement in a number of state law antitrust and consumer protection actions. Mr. Walsh is currently serving as counsel to direct purchasers of urological catheters in a federal antitrust case pending in the Eastern District of Missouri.

Prior to joining KM, Mr. Walsh served as national counsel in significant federal and state antitrust actions while with Boies, Schiller, Flexner, LLP and Straus & Boies, LLP.

During his time at Boies, Schiller & Flexner, LLP, Mr. Walsh served as co-lead national counsel for approximately 3,700 independent retail pharmacies who are plaintiffs in a federal antitrust case pending against major drug manufacturers. He also defended AT&T/Southwestern Bell Telephone against monopolization claims brought in Texas state courts and in federal court in Oklahoma. Mr. Walsh also had significant involvement in a trademark infringement action that the firm brought and successfully settled on behalf of a prominent fashion designer. During his time at Straus & Boies, LLP, Mr. Walsh represented nationwide classes of indirect purchasers of computer chips and Vitamin C.

Mr. Walsh is admitted to the New York State Bar and the United States District Courts for the Eastern and Southern Districts of New York. He graduated from Catholic University (B.A., 1987) and from New York Law School (J.D., 1992).



**James P. Carroll, Jr.** is an associate based in our Texas office focusing on antitrust, securities and consumer fraud litigation. Mr. Carroll joined the firm in 1995.

Recent cases in which Mr. Carroll has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing;

- Representation as co-lead counsel of a class of consumers in connection with *Gordon v. Microsoft Inc.*, a Minnesota State civil antitrust case which settled for $175 million after nearly two months of trial; and

- Representation, as one of the firms with primary responsibility for the case, of a class of retailers in *In re Visa Check/MasterMoney Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class.

Mr. Carroll is admitted to the New York State Bar, the Texas State Bar, the Colorado State Bar, the United States District Court for Colorado, the United States District Courts for the Eastern and Southern Districts of New York, the United States Tax Court and the United States Courts of Appeals for the Ninth and Tenth Circuits. He graduated from Duke University (B.A., 1988) and University of Denver (J.D.,1994).

Prior to joining KM, Mr. Carroll served as General Counsel & Director of U.S. Operations for Emerging Technologies, ET AB, a venture capital firm based in Stockholm, Sweden, and for Twobyfour Software AB, an application management software company where he served as General Counsel, Head of Business Development & Director of U.S. Operations.

 **Aaron Hovan** is an associate in our New York office who specializes in health care fraud litigation. Mr. Hovan joined the firm in 2003 and serves as Special Assistant Attorney General to the States of Michigan and Iowa, and counsel to the City of New York and forty two New York County governments in connection with ongoing Medicaid fraud and false claims act litigations and other matters arising out of the health related expenditures of these state and local governmental entities.

Mr. Hovan also represents and advises numerous public employee health benefit funds and Taft Hartley funds on an array of issues related to their health care expenditures and relationships with Pharmacy Benefit Managers.

Recent cases in which Mr. Hovan has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing; and

- Advising County Health Benefit Plans and Taft Hartley Funds on the services rendered by those with whom they contract for health care services, including pharmacy benefit managers.

Mr. Hovan is admitted to the New York State Bar and the United States District Courts for the Southern, Eastern, Western and Northern Districts of New York. He graduated from Colgate University *cum laude* (B.A., 1996) and Columbia University School of Law (J.D., 2002).

Before attending law school, Mr. Hovan worked for the Petroleum Finance Company as an upstream oil & gas industry analyst. Prior to joining KM, Mr. Hovan practiced at Baker Botts, LLP.



**David E. Kovel** is an associate based in our New York office focusing on antitrust, commodities and various corporate governance matters. Mr. Kovel joined the firm in 2004.

Recent cases in which Mr. Kovel has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antirust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline.

- Representation of consumers of propane who were harmed by BP America's manipulation of the propane market; and

- Representation of whistleblowers who claim that their companies have defrauded the United States Government.

Mr. Kovel is admitted to the New York State Bar, the United States District Courts for the Southern, Eastern, Western and Northern Districts of New York, the First Circuit and the Connecticut State Bar. He graduated from Yale University (B.A., 1993), Columbia University School of Law (J.D., 2002) and Columbia University School of Business Administration (M.B.A., 2003).

Mr. Kovel traded commodities for several years before attending law school. Prior to joining KM, Mr. Kovel practiced at Simpson Thacher & Bartlett, LLP.



**Sarah G. Lopez** is an associate in our New York office focusing on securities litigation. Ms. Lopez joined the firm in 2006.

Recent cases in which Ms. Lopez has been involved include:

- Representation, as lead counsel, in the securities class action *In Re Herley Industries Inc. Securities Litigation* on behalf of investors. This litigation is ongoing;

- Representation of institutional investors who have opted out of a securities class action filed against Tenet Healthcare Corp. and KPMG LLP to pursue their individual claims. This litigation is ongoing;

- Representation, as lead counsel, of a class of limited partners of hedge fund Lipper Convertibles, L.P. in *In re Serino v. Lipper et al.*, a securities class action filed against Lipper, certain of its officers and PriceWaterhouseCoopers, its auditor, in connection with alleged accounting fraud. This litigation is ongoing;

- Representation, as lead counsel, of brokerage customers of Refco Capital Markets in *In re: Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, an action pertaining to an alleged ponzi scheme executed by Refco which resulted in billions in brokerage customer losses. This litigation is ongoing.

Prior to joining KM, Ms. Lopez practiced at Wilson, Elser, Moskowitz, Edelman & Dicker, LLP where her practice primarily focused on professional liability defense with a specialty in defending accountants and experience in defending directors and officers in shareholder derivative suits. Ms. Lopez's specialty in accountants liability encompassed defending accounting firms against claims of negligence and fraud in connection with audit services provided to both profit and not-for profit entities as well as consulting services and tax preparations services provided to individuals and commercial entities.

During her time at Wilson Elser, Ms. Lopez also advised clients in connection with responding to subpoena requests issued in various investigations by government agencies such as the U.S. Attorney, SEC and NYS Attorney General. Ms. Lopez also has experience with ERISA matters and has experience representing Plaintiffs asserting commercial claims for breach of contract and various business torts. Finally, Ms. Lopez has extensive experience litigating matters at every phase of an action from commencement through the appellate process, in both New York State and Federal Court as well as before various arbitration tribunals.

Ms. Lopez is admitted to the New York State Bar, the United States District Courts for the Southern and Eastern Districts of New York, and the New Jersey State Bar. She graduated from Colgate University (B.A., 1998) and from St. John's University (J.D., 2003).

**Karina Shostakovsky** is an associate based in our New York office focusing on antitrust litigation. Ms. Shostakovsky joined the firm in 2005.

Recent cases in which Ms. Shostakovsky has been involved include:

- Representation, as a lead counsel, of direct purchasers of urological catheters in a federal antitrust case pending in the Eastern District of Missouri.  The case alleges that C.R. Bard and co-conspirators devised anticompetitive schemes to eliminate or lessen competition in order to acquire and maintain monopoly;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antirust and Patent Litigation and Related Actions*.  This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as a lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota, where the litigation proceeded to trial.

Ms. Shostakovsky is admitted to the New York State Bar and the New Jersey State Bar. She graduated from Boston University (B.A., 2000) and from New York Law School (J.D., 2007).



**Christopher S. Studebaker** is an associate in the New York office focusing on antitrust and securities litigation.  Mr. Studebaker joined the firm in 2007.

Prior to joining KM, Mr. Studebaker worked at Straus & Boies, LLP, primarily litigating private antitrust cases involving the medical device, food supplements, electronics, and semiconductor industries.  Some of his notable antitrust experience includes the representation of a hospital against a pulse oximetry manufacturer, a distributor against a hypodermic syringe manufacturer, and consumers against manufacturers of Vitamin C.

Mr. Studebaker's previous experience also includes his work at the U.S. Department of Commerce, where he advised senior administration officials, multinational companies and trade associations on international trade policy and agreements; litigation of disputes before the World Trade Organization (WTO); and Customs matters.  He also represented the United States in a WTO dispute settlement proceeding and in trade agreement negotiations.  Before his legal career, Mr. Studebaker spent several years working and studying in Japan.  He is fluent in Japanese.

Mr. Studebaker is admitted to the New York State Bar and the Washington State Bar.  He graduated from Georgetown University *cum laude* (B.S.F.S., 1997), Waseda University (M.A., 2001), and University of Kansas (J.D., 2004), where he was the Managing Editor of the Kansas Journal of Law and Public Policy. He is an active member of the Asian American Bar Association of New York.



**Beverly Tse** is an associate based in our New York office focusing on antitrust and securities litigation. Ms. Tse joined the firm in 2004.

Recent cases in which Ms. Tse has been involved include:

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in a recovery of $150 million for the class;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Ms. Tse and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

Ms. Tse is admitted to the California State Bar and the United States District Courts for the Northern and Central Districts of California. She graduated from California State University of Los Angeles *magna cum laude* (B.S., 2000) and from California Western School of Law (J.D., 2004).



**Edward M. Varga, III** is an associate based in our New York office. focusing on securities and antitrust litigation.  Mr. Varga joined the firm in 2006.

Recent cases in which Mr. Varga has been involved include:

• Representation, as lead counsel, in the securities class action *In Re Herley Industries Inc. Securities Litigation* on behalf of investors.  This litigation is ongoing;

• Representation of companies that offered IPO securities in antitrust litigation against the 27 largest investment banks in the United States.  Plaintiffs allege that the banks conspired to price fix underwriting fees in the mid-sized IPO market.

• Representation of the NY State Common Retirement Fund as lead plaintiff in *Robert Casey, et al. v. National City Corporation*, et al, a securities class action arising from National City's issue of alleged materially false and misleading statements regarding the Company's business, including the extent of its exposure to subprime mortgage related losses.  During the class period, the company's stock fell from approximately $30 to less than $16.

Mr. Varga is admitted to the New York State bar.  He graduated from Cornell University  (B.S., 2000) and from New York University Law School (J.D., 2006).

# Client & Adversary Recognition

*"The case has been in front of the Supreme Court of the United States once, and in front of the Ninth Circuit no fewer than three times. Throughout, [KM] has . . . brought a considerable degree of success . . . and thwarted attempts by other counsel who sought to settle . . . and destroy a potential billion dollars of class rights."*

**Plaintiff / client, Epstein v. MCA, Inc.**

*"[The KM firm] proved to be a highly able and articulate advocate. Single-handedly, [KM] was able to demonstrate not only that [KM's] client had a good case but that many of the suspicions and objections held by the Nigerian Government were ill-founded."*

**English adversary in The Nigerian Cement Scandal**

*"[KM] represented us diligently and successfully. Throughout [KM's] representation of our firm, [KM's] commitment and attention to client concerns were unimpeachable."*

**European institutional defendant /client**
**involved in a multi-million dollar NASD arbitration**

*"Against long odds, [KM] was able to obtain a jury verdict against one of the larger, more prestigious New York law firms."*

**Plaintiff / client,**
**Vladimir v. U.S. Banknote Corporation**

*"[KM] represented our investors with probity, skill, and diligence. There is too much money involved in these situations to leave selection of class counsel to strangers or even to other institutions whose interests may not coincide."*

**Plaintiff / institutional client,**
**In re Cendant Corporation PRIDES Litigation**

## Notables

The firm has repeatedly demonstrated its expertise in the field of class litigation and its expertise has been repeatedly recognized.  For example:

•  *In re Bisys Securities Litigation,* C.A. No. 04-CV-3840 (S.D.N.Y. 2007).  Co-lead counsel, $66 million settlement.

•  *In re AT&T Corp. Securities Litigation*, C.A. No. 00-CV-8754 (S.D.N.Y. 2006).  Sole counsel, $150 million settlement.

> "Nonetheless, in this Court's experience, relatively few cases have involved as high level of risk, as extensive discovery, and, most importantly, as positive a final result for the class members as that obtained in this case."

•  *In re Adelphia Communications, Inc. Securities Litigation*, No. 04 CV 05759 (S.D.N.Y. 2006).  Co-lead counsel,  $455 million settlement.

> "[T]hat the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."

•  *Carnegie v. Household International Inc., et al.,* 98 C 2178 (EEB)(N.D.Ill. 2006).  Co-lead counsel, $39 million settlement:

> "Since counsel took over the representation of this case . . ., they have pursued this case, conducting discovery, hiring experts, preparing for trial, filing motions where necessary, opposing many motions, and representing the class with intelligence and hard work. They have obtained an excellent result for the class."

•  *Argent Convertible Classic Arbitrage Fund, L.P. v. Amazon.com, Inc. et al.,* CV No. 01-0640L (W.D. Wash. Oct. 20, 2005).  Lead counsel for class of convertible euro-demoninated bond purchase.  $20 million settlement.

•  *Muzinich & Co., Inc. et al. v. Raytheon Company et al. ,* No. C-01-0284-S-BLW  (D. Idaho 2005).   Co lead counsel.  $39 million settlement.

- *Gordon v. Microsoft Corporation*, Civil No. 00-5994 (Minn. Dist. Ct., Henn. Co. 2004). Co-lead counsel; $175 million settlement following two months of trial.

- *In re Visa Check/MasterMoney Antitrust Litigation*, 96-CV-5238 (E.D.N.Y. 2003) $3 billion monetary settlement; injunctive relief.

- *In re Florida Microsoft Antitrust Litig.*, Case No. 99-27340 CA 11 (Fl. Cir. Ct. 11th Cir., Miami/ Dade Co. 2003). Co-lead counsel. $200 million settlement of antitrust claims.

- *In re Churchill Securities, Inc.* (SIPA Proceeding), Case No. 99 B 5346A (Bankr. S.D.N.Y. 2003: Sole Counsel; recovered over $9 million for 500+ victims of pyramid scheme perpetrated by defunct brokerage firm.

- *In re Laidlaw Bondholder Securities Litigation,* 00 cv 2518-17 (D. S.C. 2002). Lead counsel; $42.8 million settlement.

- *Cromer Finance v. Berger et al.* (*In re Manhattan Fund Securities Litigatio*n), 00 cv 2284 (S.D.N.Y. 2002). Co-lead counsel; $32 million settlement.

- *In re Boeing Securities Litigation,* 97 cv 715 (W.D. Wash. 2001). $92.5 million settlement.

- *In re MCI Non-Subscriber Telephone Rates Litigation,* MDL No. 1275 (S.D. Ill. 2001). Chairman of steering committee; $88 million settlement.

- *In re General Instrument Corp. Securities Litigation*, 01 cv 1351 (E.D. Pa. 2001). Co- lead counsel; $48 million settlement.

- *In re Bergen Brunswig/Bergen Capital Trust Securities Litigation,* 99 cv 1305 and 99 cv 1462 (C.D. Cal. 2001). Co-lead counsel; $42 million settlement.

- *Steiner v. Aurora Foods,* 00 cv 602 (N.D. Cal. 2000). Co-lead counsel; $36 million settlement.

- *Gerber v. Computer Associates International, Inc.*, No. 91 C 3610 (E.D.N.Y. 2000). Multi-million dollar jury verdict in securities class action.

- *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000). Principal counsel of record in appeal that resulted in first ever appellate reversal of the dismissal of a securities fraud class action under the Securities Reform Act of 1995.

- *Bartold v. Glendale Federal Bank,* (2000) 81 Cal.App.4th 816. Ruling on behalf of hundreds of thousands of California homeowners establishing banks' duties regarding title reconveyance; substantial damages still to be calculated in this and related cases against other banks for failures to have discharged these duties.

- *In re Cendant Corporation PRIDES Litigation,* 51 F. Supp. 2d 537, 542 (D. N.J. 1999). Lead counsel, $340 million settlement.  The court said:

  > "[R]esolution of this matter was greatly accelerated by the creative dynamism of counsel."  * * *  "We have seen the gifted execution of responsibilities by a lead counsel."

- *In re Waste Management, Inc. Securities Litigation*, No. 97C 7709 (N.D. Ill. 1999). Co-lead counsel, $220 million settlement.

  > "...[Y]ou have acted the way lawyers at their best ought to act.  And I have had a lot of cases... in 15 years now as a judge and I cannot recall a significant case where I felt people were better represented than they are here... I would say this has been the best representation that I have seen."

- *In re Bennett Funding Group Securities Litigation*, No. 96 Civ. 2583 (1999). Co-lead counsel; $140 million in settlements to date ($125 million recovered from Generali U.S. Branch, insurer of Ponzi scheme instruments issued by Bennett Funding Group; $14 million settlement with Mahoney Cohen, Bennett's auditor).  Case continuing against other defendants.

- *In re MedPartners Securities Litigation*, CV-98-06364 (Ala. June 1999). Co-lead counsel; $56 million settlement.

- *In re MTC Electronic Technologies Shareholder Litigation,*  No. CV-93-0876 (E.D.N.Y. October 20, 1998). Co-lead counsel; settlement in excess of $70 million.

- *Skouras v. Creditanstalt International Advisers, Inc., et al.,* NASD Arb., No. 96-05847 (1998).  Following an approximately one month hearing, successfully defeated multi-million dollar claim against major European institution.

- *In re Woolworth Corp. Securities Class Action Litigation,* 94 Civ. 2217 (RO) (S.D.N.Y. Sept. 29, 1997). Co-lead counsel; $20 million settlement.

**KIRBY McINERNEY LLP - 26**

- *In re Archer Daniels Midland Inc. Securities Litigation,* C.A. No. 95-2877 (C. D. Ill. April 11, 1997). Co-lead counsel; $30 million settlement.

- *Vladimir v. U.S. Banknote Corp.,* No. 94 Civ. 0255 (S.D.N.Y. 1997). Multi-million dollar jury verdict in § 10(b) action.

- *In re Archer Daniels Midland Inc. Securities Litigation,* C.A. No. 95-2877 (C. D. Ill. April 11, 1997). Co-lead counsel; $30 million settlement.

- *Vladimir v. U.S. Banknote Corp.,* No. 94 Civ. 0255 (S.D.N.Y. 1997). Multi-million dollar jury verdict in § 10(b) action.

- *Epstein et al. v. MCA, Inc., et al*., No. 92-55675, 50 F.3d 644 (9th Cir. 1995) *rev'd and remanded on other grounds, Matsushita Electric Industrial Co., Ltd. et al. v. Epstein et al.,* No. 94-1809, 116 S. Ct. 873 (February 27, 1996). Sole counsel. Appeal resulted in landmark decision concerning liability of tender offeror under section 14(d)(7) of the Williams Act, SEC rule 14d-10 and preclusive effect of a release in a state court proceeding. In its decision granting partial summary judgment to plaintiffs, the court of appeals for the Ninth Circuit stated:

    "The record shows that the performance of the Epstein plaintiffs and their counsel in pursuing this litigation has been exemplary."

- *In re Abbott Laboratories Shareholder Litigation,* No. 92-C-3869 MEA, Fed. Sec. L. Rep. ¶ 98,973 (N.D. Ill. 1995). Co-lead counsel; $32.5 million settlement:

    "The record here amply demonstrates the superior quality of plaintiffs' counsel's preparation, work product, and general ability before the court."

- *In re Morrison Knudsen Securities Litigation,* No. CV 94-334-S-EJL (D. Id. 1995). Co-lead counsel; approximately $68 million settlement.

- *In re T2 Medical Inc. Securities Litigation,* No. 1:94-CV-744-RLV (N.D. Ga. 1995). Co-lead counsel; approximately $50 million settlement.

- *Gelb v. AT&T*, 90 Civ. 7212 (LMM) (S.D.N.Y. 1994). Landmark decision regarding filed rate doctrine leading to injunctive relief.

- *In re International Technology Corporation Securities Litigation*, CV 88-40-WPG, (C.D. Cal. 1993). Co-lead counsel; $13 million settlement.

- *Colaprico v. Sun Microsystems,* No. C-90-20710 (SW) (N.D. Cal. 1993). Co-lead counsel; $5 million settlement.

- *Steinfink v. Pitney Bowes, Inc.*, No. B90-340 (JAC) (D. Conn. 1993). Lead counsel; $4 million settlement.

- *In re Jackpot Securities Enterprises, Inc. Securities Litigation*, CV-S-89-05-LDG (RJJ) (D. Nev. 1993). Lead counsel; $3 million settlement.

- *In re Nordstrom Inc. Securities Litigation,* No. C90-295C (W.D. Wa. 1991). Co-lead counsel; $7.5 million settlement.

- *United Artists Litigation*, No. CA 980 (Sup. Ct., L.A., Cal.). Trial counsel; $35 million settlement.

- *In re A.L. Williams Corp. Shareholders Litigation*, Consolidated, C.A. No. 10881 (Delaware. Ch. 1990). Lead counsel; benefits in excess of $11 million.

- *In re Triangle Inds., Inc., Shareholders' Litigation*, C.A. No. 10466 (Delaware. Ch. 1990). Co-lead counsel; recovery in excess of $70 million.

- *Schneider v. Lazard Freres*, (N.Y. Sup. 1990). Co-lead counsel.  Landmark decision concerning liability of investment bankers in corporate buyouts; $55 million settlement.

- *Rothenberg v. A.L. Williams,* C.A. No. 10060 (Delaware. Ch. 1989). Sole counsel; benefits of at least $25 million to the class.

- *Kantor v. Zondervan Corporation*, C.A. No. 88 C5425 (W.D. Mich. S.D. 1989). Sole counsel; recovery of $3.75 million.

- *King v. Advanced Systems, Inc.*, C.A. No. 84 C10917 (N.D. Ill. E.D. 1988).  Lead counsel; recovery of $3.9 million (representing 90% of damages).

- *Straetz v. Cordis*, 85-343 Civ. (SMA) (S.D. Fla. 1988). Lead counsel:

    "I want to commend counsel and each one of you for the diligence with which you've pursued the case and for the results that have been produced on both sides.  I think that you have displayed the absolute optimum in the method and manner by which you have represented your respective clients, and you are indeed a credit to the legal profession, and I'm very proud to have had the opportunity to have you appear before the Court in this matter."

**KIRBY McINERNEY LLP - 28**

- *In re Flexi-Van Corporation, Inc. Shareholders Litigation,* C.A. No. 9672 (Delaware. Ch. 1988). Co-lead counsel; $18.4 million settlement.

- *Entezed, Inc. v. Republic of Nigeria,* I.C.C. Arb. (London 1987). Multi-million dollar award for client.

- *In re Carnation Company Securities Litigation,* No. CV84-6913 (FW) (C.D. Cal. 1987). Co-lead counsel; $13 million settlement.

- *In re Data Switch Securities Litigation,* B84 585 (RCZ) (D. Conn. 1985). Co-lead counsel; $7.5 million settlement.

- *Stern v. Steans,* 80 Civ 3903 (GLG). The court characterized the result for the class obtained during trial to jury as "unusually successful" and "incredible" (Jun 1, 1984).

- *In re Datapoint Securities Litigation,* SA 82 CA 338 (W.D. Tex.). Lead Counsel for a Sub-Class; $22.5 million aggregate settlement.

- *Malchman, et al. v. Davis, et al.*, 77 Civ. 5151 (S.D.N.Y., June 8, 1984) (TPG):

  "It is difficult to overstate the far-reaching results of this litigation and the settlement.  Few class actions have ever succeeded in altering commercial relationships of such magnitude.  Few class action settlements have even approached the results achieved herein....  In the present case, the attorneys representing the class have acted with outstanding vigor and dedication . . . Although the lawyers in this litigation have appeared considerably more in the state courts than in the federal court, they have appeared in the federal court sufficiently for me to attest as to the high professional character of their work. Every issue which has come to this court has been presented by both sides with a thoroughness and zeal which is outstanding ....  In sum, plaintiffs and their attorneys undertook a very large and difficult litigation in both the state and federal courts, where the stakes were enormous. This litigation was hard fought over a period of four years.  Plaintiffs achieved a settlement which altered commercial relationships involving literally hundreds of millions of dollars."

*       *       *

**GLANCY BINKOW & GOLDBERG LLP**

ATTORNEYS AT LAW

New York Office

1430 BROADWAY
SUITE 1603
NEW YORK, NY 10018
TELEPHONE (212) 382-2221
FACSIMILE (212) 382-3944

1801 AVENUE OF THE STARS, SUITE 311
LOS ANGELES, CALIFORNIA 90067

———

TELEPHONE (310) 201-9150
FACSIMILE (310) 201-9160
info@glancylaw.com

SAN FRANCICSO OFFICE

ONE EMBARCADERO CENTER
SUITE 760
SAN FRANCISCO, CA 94105
TELEPHONE (415) 972-8160
FACSIMILE (415) 972-8166

## FIRM RESUME

Glancy Binkow & Goldberg LLP has represented investors and consumers in federal and state courts throughout the United States for sixteen years. Based in Los Angeles, California and with offices in New York, New York and San Francisco, California, Glancy Binkow & Goldberg has developed expertise prosecuting securities fraud, antitrust and complex commercial litigation. As Lead Counsel or as a member of Plaintiffs' Counsel Executive Committees, Glancy Binkow & Goldberg has recovered in excess of $1 billion for parties wronged by corporate fraud and malfeasance. The firm's efforts on behalf of individual investors have been the subject of articles in such publications as *The Wall Street Journal*, *The New York Times* and *The Los Angeles Times*.

Appointed as Lead or Co-Lead Counsel by federal judges throughout the United States, Glancy Binkow & Goldberg has achieved significant recoveries for class members, including:

In re Mercury Interactive Corporation Securities Litigation, USDC Northern District of California, Case No. 05-3395, in which Glancy Binkow & Goldberg served as Co-Lead Counsel and achieved a settlement valued at over $117 million.

In re Lumenis, Ltd. Securities Litigation, USDC Southern District of New York, Case No.02-CV-1989, in which Glancy Binkow & Goldberg served as Co-Lead Counsel and achieved a settlement valued at over $20 million.

In re Heritage Bond Litigation, USDC Central District of California, Case No. 02-ML-1475-DT, where as Co-Lead Counsel, Glancy Binkow & Goldberg recovered in excess of $28 million for defrauded investors and continues to pursue additional defendants.

In re ECI Telecom Ltd. Securities Litigation, USDC Eastern District of Virginia, Case No. 01-913-A, in which Glancy Binkow & Goldberg served as sole Lead Counsel and recovered almost $22 million for defrauded ECI investors.

<u>Yaldo v. Airtouch Communications</u>, State of Michigan, Wayne County, Case No. 99-909694-CP, in which Glancy Binkow & Goldberg served as Co-Lead Counsel and achieved a settlement valued at over $32 million for defrauded consumers.

<u>In re Infonet Services Corporation Securities Litigation</u>, USDC Central District of California, Case No. CV 01-10456 NM, in which as Co-Lead Counsel, Glancy Binkow & Goldberg achieved a settlement of $18 million.

<u>In re Musicmaker.com Securities Litigation</u>, USDC Central District of California, Case No. 00-02018, a securities fraud class action in which Glancy Binkow & Goldberg was sole Lead Counsel for the Class and recovered in excess of $13 million.

<u>In re ESC Medical Systems, Ltd. Securities Litigation</u>, USDC Southern District of New York, Case No. 98 Civ. 7530, a securities fraud class action in which Glancy Binkow & Goldberg served as sole Lead Counsel for the Class and achieved a settlement valued in excess of $17 million.

<u>In re Lason, Inc. Securities Litigation</u>, USDC Eastern District of Michigan, Case No. 99 76079, in which Glancy Binkow & Goldberg was Co-Lead Counsel and recovered almost $13 million for defrauded Lason stockholders.

<u>In re Inso Corp. Securities Litigation</u>, USDC District of Massachusetts, Case No. 99 10193, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement valued in excess of $12 million.

<u>In re National TechTeam Securities Litigation</u> USDC Eastern District of Michigan, Case No. 97-74587, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement valued in excess of $11 million.

<u>In re Ramp Networks, Inc. Securities Litigation</u>, USDC Northern District of California, Case No. C-00-3645 JCS, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of nearly $7 million.

<u>In re Gilat Satellite Networks, Ltd. Securities Litigation</u>, USDC Eastern District of New York, Case No. 02-1510 CPS, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of $20 million.

<u>Taft v. Ackermans (KPNQwest Securities Litigation)</u>, USDC Southern District of New York, Case No. 02-CV-07951, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement worth $11 million.

Ree v. Procom Technologies, Inc., USDC Southern District of New York, Case No. 02CV7613, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of $2.7 million.

Capri v. Comerica, Inc., USDC Eastern District of Michigan, Case No. 02CV60211 MOB, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of $6.0 million.

Tatz v. Nanophase Technologies Corp., USDC Northern District of Illinois, Case No. 01C8440, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of $2.5 million.

In re Livent, Inc. Noteholders Litigation, USDC Southern District of New York, Case No. 99 Civ 9425, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of over $27 million.

Plumbing Solutions Inc. v. Plug Power, Inc., USDC Eastern District of New York, Case No. CV 00 5553 (ERK) (RML), a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of over $5 million.

Glancy Binkow & Goldberg filed the initial landmark antitrust lawsuit against all of the major NASDAQ market makers and served on Plaintiffs' Counsel's Executive Committee in In re Nasdaq Market-Makers Antitrust Litigation, USDC Southern District of New York, Case No. 94 C 3996 (RWS), MDL Docket No. 1023, which recovered $900 million for investors in numerous heavily traded Nasdaq issues.

In addition, Glancy Binkow & Goldberg serves as Class Counsel in In re Real Estate Associates Limited Partnership Litigation, USDC Central District of California, Case No. 98-7035 DDP, in which plaintiffs' Counsel achieved a $184 million jury verdict after a complex six week trial in Los Angeles, California and later settled the case for $83 million.

The firm currently serves as Lead or Co-Lead Counsel in numerous securities fraud and consumer fraud actions throughout the United States, including, among others:

Shah v. Morgan Stanley Co.,
USDC Southern District of New York, Case No. 03 Civ. 8761 (RJH)

Lapin v. Goldman Sachs,
USDC Southern District of New York, Case No. 03-0850-KJD

In re Heritage Bond Litigation,
USDC Central District of California, Case No. 02-ML-1475-DT

Payne v. IT Group, Inc.,
USDC Western District of Pennsylvania, Case No. 02-1927

Oscar Private Equity Investments v. Holland (Allegiance Telecom Securities Litigation),
USDC Northern District of Texas, Case No. 3:-CV-2761-H

Winer Family Trust v. Queen (Pennexx Securities Litigation),
USDC Eastern District of Pennsylvania, Case No. 2:03-cv-04318 JP

In re ADC Telecommunications Inc. Securities Litigation,
USDC District of Minnesota, Case No. 03-1194 (JNE/JGL)

Porter v. Conseco, Inc.,
USDC Southern District of Indiana, Case No. 02-1332 SEB

In re Simon Transportation Services, Inc. Securities Litigation,
USDC District of Utah, Case No. 2:98 CV 0863 K

        The firm has also recently acted as Class Counsel in obtaining substantial benefits for
shareholders in a number of actions, including:

In re F & M Distributors Securities Litigation,
Eastern District of Michigan, Case No. 95 CV 71778 DT (Executive Committee Member) ($20.25
million settlement)

James F. Schofield v. McNeil Partners, L.P. Securities Litigation,
California Superior Court, County of Los Angeles, Case No. BC 133799

Resources High Equity Securities Litigation,
California Superior Court, County of Los Angeles, Case No. BC 080254

        The firm has served and currently serves as Class Counsel in a number of antitrust class
actions, including:

In re Nasdaq Market-Makers Antitrust Litigation,
USDC Southern District of New York, Case No. 94 C 3996 (RWS), MDL Docket No. 1023

In re Brand Name Prescription Drug Antitrust Litigation,
USDC Northern District of Illinois, Eastern Division, Case No. 94 C 897

Glancy Binkow & Goldberg LLP has been responsible for obtaining favorable appellate opinions which have broken new ground in the class action or securities fields, or which have promoted shareholder rights in prosecuting these actions. Glancy Binkow & Goldberg successfully argued the appeals in <u>Silber v. Mabon I</u>, 957 F.2d 697 (9th Cir. 1992) and <u>Silber v. Mabon II</u>, 18 F.3d 1449 (9th Cir. 1994), which are the leading decisions in the Ninth Circuit regarding the rights of opt-outs in class action settlements. In <u>Rothman v. Gregor</u>, 220 F.3d 81 (2d Cir. 2000), Glancy Binkow & Goldberg won a seminal victory for investors before the Second Circuit Court of Appeals, which adopted a more favorable pleading standard for investors in reversing the District Court's dismissal of the investors' complaint. After this successful appeal, Glancy Binkow & Goldberg then recovered millions of dollars for defrauded investors of the GT Interactive Corporation. The firm also argued <u>Falkowski v. Imation Corp.</u>, 309 F.3d 1123 (9th Cir. 2002), *as amended*, 320 F.3d 905 (9th Cir. 2003) and favorably obtained the substantial reversal of a lower court's dismissal of a cutting edge, complex class action initiated to seek redress for a group of employees whose stock options were improperly forfeited by a giant corporation in the course of its sale of the subsidiary at which they worked. The revived action is currently proceeding in the California state court system.

The firm is also involved in the representation of individual investors in court proceedings throughout the United States and in arbitrations before the American Arbitration Association, National Association of Securities Dealers, New York Stock Exchange, and Pacific Stock Exchange. Mr. Glancy has successfully represented litigants in proceedings against such major securities firms and insurance companies as A.G. Edwards & Sons, Bear Stearns, Merrill Lynch & Co., Morgan Stanley, PaineWebber, Prudential, and Shearson Lehman Brothers.

One of firm's unique skills is the use of "group litigation" - the representation of groups of individuals who have been collectively victimized or defrauded by large institutions. This type of litigation brought on behalf of individuals who have been similarly damaged often provides an efficient and effective economic remedy that frequently has advantages over the class action or individual action devices. The firm has successfully achieved results for groups of individuals in cases against major corporations such as Metropolitan Life Insurance Company, and Occidental Petroleum Corporation.

Glancy Binkow & Goldberg LLP currently consists of the following attorneys:

## THE FIRM'S PARTNERS

**LIONEL Z. GLANCY**, a graduate of the University of Michigan Law School, is the founding partner of the firm. After serving as a law clerk for United States District Judge Howard McKibben, he began his career as an associate at Patterson Belknap Webb & Tyler LLP, concentrating in securities litigation. Thereafter, he started a boutique law firm specializing in securities litigation, and other complex litigation, from the Plaintiff's perspective. Mr. Glancy has established a distinguished career in the field of securities litigation over the last fifteen years, appearing as lead counsel on behalf of aggrieved investors in securities class action cases throughout the country. He

has appeared and argued before dozens of district courts and several appellate courts, and has recovered billions of dollars in settlement proceeds for large classes of shareholders. Well known in securities law, he has lectured on its developments and practice at CLE seminars and law schools.

**PETER A. BINKOW**, a partner in Glancy Binkow & Goldberg, was born in Detroit, Michigan on August 16, 1965. Mr. Binkow earned his degree in English Literature from the University of Michigan in 1988 and attended law school at the University of Southern California (J.D., 1994). Mr. Binkow joined the Law Offices of Lionel Z. Glancy upon graduation and became a partner in 2002.

Mr. Binkow has prosecuted lawsuits on behalf of consumers and investors in state and federal courts throughout the United States. He has served as Lead or Co-Lead Counsel in many class action cases, including In re Mercury Interactive Corp Securities Litigation ($117.5 million recovery), In re Lumenis Ltd Securities Litigation ($20.1 million recovery), In re Heritage Bond Litigation ($28 million recovery), In re National Techteam Securities Litigation ($11 million recovery), In re Credit Acceptance Corporation Securities Litigation ($2.5 million recovery), In re Lason Inc. Securities Litigation ($12.68 million recovery), In re ESC Medical Systems, Ltd. Securities Litigation ($17 million recovery) In re GT Interactive Securities Litigation ($3 million recovery) and many others. Mr. Binkow has prepared and/or argued appeals before the Ninth Circuit, Sixth Circuit and Second Circuit Courts of Appeals.

Mr. Binkow is admitted to practice before the state of California, the United States District Courts for the Central, Northern and Southern Districts of California, the United States District Court for the Eastern District of Michigan and the Ninth Circuit Court of Appeals. He is a member of the Los Angeles County Bar Association and the American Bar Association.

**MICHAEL GOLDBERG**, a partner in Glancy Binkow & Goldberg, specializes in federal securities, federal and state antitrust, and consumer fraud class action lawsuits. He has successfully litigated numerous cases which resulted in multi-million dollar recoveries for investors, consumers and businesses.

Mr. Goldberg was born in New York on April 27, 1966. He earned his B.A. degree in 1989 from Pitzer College - The Claremont Colleges, and his J.D. degree in 1996 from Thomas M. Cooley Law School. After graduation from law school, Mr. Goldberg joined the Law Offices of Lionel Z. Glancy and became a partner of Glancy Binkow & Goldberg in 2003. He was admitted to both the California and Florida bars in 1997 and is admitted to practice in numerous courts.

**SUSAN G. KUPFER**, a partner of Glancy Binkow & Goldberg LLP, joined the firm in 2003, where she established its antitrust practice. She is a native of New York City and received her A.B. degree from Mount Holyoke College in 1969 and her J.D. from Boston University School of Law in 1973. She did graduate work at Harvard Law School. In 1977, she was named Assistant Dean and Director of Clinical Programs at Harvard, where she supervised that program of legal practice and taught its related academic components: Introduction to Advocacy (a NITA-style workshop), Lawyering Process and Professional Responsibility.

For much of her legal career, Ms. Kupfer has been a professor of law. She subsequently taught at Hastings College of the Law, Boston University School of Law, Golden Gate University School of Law and Northeastern University School of Law. From 1991 to 2002, she was a lecturer on law at University of California, Berkeley, Boalt Hall, teaching Civil Procedure and Conflict of Laws. Her areas of academic expertise are Civil Procedure, Federal Courts, Conflict of Laws, Constitutional Law, Legal Ethics and Jurisprudence. Her publications include articles on federal civil rights litigation, legal ethics and jurisprudence. She has also taught various aspects of practical legal and ethical training, including trial advocacy, negotiation and legal ethics, to both law students and practicing attorneys.

Ms. Kupfer previously served as corporate counsel to The Architects Collaborative in Cambridge and San Francisco and was the executive director of the Massachusetts Commission on Judicial Conduct. She returned to the practice of law in San Francisco with Morgenstein & Jubelirer and Berman DeValerio Pease Tabacco Burt & Pucillo before joining the Glancy Firm. Her practice is concentrated in antitrust, securities and consumer complex litigation. She has been a member of the lead counsel team which achieved significant settlements in the following cases: In re Sorbates Antitrust Litigation ($96.5 million settlement), In re Pillar Point Partners Antitrust Litigation ($50 million settlement), In re Critical Path Securities Litigation ($17.5 million settlement).

Ms. Kupfer is a member of the Massachusetts and California State Bars and the United States District Courts for the Northern, Central and Southern districts of California, the District of Massachusetts, the First and Ninth Circuits Courts of Appeal and the U.S. Supreme Court. She was named one of Northern California's Super Lawyers of the Year in 2004, 2005, and 2006 in antitrust litigation.

Ms. Kupfer is currently serving in leadership positions in the following cases:

In re Korean Air Lines Co., Ltd. Antitrust Litigation, U.S.D.C., Central District of California, MDL 1891, No. 07-5107, Interim Co-Lead Counsel

In re: Urethane Antitrust Litigation, U.S.D.C., District of Kansas, No. 2:04-md-01616, Co-Lead Counsel.

In re: Western States Wholesale Natural Gas Antitrust Litigation, U.S.D.C., District of Nevada, No. 2:03-cv-01431, Co-Lead Counsel.

Sullivan et al v. DB Investments, Inc., et al., U.S.D.C, District of New Jersey, No. 3:04-cv-02819, Counsel for Reseller Subclass.

## OF COUNSEL

**ROBIN BRONZAFT HOWALD**, a native of Brooklyn, New York, returned home in 2001 to open the firm's New York City office. Ms. Howald graduated *magna cum laude* from Barnard College in 1980, with a B.A. in psychology. In 1983, she received her J.D. from Stanford Law School, where she served as an Articles Editor for the Stanford Law Review. In addition to her current focus on securities fraud and consumer class action matters, during her 20-year career Ms. Howald has handled cases in many different practice areas, including commercial disputes, professional malpractice, wrongful termination, bankruptcy, patent and construction matters. As outside counsel for the City of Torrance, California, she also handled a number of civil rights and land use matters, as well as a ground-breaking environmental action concerning Mobil Oil's Torrance refinery. Ms. Howald has experience in pre-trial and trial procedure and has successfully prosecuted post-trial motions and appeals.

Mrs. Howald is a member of the bar of both California (1983) and New York (1995), and is admitted to practice in all federal judicial districts in California, the Southern and Eastern Districts of New York, and the United States Supreme Court. She co-authored "Potential Tort Liability in Business Takeovers" (*California Lawyer*, September 1986), was a speaker and contributing author at the Eighth Annual Current Environmental and Natural Resources Issues Seminar at the University of Kentucky College of Law (April 1991), and served as a Judge Pro Tem for the Los Angeles County Small Claims Court (1996-1997). Married in 1985, Mrs. Howald and her husband have two sons. An avid runner, Mrs. Howald has completed six marathons.

**NEAL A. DUBLINSKY** was born in Flushing, New York on January 15, 1963. He earned his undergraduate degree from Yeshiva University in 1984, graduating *summa cum laude*, (highest-ranking graduate of his class) and was the recipient of the Dean Isaac Bacon Award for Excellence in the Humanities. Mr. Dublinsky earned his J.D. from New York University School of Law in 1987 where he participated in the Consumer Protection Clinical Program under renowned Professor Anthony G. Amsterdam. Mr. Dublinsky was admitted to the state bar of California in 1988.

Mr. Dublinsky played a strong part in the Firm's successful resolution of the aforementioned matters of <u>In re ESC Medical Systems, Ltd. Securities Litigation</u>, USDC Southern District of New York, Case No. 98 Civ. 7530 and <u>In re Lason, Inc. Securities Litigation</u>, USDC Eastern District of Michigan, Case No. 99 76079. The published opinions in which Mr. Dublinsky has played a primary role include: <u>City of Sterling Heights Police and Fire Retirement System v. Abbey Nat., PLC</u>, --- F.Supp.2d ----, 2006 WL 846261 (S.D.N.Y., Mar 31, 2006) (NO. 05 CIV. 2141 (DC)); <u>Falkowski v. Imation Corp.</u>, 309 F.3d 1123 (9th Cir. 2002), *as amended*, 320 F.3d 905 (9th Cir. 2003); <u>Falkowski v. Imation Corp.</u>, 132 Cal.App.4th 499, 33 Cal.Rptr.3d 724 (Cal.App. 2005), *reh. den.* (Sep 27, 2005), *rev. den.* (Nov 30, 2005), and; <u>Mirpuri v. ACT Mfg., Inc.</u>, 212 F.3d 624 (1st Cir. 2000). In addition, he played a primary role in <u>Caprin v. Simon Transportation Services, Inc.</u>, 99 Fed.Appx. 150 (not selected for publication), 2004 WL 326995 (10th Cir. 2004). He also was an important participant in <u>Rothman v. Gregor</u>, 220 F.3d 81 (2nd Cir. 2000) and <u>Shah v. Meeker</u>, 435 F.3d 244 (2nd Cir. 2006).

**KEVIN F. RUF** was born in Wilmington, Delaware on December 7, 1961. Mr. Ruf graduated from the University of California at Berkeley in 1984 with a B.A. in Economics and earned his J.D. from the University of Michigan in 1987. Mr. Ruf was admitted to the State Bar of California in 1988. Mr. Ruf was an associate at the Los Angeles firm Manatt Phelps and Phillips from 1988 until 1992, where he specialized in commercial litigation and was a leading trial lawyer among the associates there. In 1993 he joined the firm Corbin & Fitzgerald in order to gain experience in criminal law. There he specialized in white collar criminal defense work, including matters related to National Medical Enterprises, Cynergy Film Productions and the Estate of Doris Duke. Mr. Ruf joined Glancy Binkow & Goldberg in 2001 and has taken a lead trial lawyer role in many of the firm's cases. In 2006, Mr. Ruf argued before the California Supreme Court in the case *Smith v. L'Oreal* and achieved a unanimous reversal of the lower court rulings; the case established a fundamental right of all California workers to immediate payment of all earnings at the conclusion of employment. In 2007, Mr. Ruf took an important case before the Ninth Circuit Court of Appeals, convincing the Court to affirm the lower court's certification of a class action in a fraud case (fraud cases have traditionally faced difficulty as class actions because of the requirement of individual reliance). Mr. Ruf has extensive trial experience, including jury trials, and considers his courtroom and oral advocacy skills to be his strongest asset as a litigator. Mr. Ruf currently acts as the Head of the Firm's Labor and Consumer Practice, and has extensive experience in Securities cases as well. Mr. Ruf also has experience in real estate law and has been a Licensed California Real Estate Broker since 1999.

**ROBERT M. ZABB** attended Yale University and Columbia Law School, and received his B.A. in 1975 and his J.D. in 1979. Mr. Zabb is admitted to practice in California, New York and Massachusetts, in state and federal courts in those jurisdictions. His practice has consisted of general business litigation with a specialization in federal securities litigation on the plaintiff and defense sides. He has practiced actively in the United States District Courts for the Southern and Eastern Districts of New York, which are important centers for securities litigation. Mr. Zabb's accomplishments are reflected in numerous reported case decisions, particularly in the cases known as <u>SEC v. Thrasher</u> (Southern District of New York) and <u>In re MTC Securities Litigation</u> (Eastern District of New York). Mr. Zabb has had the privilege of arguing a case before the U.S. Supreme Court. This was a securities case delineating the permissible scope of a private right of action, and is known as <u>Employers Insurance of Wausau v. Musick, Peeler and Garrett</u>.

**FREDERICK W. GERKENS, III**, an of counsel to Glancy Binkow & Goldberg LLP, graduated from Fordham University Law School *cum laude* in 1997 with an LL.M. in Corporate, Banking, and Finance law. Mr. Gerkens received his J.D. degree from New York Law School, graduating *cum laude* in 1995, and an M.B.A. from Temple University in 1978. Mr. Gerkens received his undergraduate degree from Temple University (B.A. Psychology, *cum laude*) in 1975. Mr. Gerkens also is a Certified Public Accountant (New York, 1980).

After graduating law school, Mr. Gerkens was employed at the United States Securities and Exchange Commission, Division of Market Regulation, and thereafter practiced principally in securities class actions, complex commercial litigation, and employment law, and was a partner at another prominent class action litigation firm.

Prior to law school, Mr. Gerkens was employed at a major Wall Street investment firm as director of financial reporting and manager of regulatory reporting (1985-1992). Prior to that, Mr. Gerkens was an auditor employed by recognized public accounting firms, with mostly financial institution clientele (1978-1985).

Mr. Gerkens is a member of the American Bar Association (Litigation Section), the Association of the Bar of the City of New York and the American Institute of Certified Public Accountants.

Mr. Gerkens played a prominent role in prosecuting several securities class actions to successful conclusion, resulting in settlements to the respective shareholder classes, including In re BankOne Shareholders Litig., No. 00-CV-0880 (N.D. Ill.); In re UNUMProvident Sec. Litig., No. 99-CV-301 (D. Me.); In re Allied Products Sec. Litig., No. 99-CV-3597 (N.D. Ill.); In re Laidlaw Stockholders Litig., No. 3:00-CV-0855-17 (D.S.C.); In re Alliance Pharm. Corp. Sec. Litig., No. 01-CV-1674 (S.D.N.Y.); In re Warnaco Group, Inc. Sec. Litig. (II), No. 01-CV-3346 (S.D.N.Y.); In re Rediff Inc. Sec. Litig., No. 01-CV-3020 (S.D.N.Y.); In re Abercrombie & Fitch Co. Sec. Litig., M21-83 (S.D.N.Y.); In re Global Crossing, Inc. Sec. Litig., No. 02-CV-0910 (S.D.N.Y.); In re Amazon.com, Inc. Sec. Litig., No. C-01-0358-L (W.D. Wash.); In re Harnischfeger, Inc. Sec. Litig., Nos. 98-C-0524, 99-C-0598 (E.D. Wis.); In re American Bank Note Holographics, Inc. Sec. Litig., No. 99-C-0598 (S.D.N.Y.); and In re Avista Corp. Sec. Litig., No. CV-02-0328 (E.D. Wash.).

Mr. Gerkens is admitted to practice in New York (1995), the United States Supreme Court, the United States Courts of Appeals for the Second, Third, Fourth, Fifth and Sixth Circuits, and the United States District Courts for the Southern and Eastern Districts of New York and the Eastern District of Wisconsin.

**MICHAEL B. ACKERMAN** was born in Brooklyn, New York on June 30, 1962. He received his Bachelor of Arts from Columbia University in 1984 and attended Fordham University Law School (J.D. 1987). Mr. Ackerman was admitted to the New York bar in 1989 and the California bar in 1990. Mr. Ackerman is a member of the American Bar Association, the Los Angeles County Bar Association and the Association of the Bar of the City of New York.

**BRADLEY J. HILLIS** graduated from the University of Washington School of Law (J.D., 1988), where he was a member of Moot Court Honor Board. He received a B.A. from The Colorado College and M.A. in history from the University of Washington. Mr. Hillis is a member of the bars of New York, Massachusetts and Washington State, the U.S. District Courts for the Western District of Washington and Massachusetts, and the U.S. Courts of Appeal for the First and Ninth Circuits. He is the author of "Electronic Court Filing and the Internet," (The Journal of Appellate Practice and Process, volume 2:2, Winter 2000). He has previously worked as a deputy prosecuting attorney for

the King County Prosecutor's Office, in Seattle, Washington, and was a member of the Advisory Board of Findlaw.com.

**ILANA KOHN** was born in Encino, California, on October 7, 1967. She earned her undergraduate degree from Mills College in 1993, with honors, and her J.D. from the University of San Francisco School of Law in 1999, with honors. Ms. Kohn was admitted to the State Bar of California in 1999, and is admitted to practice before the Northern, Central and Eastern Districts of California. Ms. Kohn specializes in class actions on behalf of defrauded investors and consumers. Prior to her class action work, Ms. Kohn was an associate in the San Francisco office of Schnader Harrison Segal and Lewis, where she specialized in commercial litigation. Since joining the firm in 2003, Ms. Kohn has been involved in the prosecution of the Initial Public Offering Securities Litigation pending in the United States District Court for the Southern District of New York, a coordinated proceeding of over 300 class action lawsuits based on market manipulation in initial public offerings during the high technology boom of the late 90s.

**JALA AMSELLEM** has been engaged in the private practice of civil ligation for over ten years. She has handled a broad variety of cases in the areas of corporate commercial, family law, personal injury and entertainment litigation. Jala is also a former legal writing professor who taught legal skills for twelve years. In her last academic position she was the Associate Director of the legal writing program at The George Washington School of Law. Recently, Jala founded The Bar Coach, a company dedicated to assisting bar takers pass the California Bar Exam.

Jala received her undergraduate degree from New York University in 1982 and her J.D. from Touro Law School in 1985. At Touro, Jala was the Senior Editor of the law review. Jala is admitted to the bars of California, New York, New Jersey, Michigan and the District of Columbia.

**KATHARINE A. KATES**, Of Counsel to the Firm in San Francisco, graduated from Hastings College of the law (1991, with honors) where she was a member of the Hastings Law Journal. She received a B.A. (1985, with high honors) and an M.A. (1988) in the History of Art from the University of California, Berkeley. After obtaining her law degree, Ms. Kates practiced at Sonnenschein Nath & Rosenthal in San Francisco. Ms. Kates was a staff attorney at the United States District Court for the Central District of California, then joined the Los Angeles litigation boutique O'Neill Lysaght & Sun and later, Murphy Rosen & Cohen. Prior to focusing on antitrust litigation, Ms. Kates' experience included complex commercial litigation and white collar criminal defense, with a particular emphasis on securities matters.

**SYLVIE KULKIN KERN** has been a commercial litigator for more than twenty years. She began her legal career as a law clerk to Justice John Holmdahl of the California Court of Appeal, First District, and then practiced law in San Francisco at Severson, Werson, Berke & Melchior (1985-1988); Brobeck Phleger & Harrison (1988-1993); and Morrison & Foerster LLP (1995-2004), where she was Of Counsel on the firm's securities litigation team. She joined Glancy Binkow & Goldberg LLP in 2005. In addition to her work in the securities field and her current focus on antitrust litigation, Ms. Kern has handled numerous complex commercial cases in state and federal

court in the transportation, insurance, banking, real estate, and telecommunications industries, at both the law-and-motion and appellate stages.

Originally from France, Ms. Kern graduated from the University of California at Los Angeles in 1973, Magna cum Laude and Phi Beta Kappa with dual degrees in French and Political Science. She obtained her master's degree from the Johns Hopkins School of Advanced International Studies in 1975, and a law degree from Hastings College of the Law, where she served on the Hastings International and Comparative Law Review, in 1983. Prior to attending law school, Ms. Kern served as a Foreign Service officer with the United States Agency for International Development, managing foreign aid programs in El Salvador and Haiti. She speaks French, Spanish and Italian, and has lived or traveled in over thirty countries.

## ASSOCIATES

**MARC L. GODINO** has extensive experience successfully litigating complex, class action lawsuits as a plaintiffs' lawyer. Mr. Godino has played a primary role in cases resulting in settlements of more than $100 million. He has prosecuted securities, derivative, ERISA, and consumer cases throughout the country in both State and Federal court as well as represented defrauded investors at NASD arbitrations.

While an associate with Stull Stull & Brody, Mr. Godino was one of the two primary attorneys involved in Small v. Fritz Co., 30 Cal. 4th 167 (April 7, 2003) in which the California Supreme Court created new law in the state of California for shareholders that held shares in detrimental reliance on false statements made by corporate officers. The decision was widely covered by national media including *The National Law Journal*, *Los Angeles Times*, *New York Times*, and the *New York Law Journal*, among others and was heralded as a significant victory for shareholders.

Other published decisions include: In re 2TheMart.com Securities Litigation, 114 F.Supp 2d 955 (C.D.Cal. 2002); In re Irvine Sensors Securities Litigation, 2003 U.S. Dist. LEXIS 18397 (C.D.Cal. 2003); Brown v. Computerized Thermal Imaging Inc., 2002 WL 31109563 (D.Or. 2002).

Mr. Godino received his undergraduate degree from Susquehanna University with a bachelor of science degree in Business Management. He received his J.D. from Whittier Law School in 1995.

Mr. Godino is admitted to practice before the state of California, the United States District Courts for the Central, Northern and Southern Districts of California, the District of Colorado, and the Ninth Circuit Court of Appeals.

**DALE MacDIARMID** is a native of Los Angeles, California. He holds a B.A. in Journalism (with Distinction) from the University of Hawaii, and a J.D. from Southwestern University School of Law, where he was a member of the Board of Governors of the Trial Advocacy Honors Program. He is admitted to practice in California, before the United States District Courts for the Southern, Central and Northern Districts of California and the District of Colorado. Dale is a member of Kappa Tau

Alpha, the national journalism honor society, and before joining Glancy Binkow & Goldberg he was a writer and editor for newspapers and magazines in Honolulu and Los Angeles.

**KARA M. WOLKE** graduated summa cum laude with a B.S.B.A. in Economics from The Ohio State University in 2001. Kara earned her J.D. (with honors) from Ohio State in May, 2005, where she was active in Moot Court and received the Dean's Award for Excellence for each of her three years. In 2005, she was a finalist in a national writing competition co-sponsored by the American Bar Association and the Grammy® Foundation. (7 Vand. J. Ent. L. & Prac. 411). Kara joined Glancy Binkow & Goldberg in the fall of 2005 and was admitted to the State Bar of California in January, 2006.

**ANDY SOHRN** joined Glancy Binkow & Goldberg LLP in 2006. He was admitted to the California Bar in January 2006 after receiving his J.D. from the University of California Los Angeles School of Law in May 2005. While attending law school, Andy was the Managing Editor of the Pacific Basin Law Journal, participated in Moot Court and was a Teaching Assistant for the Lawyering Skills program. He also holds a B.A. in Economics and Mathematics from Yale University (class of 2002).

**KATHERINE DEN BLEYKER** joined Glancy Binkow & Goldberg LLP in 2007. She holds a B.A. in Political Science from the University of Michigan and a J.D. from Fordham University School of Law (class of 2007). While in law school, Katherine received the Fordham Legal Writing Award, and her note on military blogging and the First Amendment, 17 Fordham Intell. Prop. Media & Ent. L.J. 401, was nominated for best student-written work. She was also a member of the Moot Court editorial board, an extern for the Honorable Magistrate Judge Patty Shwartz (D.N.J.), and an extern at Jazz at Lincoln Center. Katherine was admitted to the state bar of New York in 2008.

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————— x

| | | |
|---|---|---|
| MORTON LIPETZ and EVELYN JEAN LIPETZ, Individually and On Behalf of All Others Similarly Situated, | : | Civil Action No. 08-6171 |
| | : | |
| | : | <u>CLASS ACTION</u> |
| | : | |
| Plaintiffs, | : | COMPLAINT FOR VIOLATION OF THE |
| | : | FEDERAL SECURITIES LAWS |
| vs. | : | |
| | : | |
| WACHOVIA CORPORATION, G. | : | |
| KENNEDY THOMPSON and THOMAS J. | : | |
| WURTZ, | : | |
| | : | |
| Defendants. | : | <u>DEMAND FOR JURY TRIAL</u> |
| | x | |

———————————————————

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Wachovia Corporation ("Wachovia" or the "Company") between May 8, 2006 and June 6, 2008 (the "Class Period"), against Wachovia and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Wachovia is registered as a financial holding company and a bank holding company, and provides commercial and retail banking and trust services through full-service banking offices.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results and concealed the Company's extremely aggressive residential mortgage lending practices, its failure to write down impaired securities containing subprime debt, its poor internal controls and its improper practices with respect to auction rate securities. As a result of defendants' false statements, Wachovia stock traded at artificially inflated prices during the Class Period, reaching a high of $58.80 per share in February 2007.

4.      In mid-July 2007, it became apparent to the market that banks, including Wachovia, would be adversely affected by the mortgage meltdown. As it relates to Wachovia, investors would have known this information at the beginning of the Class Period had defendants disclosed Wachovia's risky practices with respect to mortgage lending and taken appropriate reserves for the large amount of securities linked to subprime mortgages in its portfolio. While Wachovia's stock declined during July, it continued to be artificially inflated due to defendants' concealment of Wachovia's enormous problems with mortgage-related assets.

5.      On November 8, 2007, Wachovia announced that the Company was setting aside $600 million in the fourth quarter and that the value of securities it owned linked to subprime mortgages dropped by $1.1 billion in October 2007. This followed write-downs of $1.3 billion in the third quarter. Even with the write-downs, Wachovia's stock continued to be artificially inflated

as defendants represented that future residential mortgage-backed securities losses, net of hedges, would be immaterial.  The press release stated:

> **October Market Events**  Following our October 2007 announcement of third quarter 2007 results of operations and our financial outlook for the remainder of 2007, certain financial markets experienced further deterioration, particularly the markets for subprime residential mortgage-backed securities ("RMBS") and for collateralized debt obligations ("CDOs") collateralized by RMBS ("ABS CDOs"). In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

> \*       \*       \*

> The value of CDOs we have in our portfolio depends on the value of the underlying collateral. ABS CDOs experienced declines in value correlated to the declines in value of subprime RMBS in October. Our third quarter 2007 market disruption-related losses totaling $1.3 billion pre-tax included $347 million of subprime-related valuation losses, net of hedges, on ABS CDOs. Due to the October market deterioration, these ABS CDOs experienced further declines in value in the month of October 2007 by an amount we currently estimate to be approximately $1.1 billion pre-tax. ***At October 31, 2007, we had remaining exposure to ABS CDOs of $676 million***, including on-balance sheet positions and the notional amount of off-balance sheet positions, compared to $1.8 billion at September 30, 2007.

> We have exposure to subprime RMBS in other positions totaling $2.1 billion at both October 31, 2007, and September 30, 2007. Estimated aggregate valuation ***losses of these other positions during the month of October 2007 are immaterial net of hedges***.

> \*       \*       \*

> ***Of the remaining asset classes where we recorded market disruption-related losses in the third quarter of 2007, the aggregate net market value changes in October in these investments have not been significant. These asset classes include commercial mortgage, leveraged finance, consumer mortgage, and other structured credit products not collateralized by subprime RMBS. Some of the markets for these asset classes continue to demonstrate poor liquidity and higher than typical volatility while others have displayed moderate stability in October.***

6.      As a result of this news entering the market, Wachovia's stock dropped to close at $40.65 per share on November 9, 2007, a decline of 11% from October 31, 2007, and a decline of 19% from October 15, 2007.

- 2 -

7.     However, even these disclosures failed to inform investors of the extent of Wachovia's problems.

8.     On December 12, 2007, Wachovia disclosed that it would set aside $1 billion in excess of charge-offs, an increase from the previous estimate of $500 million to $600 million.

9.     On January 22, 2008, Wachovia issued its fourth quarter and full year 2007 financial results, in a release which stated in part:

> Wachovia Corp. today reported net income of $51 million, or 3 cents per share, in the fourth quarter of 2007 compared with $2.30 billion, or $1.20 per share, in the fourth quarter of 2006.
>
> *     *     *
>
> "The continued turmoil in the capital markets and the dramatic change in the credit environment diminished our fourth quarter results substantially," said Ken Thompson, Wachovia chairman and chief executive officer. "We took active and prudent steps in the second half of the year to deal with the market disruption and credit deterioration, and we believe this allows us to move forward from a position of strength despite the uncertain economic environment. . . . . Our management team and dedicated employees are focused intently on the strategic priorities that prepared us well for this more difficult economic environment: controlling expenses, managing risk appropriately, creating revenue synergies between our businesses, and continuing to provide industry-leading customer service. We're excited about the future with our new partners from A.G. Edwards and with our newest banking markets in some of the nation's fastest growing and affluent regions."

10.     On February 5, 2008, *The New York Times* reported that Wachovia was accused in a lawsuit of allowing fraudulent telemarketers to use its accounts to steal millions from victims. Also on February 5, 2008, Wachovia had to offer the highest coupon the bank had ever paid on bonds in order to raise capital.

11.     On February 28, 2008, Wachovia disclosed it expected even higher losses on mortgage defaults, as the Company raised its expected losses from lending to more than triple the prior year's levels because of rising mortgage defaults. The Company's stock dropped to $32.36 per share on the news, but continued to be artificially inflated as defendant G. Kennedy Thompson, the

- 3 -

Company's CEO and President, assured investors: "We have every confidence we'll navigate the headwinds of the current cycle."

12.    On March 3, 2008, Wachovia was sued by hedge fund VCG Special Opportunities Master Fund Ltd. for improperly requiring it to pay out more from insurance derivatives contracts as the value of mortgage-backed bonds declined.

13.    On April 14, 2008, Wachovia reported its first quarter 2008 financial results, which included a provision for credit losses of $2.8 billion, and reduced the dividend, in a release which stated in part:

> Wachovia today announced a series of actions to further enhance its capital base and operational flexibility, and updated its credit reserve modeling to reflect greater emphasis on forecasted changes in customer behavior assuming continued house price depreciation. These actions include:
>
> • Plans to raise capital through a public offering of common stock and perpetual convertible preferred stock;
>
> • Lowering the quarterly common stock dividend, which preserves $2.1 billion of capital annually, to build capital ratios and provide more operational flexibility. The board of directors declared a quarterly common stock dividend of $0.375 cents per common share, payable on June 16, 2008, to stockholders of record on May 30, 2008. This dividend level is consistent with Wachovia's capital needs and growth opportunities for each of its business segments, and with an anticipated 40 percent to 50 percent cash payout ratio over the intermediate horizon; and
>
> • The update in the credit reserve modeling in response to the current and forecasted market environment and its effect on consumer behavior, particularly in stressed markets, resulting in a significant increase in the first quarter 2008 provision for credit losses. In addition, the scope of credit disclosures was increased to provide enhanced insight into the payment option consumer real estate portfolio.
>
> In addition, Wachovia reported a first quarter 2008 net loss of $350 million before preferred dividends, or a net loss available to common stockholders of $393 million, (20 cents per common share). These results, which reflect higher credit costs and the continued disruption in the capital markets, compared with earnings of $2.30 billion, or $1.20 per share, in the first quarter of 2007.

\*        \*        \*

Other key trends in the first quarter of 2008 compared with the first quarter of 2007 included:

\*        \*        \*

- Provision for credit losses of $2.8 billion, which exceeded net charge-offs by $2.1 billion. The provision largely reflected more severe deterioration in the residential housing market, particularly in specific markets in California and Florida, as well as the result of the refinements made to the credit reserve model for the payment option product. These refinements incorporate multiple and more granular factors regarding unprecedented consumer behavior, housing price deterioration and increased foreclosures. Net charge-offs were $765 million, or an annualized 0.66 percent of average net loans. Total nonperforming assets including loans held for sale were $8.4 billion, or 1.70 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer real estate-related nonperforming assets due to the effects of the weakened housing industry.

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, other intangible amortization and discontinued operations. Segment earnings are the basis on which Wachovia manages and allocates capital to its business segments. In accordance with Wachovia's business segment methodology, provision expense in excess of charge-offs, which amounted to $2.1 billion in the first quarter of 2008, is not allocated to business segments.

14.    On this news, Wachovia's stock declined to $25.55 per share, on volume of 191 million shares, a decline of 56% from the Class Period high of $58.80 per share in February 2007.

15.    On April 15, 2008, Oppenheimer cut Wachovia's fiscal 2008 earnings estimate to $1.70 a share from $2.70 a share, citing the Company's share sale to replenish capital, which diluted existing stock by about 15%, and credit losses linked to the U.S. subprime slump.  As *Bloomberg* reported:

Richard Bove, an analyst at Punk Ziegel & Co. LP, questioned the company's credibility, saying the bank cut its dividend after previously suggesting it wouldn't trim the payout.  Bove called for the removal of Lanty Smith, the Wachovia director

- 5 -

who said in a Wall Street Journal article that it was "disingenuous" for investors to be surprised by Wachovia's dividend reduction.

'Outrageous Statement'

"This is not acceptable," said Bove in a note to investors. "It is the most outrageous statement I can ever remember made by a board member directly insulting shareholders."

16.    By late May 2008, Wachovia disclosed it had received subpoenas and/or inquiries

from the SEC and regulators from several states, related to auction rate securities.

17.    On June 2, 2008, Wachovia announced an immediate change in the Company's

management, in a release which stated in part:

Wachovia announced today that its current Chairman, Lanty Smith, has been appointed interim Chief Executive Officer, succeeding Ken Thompson, who is retiring at the request of the Board.  Ben Jenkins, currently Vice Chairman and President of the General Bank, will serve as interim Chief Operating Officer.

All of the company's staff functions will report to Smith, with the company's four lines of business – General Bank, Wealth Management, the Corporate and Investment Bank and Capital Management – reporting to Jenkins.  The Board of Directors has formed a special committee to conduct a search for a permanent Chief Executive Officer.

"Wachovia is a strong institution and well positioned even in the face of the unprecedented conditions in the financial services industry," said Smith.  "The Board is confident that we are putting in place the right interim leadership to move the company forward, and no other senior management changes are currently contemplated."

Smith continued, "No single precipitating event caused the Board to reach this decision, but a series of previously disclosed disappointments and setbacks cumulatively have negatively impacted the company and its performance.  The Board believes new leadership will help to revitalize and reenergize Wachovia and enable it to realize its potential.  We will move Wachovia steadily ahead as a strong, independent company by continuing to focus first on the needs of our customers. Our recent successful capital raising actions provide us the solid foundation and flexibility we need in an environment which remains extremely challenging for Wachovia and the entire banking industry.  Despite continued hurdles, we have confidence in our strong liquidity, good capital position and solid business model."

18.    Wachovia was then placed on creditwatch negative by Standard & Poor's.

19.    After this news, Wachovia's stock dropped to $23.40 per share on June 2, 2008, on volume of 66 million shares.  The stock continued to decline on June 3, 2008.

20.    Then, on June 9, 2008, a *BusinessWeek* article came online about Wachovia, entitled "Wachovia:  Golden West Wasn't Golden."  The article stated in part:

> When Wachovia (WB) Chief Executive Officer Ken Thompson sealed a $24 billion deal to buy Golden West Financial in May, 2006, he bragged that he had bagged "a crown jewel" of the mortgage business. Two years later it's painfully clear that Thompson bought the nation's second-largest S&L at the peak of the housing bubble, a misstep that led to his ouster on June 2.
>
> *        *        *
>
> Analysts figure Wachovia could end up incurring losses of as much as $11 billion on Golden's West $122 billion mortgage portfolio. "You'd be hard-pressed to find anything good out of this acquisition," says Terry Maltese, president of Sandler O'Neill Asset Management.
>
> *        *        *
>
> In most mergers, it's the acquirers that exert their will. But right after Wachovia bought Golden West, executives from the S&L took control of all mortgage lending. And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-A-Payment" loans. These give borrowers four choices of how much to pay each month, and cost as much as a full percentage point more than a 30-year, fixed-rate mortgage. "[Management] believed Pick-A-Payment loans were the answer for every customer," says one ex-broker.
>
> *        *        *
>
> Despite Thompson's tireless defense of the deal, it was evident by earlier this year that Golden West's approach worked best in rising markets. Analysts note that Golden West focused too much on appraisals and too little on verifying the income and assets of applicants. While this tactic helped ensure that Golden West could recover the full value of homes that went into foreclosure during up cycles, it didn't anticipate that borrowers would simply walk away if a plunge in home prices left them underwater.
>
> Thompson in January eased out Golden West's top executive and soon after required Golden West's mortgage officers to start using credit scores and better verify employment and assets from applicants. But those moves were too late to salvage his job.

21.    On this news, Wachovia's stock dropped to $18.89 per share on June 9, 2008, on volume of more than 80 million shares.

22.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Defendants' portfolio of collateralized debt obligations ("CDOs") contained billions of dollars worth of impaired and risky securities, many of which were backed by subprime mortgage loans.

(b)    Defendants failed to properly account for highly leveraged loans such as mortgage-backed securities.

(c)    Wachovia had inadequate controls to prevent employees and others from using customer account numbers to steal millions of dollars.

(d)    The Company had inadequate controls to prevent management from understating loan loss allowances by billions of dollars causing Wachovia's financial statements to be materially misstated.

(e)    Internally at Wachovia it was understood that the acquisition of Golden West Financial in 2006 for $24 billion had been a colossal mistake and would lead to large losses.

(f)    Wachovia had become heavily involved in the underwriting, sale and subsequent auctions of auction rate securities, which were much riskier than represented to investors in the securities and the municipalities which issued them.[1]  Once these auctions began failing, Wachovia would be subject to investigations and loss of reputation.

---

[1]    An auction rate security ("ARS") typically refers to a debt instrument (such as municipal bonds) with a long-term nominal maturity for which the interest rate is reset through a dutch auction.

(g)    Wachovia had been heavily involved in pay-option adjustable rate mortgages ("pay-option ARMs"). These pay-option ARMs provided that during the initial term of the loan, borrowers could pay only as much as they desired with any underpayment being added to the loan balance. These loans would become toxic (for both Wachovia and the borrowers) once housing prices stopped increasing at a rapid rate.

23.    As a result of defendants' false statements, Wachovia's stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 67% from their price before these disclosures.

## JURISDICTION AND VENUE

24.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

25.    Venue is proper here pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District. Wachovia has a substantial presence in New York. Many of the acts and transactions giving rise to the violations of law complained of occurred here.

26.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

27.    Plaintiffs Morton Lipetz and Evelyn Jean Lipetz purchased Wachovia common stock as described in the attached certification and were damaged thereby.

28.    Defendant Wachovia operates as a bank holding company. The Company engages in capital management, the general bank, wealth management, and the corporate and investment bank

businesses and provides various commercial and retail banking and trust services through full-service banking offices in the United States.  Wachovia has headquarters in Charlotte, North Carolina, and has branch offices throughout the United States, including many in this District, and around the globe.

29.     Defendant G. Kennedy Thompson ("Thompson") was, at relevant times, Chairman of the Board of Wachovia until May 2008, and was CEO and President of the Company until June 2, 2008, when the Board asked him to retire.

30.     Defendant Thomas J. Wurtz ("Wurtz") is, and at all relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of Wachovia.

31.     Defendants Thompson and Wurtz (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Wachovia's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein at ¶¶39-48, 51, 53-55, 57, 59, 61-62, 64, 67-68, 70, 72, 74, 76-77 and 80.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

32.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Wachovia.  Defendants' fraudulent scheme and course of

business that operated as a fraud or deceit on purchasers of Wachovia common stock was a success,

as it: (i) deceived the investing public regarding Wachovia's prospects and business; (ii) artificially

inflated the price of Wachovia common stock; and (iii) caused plaintiff and other members of the

Class to purchase Wachovia common stock at inflated prices.

33.    Defendants were also motivated by the compensation arrangements of Wachovia.

Defendants' compensation was in large part determined by the reported financial performance of the

Company:

> The Compensation Committee determines this compensation element at the end of the fiscal year so that all relevant data are available regarding the corporate and individual performance measures, relying upon audited financial results. Wachovia provides the annual cash incentive award opportunities to our executive officers, including the CEO, under the covered officer incentive component of the SIP. The maximum individual award, including cash incentive and restricted stock awards, under the SIP is limited to 0.5% of Wachovia's adjusted net income, which in 2006 is equal to $39.5 million. Funding for the SIP annual cash incentive award component is based on an assessment of Wachovia's actual financial performance relative to the Compensation Committee's pre-established financial performance goals:
>
> - If actual performance does not reach a certain threshold level of goal performance, the SIP does not fund;
>
> - If actual performance reaches a threshold level, the SIP funds at 50% of target;
>
> - If actual performance reaches the target level, the SIP funds at 100% of target; and
>
> - If actual performance reaches a superior level, the SIP funds at 200% of target.

34.    For 2006, defendants received the following amounts:

Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Thompson | 2006 | 1,090,000 | 9,064,002 | 8,144,728 | 5,150,000 | 216,178 | 23,846,282 |
| Wurtz | 2006 | 420,833 | 527,162 | 328,606 | 1,750,000 | 37,755 | 3,126,515 |

35.    Defendants Thompson and Wurtz also benefited from the inflation in Wachovia's stock price caused by their false statements, each selling $1.7 million worth of their Wachovia stock during the Class Period.

## BACKGROUND

36.    Wachovia operates as a bank holding company. It engages in capital management, and the general bank, wealth management, and corporate and investment bank businesses.  The Company provides various commercial and retail banking and trust services through full-service banking offices in the United States.  Wachovia offers checking, savings, check card, foreign currency, annuities, life insurance, brokerage account transfers, CAP accounts, individual retirement accounts, credit cards, home equity, mortgage, hazard and flood insurance, escrow, taxes, private mortgage insurance, education loans, online services, online banking, online bill pay, and online brokerage services.  The Company also provides various other financial services, including mortgage banking, investment banking, estate planning, investment advisory, asset management, credit and debit card products, trust services, charitable services, mortgage banking, asset-based lending, leasing, insurance, and international and securities brokerage services.  In addition, Wachovia engages in equity and debt underwriting activities, private equity investment activities, derivative securities activities, investment and wealth management advisory businesses, and brokerage activities.

- 12 -

37.    On October 1, 2006, Wachovia completed the acquisition of Golden West Financial Corporation, the parent company of World Savings Bank.  Golden West shareholders received 1,051 shares of Wachovia plus $18.6461 in cash for each Golden West share.  The total cost of the acquisition was $24.3 billion.

38.    By this time, the residential real estate market was beginning to show signs of peaking or, at minimum, indications of reduced growth prospects.  Wachovia was heavily exposed to this market, yet defendants made efforts to conceal the actual threat to Wachovia from the changing housing market.  To conceal their problems, which could devastate the Company, defendants failed to take adequate reserves for mortgage-related assets, and discussed in positive, but false, terms the benefits of the Golden West acquisition.

**DEFENDANTS' FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

39.    On May 7, 2006, after the market closed, Wachovia issued a press release entitled "Wachovia to Acquire Golden West Financial, Nation's Most Admired and 2nd Largest Savings Institution; Enhances Retail Banking Network in Attractive Growth Markets and Bolsters National Consumer Lending," which stated in part:

> Wachovia Corporation and Golden West Financial Corporation, parent of World Savings Bank, said today they have signed a definitive agreement to merge, creating a leading retail banking and mortgage lending franchise in many of the nation's most attractive growth markets. This combination strengthens Wachovia's presence in California, Florida and Texas, and extends the banking franchise within reach of 55 percent of the U.S. population.
>
> With the acquisition of Oakland, California-based Golden West, Wachovia will add 285 consumer banking offices with $62 billion in retail deposits in 10 states while entering new markets in California, Arizona, Colorado, Illinois, Kansas and Nevada. The combined company, which will have assets of $669 billion and a market capitalization of $117 billion, will serve banking customers in 21 states and Washington, D.C. Wachovia will gain mortgage lending operations under the World Savings Bank name in 39 states.

- 13 -

"We believe this combination of our two companies, both known for exceptional customer service and pristine credit quality, will generate superior long-term growth in earnings per share," said Ken Thompson, Wachovia chairman and chief executive officer, who noted that Golden West's World Savings Bank is the nation's only standalone savings and loan with a "AA" debt rating. "For four decades, Golden West has taken industry-wide challenges in stride and maintained a singular focus as a risk-averse residential mortgage portfolio lender. The result is an astonishing 25-year track record of 17 percent compound annual growth in earnings per share and virtually no credit losses realized even in the toughest year in its history."

Herbert M. Sandler, Golden West chairman and chief executive officer, commented, "I've been a keen observer of the market and the mortgage and banking industries for nearly 40 years. Wachovia is the company we selected to entrust with our legacy as one of the nation's most admired and trusted financial institutions. We share the same values of operating with integrity, putting customers first and encouraging teamwork."

Added Marion O. Sandler, Golden West chairman and chief executive officer, "Golden West has grown consistently over many years, and now we'd like to provide our loyal customers with the additional banking products they've been asking for. We believe Wachovia is the perfect partner to deliver on customers' needs and further enhance the strong company we have built."

Terms of the agreement call for each Golden West shareholder to receive a package of 1.051 shares of Wachovia common stock and $18.65 in cash. Based on the closing price of Wachovia common stock on May 5, 2006, this represents total consideration of $25.5 billion, or a price of $81.07 per share of Golden West common stock, a 15 percent premium over Golden West's share price on that date. The purchase accounting transaction, which is expected to close in the fourth quarter of 2006, is expected to add to Wachovia's earnings per share excluding merger-related and restructuring expense and intangibles amortization in the second year after closing. It is expected to provide an internal rate of return of 17 percent for Wachovia shareholders.

Wachovia and Golden West will be well-positioned in numerous high-growth markets, with an extensive product offering – the No. 1 retail bank in the Southeast, a Top 5 bank in the western United States, Top 10 mortgage origination and servicing company, Top 10 indirect auto lender, a leading national brokerage and fund manager, and a well-positioned corporate and investment bank. The combined company will have total deposits of $390 billion and loans of $402 billion. The company's 15 million customers will be served by more than 110,000 employees, 3,400 banking branches, 5,300 ATMs, 360 mortgage lending offices and 730 full-service retail brokerage offices.

"We're very excited to partner with such strong management and with an extremely knowledgeable and diligent team of sales leaders," said Ben Jenkins,

Wachovia vice chairman and General Bank president. "Customers will continue to be served by the same dedicated and passionate people who have always met their needs – only over time, they'll have more products and services to choose from. We'll work hard with our new partners to achieve merger efficiencies, but we expect that no employees who deal directly with customers will lose their jobs."

"Both companies are proud of their tradition of outstanding community service," added Marion Sandler of Golden West. "Together, we will strengthen our community leadership, and our shared commitment to the communities we serve will be made more powerful by this merger." Each company currently has been rated "outstanding" for Community Reinvestment Act compliance by federal regulators.

Wachovia expects the merger will generate $53 million after tax in annual expense reductions, phased in over two years. This equals less than 1 percent of the companies' current combined expense base. Wachovia expects to take merger-related one-time charges of $293 million after tax, related to staff training, retention and severance; real estate; systems integration; and other miscellaneous accruals.

The complementary strengths of the two companies are expected to generate significant revenue opportunities; however, revenue assumptions were not included in the financial assumptions for the transaction.

40.    On July 20, 2006, Wachovia issued its second quarter 2006 financial results, in a release which stated in part:

Wachovia Corp. today reported record net income of $1.88 billion, or $1.17 per share, in the second quarter of 2006 compared with $1.65 billion, or $1.04 per share, in the second quarter of 2005.

Excluding after-tax net merger-related expenses of 1 cent per share in the second quarter of 2006 and 3 cents per share in the second quarter of 2005, earnings were $1.90 billion, or $1.18 per share, in the second quarter of 2006 compared with $1.70 billion, or $1.07 per share, in the second quarter of 2005.

"This was a strong quarter for Wachovia. In the face of a challenging yield curve environment, we generated double-digit revenue and earnings growth driven by solid execution. Our team delivered record results in three of our four major businesses, and the first full quarter of results in our new auto lending businesses exceeded our expectations," said Ken Thompson, Wachovia chairman and chief executive officer. "Our fundamentals remain strong with improving overhead efficiency, stellar asset quality and industry-leading customer service. We're excited about our prospects as we work with our merger partners to extend our brand promise to customers nationwide."

\*    \*    \*

- 15 -

Results include the impact of the acquisition of Westcorp on March 1, 2006. Also announced during the quarter was the proposed acquisition of Golden West Financial Corporation, which is expected to close in the fourth quarter of this year.

In the second quarter of 2006 compared with the second quarter of 2005, Wachovia:

- Grew revenue 14 percent, driven by strong balance sheet growth and fee and other income related to solid capital markets results, including higher principal investing gains and strong trading profits.

\*       \*       \*

- Noninterest expense rose 12 percent on higher personnel expense reflecting revenue-based incentives and the effect of the Westcorp acquisition.

- Recorded a provision for credit losses of $59 million. Net charge-offs were $51 million, or an annualized 0.08 percent of average net loans. Total nonperforming assets including loans held for sale were $741 million, declining to 0.25 percent of loans, foreclosed properties and loans held for sale.

\*       \*       \*

**Capital Management**

Capital Management includes retail brokerage services and asset management. The second quarter of 2006 compared with the second quarter of 2005 included:

- Record earnings of $195 million on 12 percent revenue growth, as strength in retail brokerage managed account fees overcame relatively flat brokerage transaction activity. Managed assets grew 35 percent to $121.9 billion.

- 41 percent growth in net interest income largely due to improved deposit spreads.

- 7 percent growth in noninterest expense primarily due to increased production-based commissions, employee stock compensation expense and the impact of two June 1, 2006, acquisitions. The overhead efficiency ratio improved 355 basis points to 78.33 percent due to strong net interest income growth, retail brokerage managed account fee growth and disciplined expense control.

- Total assets under management of $237.3 billion at June 30, 2006, were up 5 percent from June 30, 2005. Equity assets reached $90.6

billion, up 15 percent from June 30, 2005, including $5.5 billion in assets from the Metropolitan West Capital Management acquisition and market appreciation. Total brokerage client assets grew 3 percent from year-end 2005 and 7 percent from June 30, 2005.

41.    On August 4, 2006 , the Company filed its Form 10-Q for the second quarter of 2006, which included the same financial results as previously reported.  The Form 10-Q also included a certification by Thompson, which stated:

I, G. Kennedy Thompson, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2006 of Wachovia Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

- 17 -

        d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

42.     Defendant Wurtz signed a nearly identical certification included in the Form 10-Q.

43.     On August 31, 2006, Wachovia issued a press release entitled "Wachovia Corporation and Golden West Financial Corporation Announce Shareholder Merger Approval," which stated in part:

Wachovia Corporation and Golden West Financial Corporation announced today that the shareholders of both companies approved their merger.

"We are delighted that shareholders of both companies support the combination of Golden West and Wachovia. Wachovia is proud to join forces with a stellar company that has an impressive track record, and we are confident the combined company will generate superior growth and long-term value," said Ken Thompson, chairman, president and chief executive officer of Wachovia. "We look forward to delivering outstanding products and services to individuals and businesses from coast to coast."

"We received strong support from our shareholders today and are delighted with their response," said Herbert M. Sandler, Chairman and CEO of Golden West. "We look forward to the successful completion of the merger and to a combined company that serves the best interests of our shareholders, employees, customers and communities."

44.     On October 2, 2006, Wachovia announced the completion of the merger, in a release

which stated in part:

> "We are excited about the opportunities presented as we join forces with one
> of the country's premier financial institutions. The combination of Wachovia and
> Golden West greatly enhances our market presence, product set and mix of
> businesses, ***enabling us to deliver a stronger value proposition for our customers
> and shareholders***," said Ken Thompson, Wachovia chairman and chief executive
> officer. "For the past four months, teams from Wachovia and Golden West have
> worked together diligently to plan for the integration of our two companies. We are
> now totally focused on implementing the integration plan and delivering exceptional
> service and products to our customers. On behalf of all my Wachovia teammates, we
> welcome the employees of Golden West."

> "Today marks a momentous occasion when two great companies join to form
> an even greater, new company," said Herbert M. Sandler, Golden West chairman
> emeritus. "We have tremendous confidence in the combined Wachovia-Golden West
> team."

*     *     *

> As a result of the merger, Golden West shareholders will receive
> approximately 1.051 shares of Wachovia common stock and $18.65 in cash for each
> share of Golden West common stock they own. Shareholders may access additional
> information at Wachovia's Investor Relations Web site, wachovia.com/investor. The
> site provides access to the most current news and financial information on Wachovia.

> The merger integration process is scheduled to be completed mid-2008.

45.     On October 16, 2006, Wachovia issued its third quarter 2006 financial results, in a

release which stated in part:

> Wachovia Corp. today reported net income of $1.88 billion, or $1.17 per share, in the
> third quarter of 2006 compared with $1.66 billion, or $1.06 per share, in the third
> quarter of 2005.

> Excluding after-tax net merger-related expenses of 2 cents per share in the
> third quarter of 2006 and 3 cents per share in the third quarter of 2005, earnings were
> $1.90 billion, or $1.19 per share, in the third quarter of 2006 compared with $1.72
> billion, or $1.09 per share, in the third quarter of 2005.

> "Wachovia once again delivered double-digit earnings per share growth due
> to strong fundamentals and focused execution," said Ken Thompson, Wachovia
> chairman and chief executive officer. "In the face of a challenging yield curve
> environment, we continued to improve efficiency, while asset quality remained

- 19 -

strong. Our industry-leading customer service helped sales productivity remain stable, and our expanded consumer franchise including auto lending, credit cards and Westcorp retail branches in California generated results ahead of our expectations. With the closing of the Golden West merger on October 1, we're very excited about our prospects as we extend our brand promise to customers nationwide."

\*       \*       \*

Results include the impact of the acquisition of Westcorp on March 1, 2006. The acquisition of Golden West Financial Corporation closed on October 1, 2006, and therefore is not included in Wachovia's September 30, 2006, financial results. In the third quarter of 2006 compared with the third quarter of 2005, Wachovia:

- Grew revenue 5 percent on higher fee income and growth in loans and deposits, including the addition of Westcorp, although the benefit of a larger balance sheet was limited by margin compression.

- Increased net interest income 4 percent, reflecting higher average commercial loans, up 14 percent, and average consumer loans, up 36 percent.

  - Commercial loan growth was led by middle-market and business banking, commercial real estate and large corporate lending, while consumer loan growth was led by higher real estate-secured loans, which included the impact of year-end 2005 loan transfers from loans held for sale, as well as the addition of Westcorp.

  - Average core deposits rose 4 percent and average low-cost core deposits were relatively stable. Growth in lower spread loans, a shift in deposit mix and the effects of a more inverted yield curve resulted in 15 basis points of margin compression.

- 6 percent growth in fee and other income was led by 15 percent growth in service charges and 10 percent growth in fiduciary and asset management fees. Growth in insurance commissions was more than offset by lower retail brokerage commissions as customers migrate to retail brokerage managed account relationships. In addition, principal investing and trading results were lower, while securities gains rose from the third quarter of 2005.

- Noninterest expense rose modestly as lower incentives and a favorable resolution of franchise tax matters were offset by the impact of acquisitions. The overhead efficiency ratio improved to 57.44 percent, down 234 basis points.

- The increase in the provision for credit losses to $108 million largely reflected growth in auto lending and other consumer loans as well as lower commercial loan recoveries. Net charge-offs were $116 million, or an annualized 0.16 percent of average net loans. Total nonperforming assets including loans held for sale were $782 million, or 0.26 percent of loans, foreclosed properties and loans held for sale.

46.     On November 3, 2006, the Company filed its Form 10-Q for the third quarter of 2006, which included the same financial results as previously reported. The Form 10-Q also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

47.     On December 13, 2006, defendant Thompson appeared at a conference in New York and discussed the benefits of the Golden West acquisition:

"I think it is fair to say that with Golden West, Wachovia is positioned in the best combination of growth and affluency in the country and [that] these markets are appealing not just to our general bank, not just to the retail side of our business, but also to commercial banking, to our wealth management operation, to our brokerage business and to our capital markets business."

48.     On December 18, 2006, Wachovia issued a press release entitled "2006 Best Year Ever for Customer Service and Customer Loyalty at Wachovia." The press release stated in part:

Wachovia Corp. today announced that 2006 was the company's best year ever for customer service and customer loyalty.

"We are pleased to end the year on such a high note in terms of customer service and loyalty," said Ken Thompson, chairman and CEO of Wachovia Corporation. "The results we've seen are a testament to the investment Wachovia has made in becoming a customer service leader in our industry."

49.     On December 28, 2006, *American Banker* reported on the Golden West acquisition:

Wachovia Corp. had billed its purchase of the thrift company Golden West Financial Corp. as a way to strengthen its branch network and cross-sell products to new customers, but early on in the integration it says it is finding readier opportunities on the mortgage side of the business.

The $698 billion-asset Charlotte banking company said it remains on target to introduce retail banking products such as credit cards and checking accounts to

- 21 -

customers of the Oakland, Calif., thrift it bought in October; some products are set to appear before next year's fourth quarter, it said.

Meanwhile, however, it has already launched a mortgage product that draws on both Wachovia's and Golden West's product styles.

"We're finding opportunities that we didn't even think of when we agreed to do the deal. . . . There's more upside surprises," Robert McGee, who is coordinating the integration for Wachovia, said in a recent interview.

Wachovia has introduced a fixed-rate mortgage that offers payment options similar to those available in Golden West's adjustable-rate mortgages. The company is also replacing generalists in its East Coast branches with mortgage specialists, many of whom are coming from Golden West.

In the interview in Charlotte, Mr. McGee, who is also the chief operating officer of Wachovia's general bank, discussed how the integration is going, addressed persistent investor concern about Golden West's focus on option ARMs, and talked about his plan to relocate to Oakland to make sure things go smoothly.

The quick introduction of mortgage products makes it likely Wachovia will generate revenue faster than first projected, he said. In announcing the deal last May, Wachovia projected that it would produce $230 million of new annual revenue by 2009.

"We should make enough progress so that 2008 will be measurably better than what we had originally planned . . . , and I'm confident that we'll do better in 2009 than we told folks," he said. He declined to update the revenue-expectation number.

\*       \*       \*

Analysts "are really overreacting" to negative amortization, Mr. McGee said. "The credit and the risk isn't any different than when people draw from a home equity line," he said. Most of the deferred interest is tied to homes with loan-to-value ratios of less than 80%. "So there is still a huge amount of equity in these properties."

50.     Due to these statements, by the end of December 2006, Wachovia stock was above $56 per share, up from $54 at the beginning of December 2006.

51.     On January 23, 2007, Wachovia issued financial results for the full year 2006, which included results for the fourth quarter of 2006, in a release which stated in part:

- 22 -

**4th QUARTER 2006 COMPARED WITH 4th QUARTER 2005**

- Double-digit growth in face of difficult interest rate environment. Results include acquisitions and divestitures.

- Strong momentum and record results in market-related businesses of the Corporate and Investment Bank and Capital Management.

- Overhead efficiency ratio at record low while investment for the future continues.

- Continued strength in credit quality; increased provision reflects growth in auto, commercial lending and credit card.

- Average loans up 74 percent, including acquisitions, with strength in commercial lending and consumer real estate-secured. Expanded consumer franchise including auto lending and credit cards generates results ahead of expectations.

- Customer loyalty scores reach high of 51.8%; organic customer acquisition grew 13.2% annualized.

*      *      *

Wachovia Corp. today reported net income of $2.30 billion, or $1.20 per share, in the fourth quarter of 2006 compared with $1.71 billion, or $1.09 per share, in the fourth quarter of 2005.

Excluding after-tax net merger-related expenses of 1 cent per share in the fourth quarter of 2006 and 2 cents per share in the fourth quarter of 2005, earnings were $2.33 billion, or $1.21 per share, in the fourth quarter of 2006 compared with $1.74 billion, or $1.11 per share, in the fourth quarter of 2005.

Full year 2006 net income was $7.79 billion, up 17 percent from 2005, and earnings per share were up 11 percent from 2005 to a record $4.63. Excluding after-tax net merger-related expenses of 7 cents in 2006 and 11 cents in 2005, earnings in 2006 were $7.91 billion, or $4.70 per share, compared with $6.81 billion, or $4.30 per share, in 2005.

*      *      *

In the fourth quarter of 2006 compared with the fourth quarter of 2005, Wachovia:

- Grew revenue 31 percent on higher loans and deposits primarily due to the addition of Golden West and Westcorp, with equally strong fee income growth.

- 23 -

- Increased net interest income 29 percent, reflecting higher average commercial loans, up 12 percent, and average consumer loans, up 161 percent, including the impact of the acquisitions.

\*     \*     \*

- Generated across-the-board growth in fee and other income, up 33 percent, led by record investment banking fees, strength in service charges and higher securitization income. Asset management fees reached a new high, reflecting continued growth in retail brokerage managed account relationships, while commissions reflected renewed retail brokerage customer activity. Both trading results and securities gains turned around from losses in the fourth quarter of 2005.

- Noninterest expense rose 18 percent largely reflecting the acquisition impact, and also included higher incentives on revenue growth in the Corporate and Investment Bank and in Capital Management.

- Recorded a provision for credit losses of $206 million largely reflecting growth in auto, credit cards and commercial loan portfolios and a refinement of our reserving methodology on a portion of the business banking loan portfolio. Net charge-offs were $140 million, or an annualized 0.14 percent of average net loans. Total nonperforming assets including loans held for sale were $1.4 billion, or 0.32 percent of loans, foreclosed properties and loans held for sale and included $700 million related to the Golden West acquisition.

52.     Following these announcements, while Wachovia's stock was trading at around $57 per share, defendants Thompson and Wurtz each sold approximately 30,000 shares of their Wachovia stock for proceeds of $1,703,092 and $1,741,129, respectively.

53.     On February 28, 2007, the Company filed its Form 10-K for the full year 2006, which included the results for the fourth quarter of 2006, as previously reported.  The Form 10-K also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter 2006, as cited above.

54.     On April 16, 2007, Wachovia issued its results for the first quarter of 2007, in a press release which stated in part:

- 24 -

Wachovia Corp. today reported net income of $2.30 billion, or $1.20 per share, in the first quarter of 2007 compared with $1.73 billion, or $1.09 per share, in the first quarter of 2006.

After-tax net merger-related expenses did not affect earnings per share in the first quarter of 2007 and amounted to 3 cents per share in the first quarter of 2006. Excluding these expenses, earnings were $2.31 billion, or $1.20 per share, in the first quarter of 2007 and $1.77 billion, or $1.12 per share, in the first quarter of 2006. Results also included a lower effective tax rate of 30.99 percent compared with 35.06 percent in the first quarter of 2006.

"Once again our team delivered double-digit earnings growth," said Ken Thompson, Wachovia chairman and chief executive officer. "***Our focus on cost control and risk management continues to provide flexibility in the face of the challenging interest rate environment. Most of all, our team's dedication to serving our customers has a direct impact on our results as we provide industry-leading customer service and grow our base of loyal customers***. In addition, we're seeing very promising results as our cross-business partnerships serve customer needs and generate incremental revenues. The integration of Golden West is on track, and we're pleased with the cross-sell potential of our expanded mortgage platform, as well as our initial success in cross-selling existing World Savings banking customers."

Results in the first quarter of 2007 included the full quarter impact of the purchase accounting acquisitions of Golden West on October 1, 2006, and Westcorp on March 1, 2006. Results in the first quarter of 2006 included one month of results related to Westcorp and a $100 million termination payment received in relation to the Bank of America/MBNA merger.

\*        \*        \*

In the first quarter of 2007 compared with the first quarter of 2006, Wachovia:

- Grew revenue 17 percent on higher loans and deposits primarily due to the addition of Golden West and Westcorp, while higher fee and other income largely reflected strong brokerage managed account fees, growth in fiduciary and asset management fees related to acquisitions and organic growth, and strength in advisory and underwriting fees.

- Increased net interest income 27 percent, reflecting higher average commercial loans, up 10 percent, and increased average consumer loans, largely reflecting the impact of acquisitions.

\*        \*        \*

- 25 -

- Generated 6 percent growth in fee and other income, reflecting continued growth in retail brokerage managed account fees, strong retail brokerage transaction activity and collaboration between Capital Management and the Corporate and Investment Bank to originate and distribute new investment products. Service charges also contributed to solid growth.

- Increased noninterest expense 8 percent largely reflecting the acquisition impact, and included higher commissions on revenue growth in Capital Management.

- Recorded a provision for credit losses of $177 million largely reflecting growth in auto lending, commercial and credit cards. Net charge-offs were $155 million, or an annualized 0.15 percent of average net loans. Total nonperforming assets including loans held for sale were $1.8 billion, or 0.40 percent of loans, foreclosed properties and loans held for sale.

55.    On May 4, 2007, the Company filed its Form 10-Q for the first quarter of 2007, which included the same financial results as previously reported.  The Form 10-Q also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

56.    On May 18, 2007, Wachovia's stock continued to trade above $56 per share, as defendants concealed the Company's extensive exposure to mortgage-related asset impairments.

57.    On July 20, 2007, Wachovia issued its financial results for the second quarter of 2007, in a press release which stated in part:

Wachovia Corp. today reported net income of $2.34 billion, or $1.22 per share, in the second quarter of 2007 compared with $1.88 billion, or $1.17 per share, in the second quarter of 2006.

After-tax net merger-related expenses amounted to 1 cent per common share in the second quarters of both 2007 and 2006. Excluding these expenses, earnings were $2.36 billion, or $1.23 per share, in the second quarter of 2007 and $1.90 billion, or $1.18 per share, in the second quarter of 2006.

"Our second quarter performance reflects our continued focus on execution in both the traditional banking and markets-related businesses," said Ken Thompson, Wachovia chairman and chief executive officer. "All four of our major businesses delivered double-digit earnings growth, fueled by new markets, revenue growth

- 26 -

initiatives and an expanded product set. Especially gratifying is our employees' continuing dedication to providing industry-leading customer service — which generated record loyalty and satisfaction scores this quarter. The integration of Golden West is proceeding as planned, and we're excited by the cross-sell potential of our expanded platform. Additionally, our focus on efficiency and risk management continues to provide flexibility for investment for future growth."

Results in the second quarter of 2007 included the full quarter impact of the October 1, 2006, acquisition of Golden West.

\*       \*       \*

In the second quarter of 2007 compared with the second quarter of 2006, Wachovia:

- Grew revenue 20 percent on higher loans and deposits, driven by the addition of Golden West and organic growth, while higher fee and other income largely reflected growth in both our traditional banking and securities businesses.

- Increased net interest income 21 percent on higher average consumer loans, largely reflecting the impact of acquisitions, and higher average commercial loans, up 13 percent.

  ° Commercial loan growth was led by middle-market commercial and international lending. Increased consumer loans were led by higher real estate loans primarily due to the addition of Golden West, as well as growth in auto lending and in credit card.

  ° Average core deposits rose 30 percent and average low-cost core deposits were up 6 percent. Growth in lower spread loans, a shift in deposit mix, acquisition impact and the effects of the inverted yield curve resulted in 26 basis points of margin compression.

- Generated 18 percent growth in fee and other income, reflecting solid retail brokerage transaction activity and continued strength in retail brokerage managed account fees; record originations in key investment banking products and robust principal investing results; and higher traditional banking fees.

- Experienced a 14 percent increase in noninterest expense largely reflecting the impact of acquisitions, higher revenue-based incentives and commissions, and growth initiatives.

- Recorded a provision for credit losses of $179 million largely reflecting growth in auto, commercial, and consumer real estate lending. Net charge-offs were $150 million, or an annualized 0.14 percent of average net loans. Total nonperforming assets including loans held for sale were $2.1 billion, or 0.47 percent of loans, foreclosed properties and loans held for sale.

- In addition, in the second quarter of 2007, Wachovia announced an agreement to acquire A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri. The transaction, which is subject to applicable regulatory approvals and approval of A.G. Edwards shareholders, is expected to close in the fourth quarter of this year.

*     *     *

**Capital Management**

Capital Management includes retail brokerage services and asset management. The second quarter of 2007 compared with the second quarter of 2006 included:

- 30 percent earnings growth to $291 million on record revenue, driven by solid retail brokerage transaction activity and strength in managed account fees as managed assets grew 24 percent to $151.3 billion.

- Growth in fee income, which also reflected the effect of acquisitions including European Credit Management Ltd. (ECM), a London-based fixed income investment management firm, which closed on January 31, 2007.

- 16 percent growth in noninterest expense primarily due to higher commissions and the impact of acquisitions.

- A decrease in assets under management from the first quarter of 2007, reflecting a change in investment discretion responsibility from Capital Management to Wealth Management.

Total assets under management of $281.5 billion at June 30, 2007, were up from December 31, 2006, including $26.2 billion from the ECM acquisition, $4.9 billion in net inflows and approximately $6.0 billion in market appreciation, offset by a $34.5 billion change in investment discretion responsibility on previously co-managed, nonproprietary assets now solely managed by Wealth Management. Total brokerage client assets grew 5 percent from year-end 2006 to $795.8 billion.

58.    In late July 2007, Wachovia stock declined due to these disclosures and due to announcements by other banks about the credit crunch, which exposed the poor underlying fundamentals of the banks' mortgage risk management, including at Wachovia.

59.    On July 30, 2007, the Company filed its Form 10-Q for the second quarter of 2007, which included the same financial results as previously reported.  The Form 10-Q also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

60.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Defendants' portfolio of CDOs contained billions of dollars worth of impaired and risky securities, many of which were backed by subprime mortgage loans.

(b)    Defendants failed to properly account for highly leveraged loans such as mortgage-backed securities.

(c)    Wachovia had inadequate controls to prevent employees and others from using customer account numbers to steal millions of dollars.

(d)    The Company had inadequate controls to prevent management from understating loan loss allowances by billions of dollars causing Wachovia's financial statements to be materially misstated.

(e)    Wachovia had become heavily involved in the underwriting, sale and subsequent auctions of auction rate securities, which were much riskier than represented to investors in the securities and the municipalities which issued them.  Once these auctions began failing, Wachovia would be subject to investigations and loss of reputation.

- 29 -

(f)     Wachovia had been heavily involved in pay-option ARMs. These pay-option ARMs provided that during the initial term of the loan, borrowers could pay only as much as they desired with any underpayment being added to the loan balance. These loans would become toxic (for both Wachovia and the borrowers) once housing prices stopped increasing at a rapid rate.

61.     On October 19, 2007, Wachovia issued financial results for the third quarter of 2007, in a release which stated in part:

- Lower earnings reflecting disruption in the capital markets resulting in valuation losses of $1.3 billion before tax and reduced origination and distribution revenues in the Corporate and Investment Bank.

- Revenue growth led by a 28 percent increase in net interest income, including Golden West, coupled with disciplined expense control partially offset lower fee income.

- Average loans up 53 percent, driven by higher consumer real estate loans related to the Golden West acquisition, and strong organic growth in commercial, international and auto lending.

- Average core deposits up 30 percent, including Golden West. Sales productivity solid in expanded markets.

- Net charge-offs rose 3 basis points to an annualized 0.19 percent of average net loans. Increased provision for credit losses reflects modest deterioration in credit quality, a more uncertain credit environment and loan growth. Higher nonperforming assets largely related to Golden West consumer real estate NPAs and to higher commercial real estate NPAs largely related to downgrades of residential developers.

- Customer loyalty scores at near record 53.1 percent; organic customer acquisition grew 14.8 percent annualized.

                              *          *          *

Wachovia Corp. today reported net income of $1.69 billion, or 89 cents per share, in the third quarter of 2007 compared with $1.88 billion, or $1.17 per share, in the third quarter of 2006.

After-tax net merger-related expenses amounted to 1 cent per common share in the third quarter of 2007 and 2 cents per common share in the third quarter of 2006. Excluding these expenses, earnings were $1.71 billion, or 90 cents per share, in

the third quarter of 2007 and $1.90 billion, or $1.19 per share, in the third quarter of 2006.

"I'm very proud of our ability to provide capital, liquidity and advice to our customers and peers in the face of the disruption in the fixed income markets in the third quarter. *These conditions clearly had a disappointing impact on the results of market-oriented businesses, but the strength in our core banking and brokerage businesses continued to serve us very well*," said Ken Thompson, Wachovia chairman and chief executive officer. "Our loan and deposit trends were solid, and our retail brokerage performance was strong – and poised for even more growth as our A.G. Edwards colleagues join our team. Additionally, the first of our World Savings branch and deposit conversions was completed successfully last weekend, and going forward, attention in our expanded platform returns fully to sales production. While the impact of the market disruption was significant, it's worth noting that the majority of the lower market valuations in the third quarter largely arose from a repricing of risk in the marketplace and do not reflect deterioration in the underlying credit quality of the assets in our leveraged finance and commercial real estate securitization businesses. Looking ahead, we're taking the appropriate steps to ensure that as markets remain unsettled, we focus intently on actively managing our exposures and controlling costs. Longer term, we believe the *challenges of the third quarter will be an advantage to companies like Wachovia with strong capital and liquidity positions and a clear understanding of the needs of customers and investors*."

Results in the third quarter of 2007 included the full quarter impact of the October 1, 2006, acquisition of Golden West. Results do not include the impact of the acquisition of A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri, which closed on October 1 of this year.

\*     \*     \*

In the third quarter of 2007 compared with the third quarter of 2006, Wachovia:

- Grew revenue 4 percent on higher loans and deposits, driven by the addition of Golden West and organic growth, while fee and other income declined reflecting disruption in the capital markets in fixed income and other market-related fees, including net valuation losses of:

    ° 1.3 billion in the Corporate and Investment Bank on structured products and leveraged finance warehouse loans and commitments; and

    ° $40 million in Capital Management on asset-backed commercial paper investments.

- 31 -

- Increased net interest income 28 percent reflecting growth in average commercial loans, up 16 percent, and higher average consumer loans, including the impact of acquisitions.

- Generated strong commercial loan growth led by strength in middle-market commercial, large corporate and international lending. Increased consumer loans were led by higher real estate loans primarily due to the addition of Golden West, as well as growth in auto lending.

- Also generated 30 percent growth in average core deposits while average low-cost core deposits were up 7 percent.

- Generated continued strong performance in retail brokerage managed account fees and solid retail brokerage transaction activity. Strong principal investing results and higher traditional banking fees also contributed to growth.

- Held noninterest expense growth, including the effect of acquisitions, to 8 percent largely reflecting lower revenue-based compensation in light of the market disruption.

- Recorded a provision for credit losses of $408 million reflecting modest deterioration in credit quality, a more uncertain credit environment and loan growth. Net charge-offs were $206 million, or an annualized 0.19 percent of average net loans. Total nonperforming assets including loans held for sale were $3.0 billion, or 0.63 percent of loans, foreclosed properties and loans held for sale.

Earnings in the third quarter of 2007 included a $249 million after-tax benefit related to correction of errors primarily in earlier periods in 2007. This related primarily to incorrect application of hedge accounting to certain variable rate demand deposits in the second quarter of 2007. Wachovia's management believes that this impact is not material to current or prior period financial statements, and the Audit Committee of Wachovia's Board of Directors, based on information reviewed by management with the Committee, concurred with management's conclusion.

62.     On this news, the stock dropped to $46.40 per share.  However, if Wachovia had taken appropriate reserves for impaired assets, as required by Generally Accepted Accounting Principles ("GAAP"), its stock would have declined much more than it did.  The stock continued to drift lower after this announcement on suspicions the Company would announce larger write-downs. These fears were confirmed on November 8, 2007, when Wachovia announced the Company was

setting aside $600 million in the fourth quarter and said the value of securities it owned linked to subprime mortgages dropped by $1.1 billion in October 2007. This followed write-downs of $1.3 billion in the third quarter. Wachovia stated:

> Wachovia Corporation today is providing information on the impact of market volatility on its financial results for the month of October and is providing further information on its expectation for credit costs for the fourth quarter of 2007 and certain additional information. Wachovia is providing this information in advance of a presentation by a senior executive on November 9, 2007 to investors and analysts. This same information will be included in Wachovia's Third Quarter Report on Form 10-Q that will be filed on November 9, 2007:

> **October Market Events**  Following our October 2007 announcement of third quarter 2007 results of operations and our financial outlook for the remainder of 2007, certain financial markets experienced further deterioration, particularly the markets for subprime residential mortgage-backed securities ("RMBS") and for collateralized debt obligations ("CDOs") collateralized by RMBS ("ABS CDOs"). In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

> *       *       *

> The value of CDOs we have in our portfolio depends on the value of the underlying collateral. ABS CDOs experienced declines in value correlated to the declines in value of subprime RMBS in October. Our third quarter 2007 market disruption-related losses totaling $1.3 billion pre-tax included $347 million of subprime-related valuation losses, net of hedges, on ABS CDOs. Due to the October market deterioration, these ABS CDOs experienced further declines in value in the month of October 2007 by an amount we currently estimate to be approximately $1.1 billion pre-tax. At October 31, 2007, we had remaining exposure to ABS CDOs of $676 million, including on-balance sheet positions and the notional amount of off-balance sheet positions, compared to $1.8 billion at September 30, 2007.

> We have exposure to subprime RMBS in other positions totaling $2.1 billion at both October 31, 2007, and September 30, 2007. Estimated aggregate valuation losses of these other positions during the month of October 2007 are immaterial net of hedges.

> *       *       *

> Of the remaining asset classes where we recorded market disruption-related losses in the third quarter of 2007, the aggregate net market value changes in October in these investments have not been significant. These asset classes include

- 33 -

commercial mortgage, leveraged finance, consumer mortgage, and other structured credit products not collateralized by subprime RMBS. Some of the markets for these asset classes continue to demonstrate poor liquidity and higher than typical volatility while others have displayed moderate stability in October.

The fair values of all of our assets that are subject to market valuation adjustments, including subprime RMBS and ABS CDOs, depend on market conditions and assumptions that may change over time. Accordingly, the fair values of these investments in future periods, including at the end of the fourth quarter, and their effect on our financial results, will depend on future market developments and assumptions and may be materially greater or less than the changes in values during October discussed above. For example, markets for all asset classes discussed above have remained extraordinarily volatile in the first week of November, with additional rating agencies' downgrades on subprime RMBS and ABS CDOs, and credit spread widening and illiquidity.

Wachovia has historically been a major participant in structuring and underwriting CDOs. As measured by lead underwriter league table rankings, Wachovia ranked 3rd for both the first nine months of 2007 and the full year 2006, with issuance volumes of $19.6 billion and $23.4 billion, respectively. The primary focus of Wachovia's CDO business has been, and continues to be, transactions backed by commercial loans and commercial real estate loans. Our issuance of ABS CDOs has been limited. We originated three ABS CDOs in the first nine months of 2007 and six in full year 2006, accounting for approximately 16 percent and 23 percent, respectively, of the total issuance volume of our CDO business during these periods.

Additionally, due to anticipated loan growth and the impact of continuing credit deterioration in our loan portfolio, we expect to increase our allowance for loan losses in the fourth quarter of 2007. The expected credit deterioration will likely be focused in certain geographic areas that have recently experienced dramatic declines in housing values. We expect that these declines will correlate to increases in loan losses for loans originated within the last two years within these geographic areas. Accordingly, Wachovia now expects to record a loan loss provision in the fourth quarter of 2007 by an amount estimated to be between $500 million and $600 million in excess of charge-offs for the quarter. The actual provision will be determined in accordance with our policies and procedures, will depend on credit conditions and assumptions at quarter-end and may be materially greater or less than the range discussed in the preceding sentence.

63.     As the *Associated Press* reported on November 9, 2007, after Wachovia's

announcement:

Wachovia Corp. said Friday the value of securities it owns that are backed by loans sank by about $1.1 billion in October, making it the latest major financial institution to warn of continuing losses in the credit markets.

- 34 -

The nation's fourth largest banking company also said it plans to boost its allowance for loan losses in the fourth quarter due to expected credit deterioration in the housing market in certain regions. The provision is pegged at $500 million to $600 million in excess of charge-offs in the quarter.

Wachovia shares dropped $1.43, or 3.6 percent, to $38.87 in morning trading Friday after falling to a new 52-week low of $38.05.

The news heightened fears that the fallout from the subprime turmoil is spreading deeper into credit markets. It also raised questions about the bank's October 2006 acquisition of adjustable-rate mortgage lender Golden West Financial Corp. of Oakland, Calif.

"We believe the company is trying to get ahead of likely higher future mortgage losses in California," Deutsche Bank Securities analyst Mike Mayo wrote in a client note. "Per Golden West, it now becomes even more obvious that Wachovia purchased the thrift at the wrong time of the cycle."

The weakening markets – which Wachovia estimates could get worse over the last two months of the quarter – cut the value of the bank's so-called collateralized debt obligations by more than 60 percent.

As of Sept. 30, Wachovia had $1.8 billion in CDO exposure; after the latest writedowns, the exposure is now $676 million.

CDOs are complex instruments that combine slices of different kind of risk. CDOs are often backed, in part, by subprime mortgages – loans given to customers with poor credit history. As those mortgages have increasingly defaulted, the value of the CDOs has plummeted.

Wachovia has an additional $2.1 billion of exposure to more traditional subprime mortgage-backed bonds. The value of those holdings remained steady in October as hedging strategies offset losses.

In a regulatory filing with the Securities and Exchange Commission, the financial services provider said the market in November so far remains "extraordinarily volatile."

Analysts polled by Thomson Financial, on average, were forecasting earnings of $1.08 per share for Wachovia before the writedown announcement.

Friedman Billings Ramsey analyst Gary B. Townsend predicted Friday that Wachovia's shares "will remain under pressure until real estate markets and nonperforming assets levels stabilize."

64.    On November 9, 2007, Wachovia filed its Form 10-Q for the third quarter of 2007,

which included the same financial results as previously reported.  The Form 10-Q also contained

virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

65.    By the time this news was in the market, Wachovia's stock had collapsed to close at $40.65 per share on November 9, 2007, a decline of 11% from October 31, 2007, and a decline of 19% from October 15, 2007.  However, even this decline failed to inform investors of the extent of Wachovia's problems.

66.    On December 12, 2007, Wachovia disclosed that it would set aside $1 billion in excess of charge-offs, an increase from the previous estimate of $500 million to $600 million.

67.    On January 22, 2008, Wachovia issued its fourth quarter and full year 2007 financial results, in a release which stated in part:

> Wachovia Corp. today reported net income of $51 million, or 3 cents per share, in the fourth quarter of 2007 compared with $2.30 billion, or $1.20 per share, in the fourth quarter of 2006.
>
> Excluding after-tax net merger-related expenses of 5 cents per share in the fourth quarter of 2007 and 1 cent per share in the fourth quarter of 2006, earnings were $160 million, or 8 cents per share, in the fourth quarter of 2007 compared with $2.33 billion, or $1.21 per share, in the fourth quarter of 2006.
>
> Full year 2007 net income was $6.31 billion, down 19 percent from $7.79 billion in 2006, and earnings per share were down 30 percent from 2006 to $3.26. Excluding after-tax net merger-related expenses of 8 cents in 2007 and 7 cents in 2006, earnings in 2007 were $6.47 billion, or $3.34 per share, compared with $7.91 billion, or $4.70 per share, in 2006.
>
> "The continued turmoil in the capital markets and the dramatic change in the credit environment diminished our fourth quarter results substantially," said Ken Thompson, Wachovia chairman and chief executive officer. "We took active and prudent steps in the second half of the year to deal with the market disruption and credit deterioration, and we believe this allows us to move forward from a position of strength despite the uncertain economic environment. For the full year, we earned $6.3 billion, paid $4.6 billion in dividends, and maintained a well-capitalized balance sheet even as we had $3.1 billion in net market-related valuation losses and increased our allowance for credit losses by $1.2 billion. Our management team and dedicated employees are focused intently on the strategic priorities that prepared us well for this more difficult economic environment: controlling expenses, managing risk appropriately, creating revenue synergies between our businesses, and continuing to

provide industry-leading customer service. We're excited about the future with our new partners from A.G. Edwards and with our newest banking markets in some of the nation's fastest growing and affluent regions."

Results in 2007 included the impact of the acquisition of A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri. This transaction was consummated on October 1, 2007, and the retail brokerage business was consolidated into Wachovia Securities LLC on January 1, 2008. Integration activity will continue through 2009.

\*       \*       \*

In the fourth quarter of 2007 compared with the fourth quarter of 2006, Wachovia:

\*       \*       \*

- Recorded a 17 percent increase in noninterest expense largely reflecting the acquisition impact.

- Recorded a provision for credit losses of $1.5 billion, which exceeded net charge-offs by $1.0 billion. The provision largely reflected the recent significant deterioration in the residential housing market and the related portions of the commercial real estate portfolio, including higher expected loss factors for the consumer real estate and auto loan portfolios, and for the commercial portfolios following an extensive review of a large portion of the real estate financial services portfolio in light of this deterioration. Net charge-offs were $461 million, or an annualized 0.41 percent of average net loans. Total nonperforming assets including loans held for sale were $5.2 billion, or 1.08 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer due to the effects of the weakened housing industry.

68.    On February 4, 2008, Wachovia issued a statement, clarifying its exposure to

BluePoint Re, a Wachovia subsidiary:

On February 1, 2008, Moody's Investors Service announced that it has placed BluePoint Re, a Wachovia Corporation subsidiary, on review for possible downgrade.

Wachovia's 2007 financial results include valuation losses on BluePoint Re assets that resulted in a write-down of substantially all of Wachovia's $300 million investment in BluePoint Re. Consequently, Wachovia believes BluePoint Re should have no further negative impact on Wachovia's financial results.

- 37 -

As background, BluePoint Re is a financial guaranty re-insurer licensed in Bermuda. It is a distinct company with stand-alone operations and governance. BluePoint Re is separately capitalized and separately rated by the rating agencies. Financial guaranty re-insurers like BluePoint Re have been affected by the current dislocation in the credit markets, and Moody's review is a result of the market disruption.

69.     On February 5, 2008, *The New York Times* reported that Wachovia was accused in a lawsuit of allowing fraudulent telemarketers to use its accounts to steal millions from victims. Also on February 5, 2008, Wachovia had to offer the highest coupon the bank had ever paid on bonds in order to raise capital.

70.     On February 28, 2008, Wachovia filed its Form 10-K for the full year 2007, which included results for the fourth quarter of 2007, as previously reported on January 22, 2008. The Form 10-K also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

71.     On February 28, 2008, *Associated Press* reported the following:

Wachovia Corp., the nation's fourth-largest bank, spent nearly $1.4 million in 2007 to lobby the federal government on lending reform laws and other issues.

The company lobbied on legislation dealing with mortgage lending reform and government-sponsored entities, patent reform, student lending and more, according to the form posted online Feb. 13 by the Senate's public records office. Charlotte, N.C.-based Wachovia spent $760,000 in the second half of 2007 to lobby on those issues.

The bank took write-downs of more than $3 billion in the second half of last year as the housing slump and credit market turmoil sunk the value of certain mortgage-backed investments.

Elsewhere, Wachovia on Thursday said the Justice Department is investigating two of its employees for possible misconduct related to competitive bids in municipal derivative markets. The bank added that it expects to set aside more money in the first half of this year to cover troubled mortgage loans.

Besides Congress, Wachovia lobbied the Treasury Department, Federal Deposit Insurance Corp., Federal Reserve System, Office of the Comptroller of the Currency and the Office of Thrift Supervision.

Lobbyists are required to disclose activities that could influence members of the executive and legislative branches, under a federal law enacted in 1995.

72.    On February 28, 2008, Wachovia disclosed it expected even higher losses on mortgage defaults, as the Company raised its expected losses from lending to more than triple the prior year's levels because of rising mortgage defaults. The Company's stock dropped to $32.36 per share on the news, but continued to be artificially inflated as defendant Thompson assured investors: "We have every confidence we'll navigate the headwinds of the current cycle."

73.    On March 3, 2008, Wachovia was sued by hedge fund VCG Special Opportunities Master Fund Ltd. for improperly requiring it to pay out more from insurance derivatives contracts as the value of mortgage-backed bonds declined.

74.    On April 14, 2008, Wachovia reported its first quarter 2008 financial results, which included a provision for credit losses of $2.8 billion, and reduced the dividend, in a release which stated in part:

> Wachovia today announced a series of actions to further enhance its capital base and operational flexibility, and updated its credit reserve modeling to reflect greater emphasis on forecasted changes in customer behavior assuming continued house price depreciation. These actions include:
>
> - Plans to raise capital through a public offering of common stock and perpetual convertible preferred stock;
>
> - Lowering the quarterly common stock dividend, which preserves $2.1 billion of capital annually, to build capital ratios and provide more operational flexibility. The board of directors declared a quarterly common stock dividend of $0.375 cents per common share, payable on June 16, 2008, to stockholders of record on May 30, 2008. This dividend level is consistent with Wachovia's capital needs and growth opportunities for each of its business segments, and with an anticipated 40 percent to 50 percent cash payout ratio over the intermediate horizon; and
>
> - The update in the credit reserve modeling in response to the current and forecasted market environment and its effect on consumer behavior, particularly in stressed markets, resulting in a significant increase in the first quarter 2008 provision for credit losses. In

addition, the scope of credit disclosures was increased to provide enhanced insight into the payment option consumer real estate portfolio.

In addition, Wachovia reported a first quarter 2008 net loss of $350 million before preferred dividends, or a net loss available to common stockholders of $393 million, (20 cents per common share). These results, which reflect higher credit costs and the continued disruption in the capital markets, compared with earnings of $2.30 billion, or $1.20 per share, in the first quarter of 2007.

&ast; &ast; &ast;

Other key trends in the first quarter of 2008 compared with the first quarter of 2007 included:

&ast; &ast; &ast;

- Provision for credit losses of $2.8 billion, which exceeded net charge-offs by $2.1 billion. The provision largely reflected more severe deterioration in the residential housing market, particularly in specific markets in California and Florida, as well as the result of the refinements made to the credit reserve model for the payment option product. These refinements incorporate multiple and more granular factors regarding unprecedented consumer behavior, housing price deterioration and increased foreclosures. Net charge-offs were $765 million, or an annualized 0.66 percent of average net loans. Total nonperforming assets including loans held for sale were $8.4 billion, or 1.70 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer real estate-related nonperforming assets due to the effects of the weakened housing industry.

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, other intangible amortization and discontinued operations. Segment earnings are the basis on which Wachovia manages and allocates capital to its business segments. In accordance with Wachovia's business segment methodology, provision expense in excess of charge-offs, which amounted to $2.1 billion in the first quarter of 2008, is not allocated to business segments.

75.     On this news, Wachovia's stock declined to $25.55 per share, on volume of 191 million shares, a decline of 56% from the Class Period high of $58.80 per share in February 2007.

- 40 -

76.    On April 15, 2008, Oppenheimer cut Wachovia's fiscal 2008 earnings estimate to $1.70 a share from $2.70 a share, citing the Company's share sale, which diluted existing stock by about 15%, and credit losses linked to the U.S. subprime slump.  As *Bloomberg* reported:

> Richard Bove, an analyst at Punk Ziegel & Co. LP, questioned the company's credibility, saying the bank cut its dividend after previously suggesting it wouldn't trim the payout.  Bove called for the removal of Lanty Smith, the Wachovia director who said in a Wall Street Journal article that it was "disingenuous" for investors to be surprised by Wachovia's dividend reduction.

> ### 'Outrageous Statement'

> "This is not acceptable," said Bove in a note to investors.  "It is the most outrageous statement I can ever remember made by a board member directly insulting shareholders."

77.    Wachovia continued to disclose adverse information.  On April 30, 2008, Wachovia issued a press release entitled "Wachovia Responds to Tax Ruling in Leveraged Lease Transactions; Wachovia May Take Charge of Up to $1 Billion," which stated in part:

> Wachovia Corporation today announced that, as a result of its analysis of a ruling in *BB&T Corporation v. the United States* on April 29, 2008, it expects to record an after-tax non-cash charge of between $800 million and $1 billion in the second quarter of 2008. Wachovia expects to provide additional information when it files its 2008 First Quarter Report on Form 10-Q.

> Wachovia entered into various leasing transactions between 1999 and 2003 involving lease-to-service contracts and leases of qualified technological equipment, which are widely known as sale-in, lease-out or "SILO" transactions. Wachovia stopped originating these transactions in 2003.

> In 2006, the FASB issued guidance on the accounting treatment of leveraged leasing transactions. Previously, changes in the timing of tax cash flows did not require any change in the amount of income recognized under a leveraged lease. With the issuance of FASB Staff Position FAS 13-2, "Accounting for a Change or Projected Change in the Timing of Cash Flows Relating to Income Taxes Generated by a Leveraged Lease Transaction" (FSP 13-2), and FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" (FIN 48), changes affecting the timing of income tax cash flows but not the total net income under a leveraged lease trigger a recalculation of the net investment in the lease. Where tax cash flows are reduced or delayed, this recalculation results in a one-time non-cash charge to earnings.

- 41 -

On April 29, 2008, the U.S. Court of Appeals for the Fourth Circuit issued an opinion in the *BB&T* case that disallowed tax benefits associated with certain of BB&T's lease-in, lease-out ("LILO") transactions. Although the *BB&T* decision involved LILOs, Wachovia believes some portions of the decision may also apply to SILO transactions. There has not yet been any judicial decision that directly involves SILOs, so the tax law as applied to SILOs remains unsettled. However, applicable accounting standards require Wachovia to update the assessment of its SILO transactions in light of the *BB&T* decision. The decision has no impact on Wachovia's LILO transactions, which were settled in their entirety in 2004.

Although Wachovia continues to believe its SILO transactions comply with applicable laws, in light of the *BB&T* decision, under the principles established by FSP 13-2 and FIN 48, the non-cash charge to earnings is currently estimated to be in the range of $800 million to $1 billion and this approximate amount would be recognized as income over the remaining terms of the affected leases, generally 35 to 40 years.

78.     As *The Wall Street Journal* reported on May 1, 2008:

Wachovia Corp. said it expects to take an after-tax charge of $800 million to $1 billion in its second quarter for past leasing transactions.

The Charlotte, N.C., bank said the charge is needed because of an accounting ruling issued Tuesday by the U.S. Court of Appeals for the Fourth Circuit in a case involving BB&T Corp. The ruling provides guidance on accounting standards for recording the timing of cash flows on leveraged leases.

Wachovia said it completed the transactions affected by the ruling in 1999 through 2003. The company said it stopped originating those transactions, which involved lease-to-service contracts and leases of technological equipment, in 2003. The charges eventually will be recognized as income over the remaining terms of the leases, typically 35 to 40 years.

"We believe we have material information that we wanted to provide to our investors," said Christy Phillips-Brown, a Wachovia spokeswoman.

The news is the latest blow to the bank, which in April reported a first-quarter loss of $393 million and announced a 41% cut to its dividend. Last week, Wachovia said it will pay $144 million to settle federal allegations that it had failed to stop telemarketers who took advantage of thousands of elderly consumers.

Federal prosecutors are also investigating the bank for alleged laundering of drug proceeds by Colombian and Mexican money-transfer companies. Ms. Phillips-Brown said Wachovia "is committed to maintaining a strong anti-money-laundering program."

Carl Tobias, a law professor at Virginia's University of Richmond, said Wachovia's response shows it is being cautious because its own lease agreements

differ slightly from those of BB&T and are still legal. "Wachovia is being conservative, and they are right about it," he said. "It's a way to alert investors to this possibility."

79.    By late May 2008, Wachovia would disclose it had received subpoenas and/or inquiries from the SEC and regulators from several states due to its involvement with auction rate securities.

80.    On June 2, 2008, Wachovia announced an immediate change in the Company's management, in a release which stated in part:

> Wachovia announced today that its current Chairman, Lanty Smith, has been appointed interim Chief Executive Officer, succeeding Ken Thompson, who is retiring at the request of the Board.  Ben Jenkins, currently Vice Chairman and President of the General Bank, will serve as interim Chief Operating Officer.
>
> All of the company's staff functions will report to Smith, with the company's four lines of business – General Bank, Wealth Management, the Corporate and Investment Bank and Capital Management – reporting to Jenkins.  The Board of Directors has formed a special committee to conduct a search for a permanent Chief Executive Officer.
>
> "Wachovia is a strong institution and well positioned even in the face of the unprecedented conditions in the financial services industry," said Smith.  "The Board is confident that we are putting in place the right interim leadership to move the company forward, and no other senior management changes are currently contemplated."
>
> Smith continued, "No single precipitating event caused the Board to reach this decision, but a series of previously disclosed disappointments and setbacks cumulatively have negatively impacted the company and its performance.  The Board believes new leadership will help to revitalize and reenergize Wachovia and enable it to realize its potential.  We will move Wachovia steadily ahead as a strong, independent company by continuing to focus first on the needs of our customers. Our recent successful capital raising actions provide us the solid foundation and flexibility we need in an environment which remains extremely challenging for Wachovia and the entire banking industry.  Despite continued hurdles, we have confidence in our strong liquidity, good capital position and solid business model."

81.    Wachovia was then placed on creditwatch negative by Standard & Poor's.

82.    After this news, Wachovia's stock dropped to $23.40 per share on June 2, 2008, on volume of 66 million shares.  The stock continued to decline on June 3, 2008.

- 43 -

83.    Then, on June 9, 2008, a *BusinessWeek* article came online about Wachovia, entitled "Wachovia:  Golden West Wasn't Golden."  The article stated in part:

> When Wachovia (WB) Chief Executive Officer Ken Thompson sealed a $24 billion deal to buy Golden West Financial in May, 2006, he bragged that he had bagged "a crown jewel" of the mortgage business. Two years later it's painfully clear that Thompson bought the nation's second-largest S&L at the peak of the housing bubble, a misstep that led to his ouster on June 2.
>
> *        *        *
>
> Analysts figure Wachovia could end up incurring losses of as much as $11 billion on Golden's West $122 billion mortgage portfolio. "You'd be hard-pressed to find anything good out of this acquisition," says Terry Maltese, president of Sandler O'Neill Asset Management.
>
> *        *        *
>
> In most mergers, it's the acquirers that exert their will. But right after Wachovia bought Golden West, executives from the S&L took control of all mortgage lending. And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-A-Payment" loans. These give borrowers four choices of how much to pay each month, and cost as much as a full percentage point more than a 30-year, fixed-rate mortgage. "[Management] believed Pick-A-Payment loans were the answer for every customer," says one ex-broker.
>
> *        *        *
>
> Despite Thompson's tireless defense of the deal, it was evident by earlier this year that Golden West's approach worked best in rising markets. Analysts note that Golden West focused too much on appraisals and too little on verifying the income and assets of applicants. While this tactic helped ensure that Golden West could recover the full value of homes that went into foreclosure during up cycles, it didn't anticipate that borrowers would simply walk away if a plunge in home prices left them underwater.

84.    On this news, Wachovia's stock dropped to $18.89 per share on June 9, 2008, on volume of more than 80 million shares.

85.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Defendants' portfolio of CDOs contained billions of dollars worth of impaired and risky securities, many of which were backed by subprime mortgage loans.

(b)     Defendants failed to properly account for highly leveraged loans such as mortgage-backed securities.

(c)     Wachovia had inadequate controls to prevent employees and others from using customer account numbers to steal millions of dollars.

(d)     The Company had inadequate controls to prevent management from understating loan loss allowances by billions of dollars causing Wachovia's financial statements to be materially misstated.

(e)     Internally at Wachovia it was understood that the acquisition of Golden West Financial in 2006 for $24 billion had been a colossal mistake and would lead to large losses.

(f)     Wachovia had become heavily involved in the underwriting, sale and subsequent auctions of auction rate securities, which were much riskier than represented to investors in the securities and the municipalities which issued them.  Once these auctions began failing, Wachovia would be subject to investigations and loss of reputation.

(g)     Wachovia had been heavily involved in pay-option ARMs.  These pay-option ARMs provided that during the initial term of the loan, borrowers could pay only as much as they desired with any underpayment being added to the loan balance.  These loans would become toxic (for both Wachovia and the borrowers) once housing prices stopped increasing at a rapid rate.

86.     As a result of defendants' false statements, Wachovia's stock price traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 67% from their price before these disclosures.

## WACHOVIA'S FALSE FINANCIAL REPORTING

87.     In order to inflate the price of Wachovia stock, defendants caused the Company to falsely report its results for at least fiscal 2006 through the third quarter fiscal 2007 through its failure to timely record adequate reserves for credit impairment for its exposure to mortgage-related assets, which inflated the Company's assets and net income.  The Company also improperly accounted for leveraged leasing transactions between 1999 and 2003, which ultimately led to more than $1 billion in pre-tax charges in the second quarter of 2008.

88.     The results issued during the Class Period were included in a Form 10-K and Forms 10-Q filed with the SEC.  The results were also included in press releases disseminated to the public.

89.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

90.     In its 2006 Form 10-K, Wachovia represented the following with respect to its allowances for loan losses:

> The allowance for loan losses and reserve for unfunded lending commitments are maintained at levels that are adequate to absorb probably losses inherent in the loan portfolio and in unfunded commercial lending commitments, respectively, as of the date of the consolidated financial statements.  The Company has developed policies and procedures for assessing the adequacy of the allowance for unfunded lending commitments that reflect the assessment of credit risk considering all available information.

91.     A fundamental precept of GAAP is that impairment of financial securities that is deemed to be other than temporary should be recorded as a charge against earnings. This impairment includes credit risk, where borrowers are not expected to pay. FASB Statement of Financial Standards No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶16, states in part:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary. . . . For example, if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred. If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss).

(Footnote omitted.)

92.     Wachovia has acknowledged that it has now recorded billions of dollars in provisions for credit problems. Wachovia's failure to properly accrue and report reserves for impaired assets caused its financial statements to be materially misstated. Due to Wachovia's growing exposure to the mortgage crisis at the time the sector was becoming increasingly risky, Wachovia was required to, but did not, record adequate and timely write-downs for these assets during fiscal 2006 and early fiscal 2007. Wachovia also recorded more than $1 billion in charges due to its improper accounting for leveraged lease transactions it had previously entered into.

93.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)      The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

94.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' FAILURE TO ENSURE WACHOVIA HAD ADEQUATE INTERNAL CONTROLS

95.     Defendants were able to scheme Wachovia shareholders and inflate Wachovia's stock price through accounting improprieties which resulted in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls, which permitted and caused Wachovia's reserves for mortgage-related asset impairment to be inadequate.

96.     Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must:

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

*     *     *

(ii) transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A)-(B).

97.     These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Inv*., 567 F. Supp. 724, 746 (N.D. Ga. 1983).

98.     Defendants caused Wachovia to violate §13(b)(2)(A) of the 1934 Act by failing to maintain accurate records concerning its accounting for impaired mortgage-related assets among other accounting improprieties. Wachovia's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods. Accordingly, defendants caused Wachovia to violate §13(b)(2)(A) of the 1934 Act.

99.     In addition, defendants caused Wachovia to violate §13(b)(2)(B) of the 1934 Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Wachovia failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting accounting for loan losses. In fact, despite knowing the true state of the Company's dismal lack of adequate controls, defendants regularly issued quarterly financial statements throughout the Class Period without ever disclosing the deficiencies in Wachovia's internal accounting controls and falsely asserted that its financial statements complied with GAAP.

100.     Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASB Statement of Concepts No. 1, ¶7. For this reason, in addition to Wachovia's failure to make the required disclosures in its financial statements and in its SEC filings, Wachovia

also shirked its duty to make such disclosures in its conference calls, its press releases and its Annual Report.

101.    As defendants allowed and were responsible for initiating a gross lack of internal controls over financial reporting, defendants were enabled to scheme Wachovia shareholders and inflate the Company's stock price through accounting improprieties which resulted in materially misstated publicly filed financial statements.

## LOSS CAUSATION/ECONOMIC LOSS

102.    By misrepresenting Wachovia's financial statements, the defendants presented a misleading picture of the Company's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Wachovia's business was not as healthy as represented, Wachovia falsely concealed the extent of its exposure to mortgage-related problems.

103.    These claims of profitability caused and maintained the artificial inflation in Wachovia's stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

104.    Defendants' false and misleading statements had the intended effect and caused Wachovia stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $58.80 per share.

105.    In July 2007, the market became aware of the problems that banks (including Wachovia) were having with subprime debt.  By November 2007, Wachovia had announced it would have to write down billions of dollars of its debt securities.

106.    As a direct result of defendants' admissions and the public revelations regarding the truth about Wachovia's profitability and its actual business prospects going forward, Wachovia's stock price plummeted 16%, falling from $48.14 per share on October 18, 2007 to $40.65 per share on November 9, 2007, a decline of $7.49 per share.  In mid-December 2007, Wachovia disclosed

ever increasing write-offs, causing its stock to drop to below $40 per share. In February 2008, additional disclosures about Wachovia's other improprieties drove the stock to below $30 per share.

107. On April 14, 2008, Wachovia's stock price plummeted another 8.1% , falling from $27.81 per share on April 11, 2008 to $25.55 per share on April 14, 2008, a decline of $2.26 per share.

108. After news of defendant Thompson's ousting on June 2, 2008, Wachovia's stock declined to $23.40 per share on June 2, 2008, and to $21.92 per share on June 3, 2008, and after *BusinessWeek*'s article on Golden West Financial, Wachovia's stock dropped below $20 per share. These drops removed the inflation from Wachovia's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

109. Plaintiffs incorporate ¶¶1-108 by reference.

110. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 52 -

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Wachovia common stock during the Class Period.

112.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wachovia common stock.  Plaintiff and the Class would not have purchased Wachovia common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

113.    Plaintiffs incorporate ¶¶1-112 by reference.

114.    The Individual Defendants acted as controlling persons of Wachovia within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Wachovia stock, the Individual Defendants had the power and authority to cause Wachovia to engage in the wrongful conduct complained of herein.  Wachovia controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

115.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wachovia common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

116.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. Wachovia has nearly 2 billion shares of common stock outstanding, owned by hundreds if not thousands of persons.

117.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Wachovia common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

118.    Plaintiffs' claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

119.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

120.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiffs and the members of the Class damages, including interest;

C.      Awarding plaintiffs' reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: July 7, 2008              **BRODSKY & SMITH, LLC**

By: *_/s/ Evan J. Smith (ES3254)_*
Evan J. Smith, Esquire (ES3254)
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)

# EXHIBIT G

MWR        Law Offices of Brodsky & Smith, LLC Announces Expanded Class
           Jul 8 2008  10:37:21

Law Offices of Brodsky & Smith, LLC Announces Expanded Class Period
in Class Action Lawsuit Against Wachovia Corp.

BALA CYNWYD, PA -- (MARKET WIRE) -- 07/08/08 --  Law offices of
Brodsky & Smith, LLC announces that a class action lawsuit alleging
an expanded class period has been filed on behalf of all persons who
purchased the common stock of Wachovia Corp. ("Wachovia" or the
"Company") (NYSE: WB) between May 8, 2006 and June 6, 2008.  The
class action lawsuit was filed in the United States District Court
for the Southern District of New York.

The Complaint alleges that defendants violated federal securities
laws by issuing a series of material misrepresentations to the
market, thereby artificially inflating the price of Wachovia.

No class has yet been certified in the above action.  Until a class
is certified, you are not represented by counsel unless you retain
one.  If you are a Wachovia shareholder you have certain rights.  To
be a member of the class you need not take any action at this time,
and you may retain counsel of your choice.  If you want to discuss
your legal rights, you may e-mail or call the law office of Brodsky &
Smith, LLC who will, without obligation or cost to you, attempt to
answer your questions.  You may contact Evan J. Smith, Esquire or
Marc L. Ackerman, Esquire at Brodsky & Smith, LLC, Two Bala Plaza,
Suite 602, Bala Cynwyd, PA 19004, by e-mail at
clients@brodsky-smith.com, or by calling toll free 877-LEGAL-90.


Contact:
Evan J. Smith, Esquire
Marc L. Ackerman, Esquire
Brodsky & Smith, LLC
Email Contact
877-LEGAL-90
-0- Jul/08/2008 14:37 GMT

Copyright (c) 2008

# EXHIBIT H

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

GEORGE PAPPAS, On Behalf of Himself
and All Others Similarly Situated,

        Plaintiff,

   v.

COUNTRYWIDE FINANCIAL CORP.,
ANGELO MOZILO and ERIC P. SIERACKI,

        Defendants.

Case No.: CV-07-05295-MRP (MANx) ✓

ORDER CONSOLIDATING CASES AND
APPOINTING LEAD PLAINTIFF AND
LEAD COUNSEL

NORFOLK COUNTY RETIREMENT
SYSTEM, Individually and On Behalf of All
Others Similarly Situated,

        Plaintiff,

   v.

COUNTRYWIDE FINANCIAL
CORPORATION, ANGELO R. MOZILO,
DAVID SAMBOL, ERIC P. SIERACKI, and
STANFORD L. KURLAND,

        Defendants.

Case No.: CV-07-05727-MRP

*(Additional Captions Follow)*

-1-

| | |
|---|---|
| 1 | |
| 2 | JACK MCBRIDE, Individually and On Behalf of All Others Similarly Situated, |
| 3 | Plaintiff, |
| 4 | |
| 5 | v. |
| 6 | COUNTRYWIDE FINANCIAL |
| 7 | CORPORATION, COUNTRYWIDE HOME |
| 8 | LOANS, INC., COUNTRYWIDE CAPITAL |
| 9 | V., CITIGROUP GLOBAL MARKETS INC., |
| 10 | JP MORGAN SECURITIES INC., MERRILL LYNCH, PIERCE, FENNER & SMITH |
| 11 | INCORPORATED, MORGAN STANLEY & |
| 12 | CO. INCORPORATED, UBS SECURITIES |
| 13 | LLC, WACHOVIA CAPITAL MARKETS |
| 14 | LLC, ANGELO R. MOZILO, KATHLEEN |
| 15 | BROWN, HENRY G. CISNEROS, JEFFREY |
| 16 | M. CUNNINGHAM, ROBERT J. DONATO, |
| 17 | MICHAEL E. DOUGHERTY, MARTIN R. |
| 18 | MELONE, ROBERT T. PARRY, OSCAR P. |
| 19 | ROBERTSON, KEITH P. RUSSELL, |
| 20 | HARLEY W. SNYDER, DAVID SAMBOL, |
| 21 | ERIC P. SIERACKI, ANDREW GISSENGER, III, and CARLOS M. GARCIA. |
| 22 | |
| 23 | Defendants. |
| 24 | |

Case No. CV-07-06083-MRP

-2-

1

2      SARATOGA ADVANTAGE TRUST On          Case No. CV-07-06635-MRP

3      Behalf of Themselves and All Others

4      Similarly Situated,

5

6                      Plaintiff,

7          v.

8      COUNTRYWIDE FINANCIAL

9      CORPORATION, ANGELO R. MOZILO,

10     DAVID SAMBOL, ERIC P. SIERACKI, and

11     STANFORD L. KURLAND,

12                     Defendants.

13

14

15

16     ARGENT CLASSIC CONVERTIBLE          Case No. CV-07-07097-MRP

17     ARBITRAGE FUND L.P., Individually and

       On Behalf of All Others Similarly Situated,
18

19                     Plaintiff,

20         v.

21     COUNTRYWIDE FINANCIAL

22     CORPORATION, ANGELO R. MOZILO,

23     DAVID SAMBOL, and ERIC P. SIERACKI,

24

25                     Defendants.

26

27

28

                                   -3-

1

2

3    BARRY BRAHN, Individually and on Behalf          Case No. CV-07-07259-MRP

     of Himself and All Others Similarly Situated,

4

5               Plaintiff,

6        v.

7    COUNTRYWIDE CAPITAL V.,

8    COUNTRYWIDE FINANCIAL

9    CORPORATION, ANGELO R. MOZILO,

10   ERIC P. SIERACKI, and STANFORD L.

11   KURLAND,

12               Defendants.

13

14

15

16                                    I.

                               INTRODUCTION

17
         Before the Court are six securities class action cases brought on behalf of investors of
18
     Countrywide Financial Corporation ("Countrywide") and asserting claims against Countrywide,
19
     its subsidiaries, a variety of current and former officers and directors, and underwriters of public
20
     offerings of Countrywide securities. Several Plaintiffs from these cases have moved to
21
     consolidate some or all of the claims. Further, multiple parties have filed motions to be
22
     appointed as lead plaintiff of either a consolidated case or a case not treated as part of the
23
     consolidated case. The Court heard oral argument on the issues of consolidation and
24
     appointment of lead plaintiff on November 19, 2007.
25

26

27

28

                                       -4-

## II.

### BACKGROUND

#### A.    Defendants in all cases

Countrywide is a Delaware corporation with its principal place of business in Calabasas, California.  With its subsidiaries, Countrywide operates in five business areas: Mortgage Banking, Banking, Capital Markets, Insurance, and Global Operations.  The Mortgage Banking component originates and sells residential loans, and the Global Operations component provides ancillary services for those loans.  The Banking component operates a federally chartered bank that invests in mortgages and home equity loans that originated in Mortgage Banking.  The Capital Markets component underwrites and trades in mortgage-backed securities.

One complaint, *Jack McBride, et al., v. Countrywide Financial Corp., et al.* ("*McBride*"), also includes as defendants Citigroup Global Markets, J.P. Morgan Securities, Merrill Lynch, Morgan Stanley, UBS Securities LLC, Wachovia Capital Markets LLC (collectively the "underwriters") as defendants.  These companies served as underwriters of a November 1, 2006 public stock offering.

Finally, several complaints name individual directors and officers of Countrywide or its subsidiaries as defendants.  Angelo Mozilo, one of the original founders of Countrywide in 1969, served as CEO and Chairman of the Board of Directors of Countrywide during the period in question.  Kathleen Brown, Henry Cisneros, Jeffrey Cunningham, Robert Donato, Michael Dougherty, Martin Malone, Robert Parry, Oscar Robertson, Keith Russell, and Harley Snyder were other members of the Board of Directors in late 2006.

Stanford Kurland is a former COO and President of Countrywide, and David Sambol currently holds those positions, as well as Chairman and CEO of CHL.  Eric Sieracki is Countrywide's Executive Managing Director and CFO.  Andrew Gissinger, III is Executive Managing Director of Residential Lending, and President and COO of CHL.  Carlos Garcia is Executive Managing Director of Banking and Insurance.

#### B.    Individual cases

1. *Jack McBride, et al., v. Countrywide Financial Corp., et al.*, No. CV-07-06083-MRP and *Barry Brahn v. Countrywide Financial Corp., et al.*, No. CV-07-07259-MRP ("*Brahn*")

1    Plaintiff McBride alleges that Countrywide, its directors and officers, and its underwriters

2   failed to craft a registration statement and prospectus for a Nov. 1, 2006 securities offering

3   (collectively "Prospectus") that fully informed investors of "all material facts and industry

4   trends" affecting Countrywide.  Investors purchased Countrywide Capital V preferred stock

5   ("preferred stock") in reliance on the misstatements and omissions in the Prospectus, and
ultimately lost money when the stock decreased in value in mid-2007.

6    McBride sues on behalf of the class of all purchasers of preferred stock from the

7   November 1, 2006 offering and purchasers traceable thereto.  His action arises under § 11 and §

8   15 of the Securities Act of 1933 ("1933 Act"). 15 U.S.C. §§77k-l.  Under these sections, where a

9   registration statement or prospectus contains a misstatement of material fact or omission of

10   material fact, any person acquiring the security may sue (1) every person who signed the

11   registration statement, (2) every director and (3) every underwriter of that security, including the

12   issuer.  *Id.*  The heightened pleading requirements of the Private Securities Litigation Reform

13   Act ("PSLRA") do *not* apply to 1933 Act claims unless the complaint "sounds in fraud." *See*

14   *Anderson v. Clow (In re Stac Elecs. Sec. Litig.),* 89 F.3d 1399, 1405 n.3 (9th Cir. 1996); *In re*

15   *Portal Software*, No C-03-5138 VRW, 2006 U.S. Dist. LEXIS 61589, at *7 (N.D. Cal. Aug. 17,
2006).

16    The *Brahn* case is similar to McBride in that it asserts § 11 and § 15 of the 1933 Act

17   based on the Prospectus associated with the Nov. 1, 2006 offering of preferred securities.  It also

18   asserts a violation of § 12(a)(2) of the 1933 Act, which creates liability for sellers of securities,

19   against Countrywide Capital V.

20

21    2.   *George Pappas v. Countrywide Financial Corp.*, et al., No. CV-07-05295-MRP

22       ("*Pappas*")

23    Plaintiff Pappas alleges that Countrywide and its directors issued false and misleading

24   statements during the class period of in violation of § 10(b) and § 20(a) of the Securities and

25   Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5.  The complaint references a series of

26   press releases and public statements that contain the alleged misrepresentations and omissions.

27   Pappas highlights the positive and optimistic statements contained in those press releases and

28   characterizes them as misleading in light of the position of the Company.  Pappas contends that
the defendants should have disclosed some information about the risk of the impairment charge
and loan loss provision that resulted in a surprise to investors on July 24, 2007.

-6-

1   Pappas pleads the reliance requirement of the relevant sections by alleging "fraud on the

2   market" and alleges that the alleged misrepresentations and omissions resulted in purchasers of

3   Countrywide public securities paying artificially inflated prices during the class period of Oct.

4   24, 2006 to Aug. 9, 2007.

5           3. *Norfolk County Retirement System, et al.*, v. *Countrywide Financial Corp., et al.*,

6               No. CV-07-05727-MRP ("*Norfolk*") and *Saratoga Advantage Trust, et al., v.*

7               *Countrywide Financial Corp., et al*, No. CV-07-06635-MRP ("*Saratoga*")

8           Plaintiffs in these cases allege that during the class period Countrywide falsely

9   represented that it had strict and selective underwriting and loan origination processes, and ample

10  liquidity that would insulate the company in a market downturn. According to Plaintiffs,

11  Countrywide and its executives repeatedly assured investors and the public that its disciplined

12  and conservative strategy set it apart from other "irrational" mortgages lenders. These

13  assurances came in the form of press releases, conference calls with investors where executives

14  answered questions, SEC filings such as quarterly and annual reports, and presentations to

15  investors. Plaintiffs allege that in fact Countrywide engaged in practices that limited the ability

16  of the Company to weather any deterioration of the housing and mortgage markets.

17          As with *Pappas*, the Plaintiffs seek relief under the 1934 Act and SEC Rule 10b-5, and

18  rely on the "fraud on the market" doctrine to show that purchasers of common stock in the period

19  of April 24, 2004 to August 9, 2007 relied on the alleged misrepresentations by paying the

20  inflated prices that resulted from them.

21          4. *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide, et al.*, No. CV-

22              07-07097-MRP ("*Argent*")

23          Plaintiff Argent Classic Convertible Arbitrage Fund L.P. ("Argent") sues on behalf of

24  itself and the class of qualified institutional buyers who purchased Countrywide Series A and

25  Series B Floating Rate Convertible Senior Debentures due 2037 ("debentures") in a private

26  placement pursuant to SEC Rule 144A during a class period of May 17, 2007 to August 9, 2007.

27  Plaintiff alleges that Defendants made false and misleading statements in press releases, SEC

28  filings, and other public statements that concealed the Company's financial condition. These

misrepresentations inflated the price of Countrywide common stock, which in turn inflated the

price of debentures because they are convertible to common stock. As in *Pappas, Norfolk,* and

-7-

1    *Saratoga,* the *Argent* action alleges violations of § 10(b) and § 20(a) the 1934 Act, and SEC Rule

2    10b-5. The complaint also alleges violations of several sections of the California Corporations

3    Code.

### III.

#### CONSOLIDATION

5    **A. Legal Standard**

6           Under the PSLRA, the court must decide whether to consolidate claims before it appoints

7    a lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(ii). Federal Rule of Civil Procedure 42(a) ("Rule

8    42") grants the district court broad discretion to consolidate cases involving common issues of

9    law or fact in the interests of judicial economy and convenience. *Huane v. United States,* 743

10   F.2d 703, 704 (9th Cir. 1984). The court must weigh the saving of time and effort consolidation

11   would produce against any inconvenience, delay, or expense it would cause. *Id.*

12          Although district courts generally take a favorable view towards consolidation, the mere

13   existence of a common issue should not lead to the conclusion that the district judge must order

14   consolidation – to the contrary, a district judge "always has discretion to deny consolidation." 9

     C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2383.

15          In considering whether to consolidate securities class actions, courts have considered

16   whether the actions involved the same "core of defendants," the same law under the various

17   Securities Acts (and Rule 10b-5), and the same factual events. *See, e.g., Garber v. Juniper*

18   *Networks, Inc.,* No. 06-04327 JW, 2006 U.S. Dist. LEXIS 86721 (N.D. Cal. Nov. 20, 2006);

19   *Averdick v. Hutchinson Tech., Inc.,* No. 05-2095 MJD/SRN, 2006 U.S. Dist. LEXIS 47445 (D.

20   Minn. Feb. 9, 2006); *Meeuwenberg v. Best Buy Co.,* No. 03-6193 ADM/AJB, 2004 U.S. Dist.

21   LEXIS 7686 (D. Minn. Apr. 29, 2004).

22          Also instructive is *Aronson v. McKesson HBOC, Inc.,* in which a series of 54 securities

23   fraud class actions were brought in the Northern District of California. 79 F. Supp. 2d 1146

24   (N.D. Cal. 1999). In that case, the court consolidated several cases even though some arose from

25   10b-5 and others from the Securities Act of 1933, and the cases involved overlapping, but

26   different, sets of defendants and securities. *Id.* The court appointed a single lead plaintiff for all

     the class actions despite the differences in the cases. *Id.*

27          Other cases have held that a single lead plaintiff can represent a class of plaintiffs even if

28   that party does not have standing to sue under all claims so long as one named plaintiff does have

standing. *See, e.g., Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 669-70 (C.D. Cal. 2005); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 458 F. Supp. 2d 455, 462 (E.D. Mich. 2006).

Finally, in *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427, 438 (S.D. Tex. 2002), the district court consolidated a preferred stock claim with a common stock claim, noting that objections to consolidation because of distinct issues surrounding preferred stock can effectively be handled by dividing the class during class certification. *Id.*

**B. Arguments**

Plaintiff New York Funds[1] seeks to consolidate all claims primarily because the actions involve numerous common questions of law and fact, and because splintering the litigation could interfere with the ability of a lead plaintiff to run the litigation smoothly. Plaintiff Brahn supports consolidation of the preferred stock claims with the other public securities claims, and supports appointment of New York Funds as lead plaintiff for the consolidated class.

Plaintiff McBride opposes grouping the preferred stock claims with common stock or private placement securities because they are subject to a different pleading standard. In addition, New York Funds has not suggested that it holds any preferred stock, which raises questions about its ability to represent the preferred stock purchasers fairly.

Plaintiff Argent Classic Convertible Fund L.P. ("Argent") opposes grouping the claims involving private debentures with claims involving publicly traded securities primarily because the debentures were offered *only* to "qualified institutional buyers," which by definition cannot include pension funds such as those comprising the New York Funds conglomerate. The private debentures, according to Argent, raise factual and legal distinctions not at issue in any of the other cases and demands separate treatment from those cases.

**C. Analysis**

Resolving the question of consolidation requires a close examination at the similarities and differences in the cases before the court, and grouping cases together only when satisfied that the requirements of Rule 42 are met. Some of the cases are so similar that they can be consolidated without further discussion. The *Brahn* case and *McBride* case involve identical

---

[1] "New York Funds" refers to Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems, and as Trustee of the New York State Common Retirement Fund, and of the New York City Pension Funds.

-9-

securities (preferred stock) and an identical class (purchasers who can trace their purchase to the Nov. 1, 2006 offering), and both allege violations of nearly identical sections of law (§ 11, § 12(a) and § 15 of the 1933 Act) based on the same statements (the Prospectus). Thus, they are ordered grouped together. Likewise, *Norfolk* and *Saratoga* both allege violations of § 10(b), § 20(a) and SEC Rule 10b-5 and contemplate a class of public stock purchasers dating back to April 24, 2004. Indeed, the complaints in the two cases are identical in parts of their allegations. Therefore, they too are ordered to be grouped together.

### 1. *Pappas* and *Norfolk/Saratoga*

The Court next determines whether to group the *Pappas* claims with *Norfolk/Saratoga*. These three, the broadest complaints, allege violations of the same sections of law, and cite essentially the same public statements made by Countrywide in the period of October 2006 to November 2007 as being materially misleading. The difference is the starting date of the class period (April 2004 in *Norfolk/Saratoga* compared to October 2006 in *Pappas*), and the precise definition of the class (common stock purchasers in *Norfolk* compared to public securities purchasers in Pappas). At least in the period of October 2006 to the end of the class period in August 2007, the Court expects very similar theories and evidence to be presented. The overlap is sufficient to support consolidation to effectuate case management and discovery, and no party opposes this conclusion for these cases. Accordingly, the *Pappas*, *Norfolk*, and *Saratoga* claims are ordered consolidated.

### 2. *McBride/Brahn* and *Pappas/Norfolk/Saratoga*

The parties vigorously contest whether the preferred stock claims from *McBride/Brahn* should be grouped with the common stock claims from the other cases. The Court acknowledges that there are several important differences between the cases. For example, the preferred stock claims in *McBride/Brahn* do not face the heightened pleading requirements of the PSLRA unless they "sound in fraud" and do not require proof of scienter. Moreover, the claims involve a narrower class because they deal solely with purchasers from a particular public offering, and include several underwriters that are not involved in any other case.

However, the similarities between the claims compel the Court to consolidate them, at least at this stage. *See In re Enron Corp. Sec. Litig.*, 206 F.R.D. at 451 (explaining that "consolidation, at least pretrial, serves to promote an orderly progression of this very complex

-10-

litigation, especially since discovery necessarily involves overlapping Defendants and a common

core of facts and legal issues"). From a factual perspective, the claims concern overlapping

public statements: the Prospectus is one document that the 1934 Act claimants could very well

include in their case. Indeed, the *Pappas* complaint is brought "on behalf of all persons who

purchased Countrywide Financial *publicly traded securities* on the open market during the Class

Period," a definition which includes both preferred and common stock.[2] Thus, *Pappas* arguably

contemplates the Prospectus as one public statement that violates the 1934 Act with respect to

preferred stock. Moreover, the class periods in all the public securities cases overlap

significantly: their end date of Aug. 9, 2007 is identical, and their start date varies from late 2006

to early 2004.

The different pleading standards and evidentiary burdens in a 1933 Act claim are not so

difficult to manage that multiple lead plaintiffs of distinct classes are necessary at this stage.

"Speculations about possible conflicts do not rebut the statutory presumption that one lead

plaintiff can vigorously pursue all available causes of action against all possible defendants

under all available legal theories." *Aronson v. McKesson HBOC, Inc.,* 79 F. Supp. 2d 1146, 1151

(N.D. Cal. 1999). The Court is not persuaded by the speculative arguments made by McBride

that combining fraud claims with 1933 Act claims will delay and prejudice the claimants.[3] A

single lead plaintiff, with adequate counsel, could very easily manage both types of claims,

particularly given the overlap in facts, defendants, and time periods at issue, and because the

requirements for each cause of action are well-established.

At this time, the Court is satisfied that economy and efficiency would be promoted by

having a single lead plaintiff bring all claims involving publicly traded securities, whether they

arise under the 1933 Act or 1934 Act, and whether they concern common or preferred stock. For

these reasons, the Court consolidates claims involving purchases of public securities under a

single lead plaintiff.

[2] New York Funds mentions that it intends to amend its complaint to include all securities, public and private. It may further bring claims under § 11 for other securities that it holds. The Court, however, will only decide the issues of consolidation and lead plaintiff with the motions and complaints it has before it at this time.

### 3. *Argent* and the other cases

The Court has good reason to consolidate *Argent* and to treat it separately with a separate lead plaintiff. As has been well briefed by New York Funds, Plaintiff Argent offers two seemingly inconsistent perspectives on the litigation. On the one hand, Argent's SUPPLEMENTAL STATEMENT REGARDING LEAD PLAINTIFF MOTIONS asserts that the fact that private debentures are involved <u>requires</u> that the case be kept separate because there are <u>no common questions of law or fact</u>. Argent states that the debentures are "fundamentally different" types of securities with "different characteristics", which makes it clear "none of the plaintiffs or movants can adequately represent the *unique* interests of the Debenture class." ARGENT'S SUPPLEMENTAL STATEMENT REGARDING LEAD PLAINTIFF MOTIONS, at 6-8 (emphasis added).

On the other hand, Argent's complaint alleges "fraud on the market" under § 10(b), § 20(a), and Rule 10b-5 and discusses extensively the effect of the misrepresentations on the price of the common stock. *See* Argent's CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND CALIFORNIA STATE LAW ("Argent Complaint"). Factually and legally this is nearly identical to *Pappas*, *Norfolk*, and *Saratoga*, at least during the short *Argent* class period of May 24, 2007 to August 9, 2007. The only additional wrinkle is the contention that the price of the debentures is tied to the common stock due to the convertible nature of the private debentures. In this regard, the Court observes that the *Argent* complaint raises several common questions of *both* law and fact with the other 1934 Act cases, meeting the Rule 42 threshold for consolidation.

Nonetheless, the Court exercises its discretion to separate the *Argent* case under a distinct lead plaintiff because, as has become evident in the briefs and at oral argument, there are important and complex legal and factual issues which are unique to the private placement scenario, and there is reason to believe these issues could be lost in the fray of the public securities litigation. Plaintiff Argent makes an unusual legal argument that "fraud on the market" is available to prove reliance in a SEC Rule 144A private placement case, and in the alternative, that a private placement memorandum issued to qualified institutional investors can support common law reliance. Whether these arguments have merit depends on facts and law not involved in any other case, and concerns only qualified institutional investors who traded in a private market. Class certification for the *Argent* class may hinge on these issues in the private placement case, whereas in the public securities fraud cases, "fraud on the market" is largely straightforward if the securities trade on national exchanges. Moreover, of less importance in the

-12-

1  *Argent* case are the voluminous facts and legal analysis relevant to the class period of 1-3 years

2  asserted by the other cases because the class start date of May 24, 2007 is so very recent.

3      Thus, although there is some overlap in facts and law with the public securities claims,

the Court anticipates at the outset that the focus of the private placement claims will be different

4  from the public securities claims, and the difference is sufficient to merit separation for case

5  management purposes.  The Court is convinced that in the *Argent* case a lead plaintiff should be

6  appointed who is a qualified institutional investor so that this focus is not lost by a lead plaintiff

7  coordinating claims involving both public and private securities and markets.  The coordination

8  of discovery can be managed by later orders of the Court.

9

10      4.  Conclusion

11      For the foregoing reasons, the Court consolidates the *McBride, Brahn, Pappas, Norfolk,*

12  and *Saratoga* cases ("Public securities cases"), but orders that the *Argent* case remain separate.

13                                  IV.

14                    APPOINTMENT OF LEAD PLAINTIFF

15  A.    **Legal Standard**

16      The PSLRA provides a three-step process for identifying the lead plaintiff in securities

17  cases. *See In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002).  The first step requires that the

18  plaintiff who files the initial action must publish, "in a widely circulated national business-

19  oriented publication or wire service," notice of the pendency of the action and a statement that

20  "any member of the purported class may move the court to serve as lead plaintiff."  15 U.S.C. §

21  78u-4(a)(3)(A).  Movants have 60 days from when notice is published to provide their motions to

22  the court.  15 U.S.C. § 78u-4(a)(3)(A)(II).

23      Once notice is established, the district court must select the "presumptively most

24  adequate plaintiff" by identifying the movant that has shown "the largest financial interest in the

25  relief sought by the class" and that it satisfies the adequacy and typicality requirements of Rule

26  23(a) of the Federal Rules of Civil Procedure ("Rule 23"). *In re Cavanaugh*, 306 F.3d at 729-30.

27      In the third step, other plaintiffs have the opportunity to rebut the presumptive lead

28  plaintiff's showing of typicality and adequacy. *Id.* at 730.  The Court must examine potential

lead plaintiffs one at a time, starting with the one with the greatest financial interest, and

continuing in descending order "if and only if the presumptive lead plaintiff is found inadequate or atypical [under Rule 23 standards]." *Id.* at 732.

### 1. Largest Financial Interest

Courts typically look to four factors as being determinative of the "largest financial interest": (1) the numbers of shares of the subject securities purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. *Lax v. First Merch. Acceptance Corp.*, No. 97 C 2715, 1997 U.S. Dist. LEXIS 11866, at *5 (N.D. Ill. Aug 11, 1997); *In re Cendant*, 264 F.3d 201, 262 (3d. Cir. 2001) (citing with approval the Lax court and others that utilized these factors). While these factors are widely recognized by the courts, the Ninth Circuit does not require them; it demands only that district courts select "accounting methods that are both rational and consistently applied." *In re Cavanaugh*, 306 F.3d at 730 n.4.

### 2. LIFO vs. FIFO

The two most common accounting techniques in calculating losses suffered by plaintiffs are FIFO and LIFO. FIFO stands for "first-in, first-out"; LIFO stands for "last-in, first-out." *See In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100 (S.D.N.Y. 2005). They represent different methods for matching specific sales of stock with specific purchases. *See generally Johnson v. Dana Corp.*, 236 F.R.D. 349, 352 (N.D. Ohio 2006) (explaining the FIFO and LIFO concepts in the approximate losses context). The choice of which accounting methodology applies is a question of law. *Arenson v. Broadcom Corp.* No. CV-02-301-GLT, 2004 U.S. Dist. LEXIS 27522 (C.D. Cal. Dec. 6, 2004) (citing *Crow Tribe v. Racicot*, 87 F.3d 1039, 1045 (9th Cir.1996)).

While the New York Funds characterize FIFO as the "predominant" method of matching purchases and sales, it appears that district courts have "generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases." *eSpeed*, 232 F.R.D. at 101 (citing *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 378-79 (E.D. Va. 2003)) (emphasis added). *See also Arenson*, 2004 U.S. Dist. LEXIS, at *5-7. FIFO is disfavored because it "encompasses purchases made outside the class period," *Weisz v. Calpine Corp.*, No. C 02-1200 SBA, 2002 U.S. Dist. LEXIS 27831, at *26 (N.D. Cal. Aug. 19, 2002), and thus in

-14-

some cases "will identify damages where in reality there is none." *In re Clearly Canadian Sec. Litig.*, No. C-93-1037-VRW, 1999 U.S. Dist. LEXIS 14273, at *13 (N.D.Cal. Sep. 3, 1999).

### 3.  Rule 23 Requirements

As noted above, a movant must also satisfy the requirements of Rule 23 in order to invoke the presumption of being the "most adequate" plaintiff.  In particular, the potential lead plaintiff must make a prima facie showing of the "typicality" and "adequacy" requirements of Rule 23 class certification. *In re Cavanaugh*, 306 F.3d at 730.  "Numerosity" and "commonality" need not be shown because they are class requirements more properly directed towards the class as a whole. *Id.* at 730 n.5 (noting that the absence of this factor "would preclude certifying a class action at all"). The district court has latitude as to what information it will consider in determining typicality and adequacy. *Id.* at 732.  In making these determinations, the Court reviews the plaintiffs' pleadings and declarations, *id.* at 730, and applies established Rule 23 principles. *In re Cendant*, 264 F.3d at 264-265.

#### a.  Typicality

The court assesses typicality by determining whether "the circumstances of the movant ... are markedly different or the legal theory upon which the claims [of that movant] are based differ from the theories of the claims of the other class members." *In re Cendant*, 264 F.3d at 265 (internal quotations omitted). *See also* (a)(3)(B)(iii)(II)(bb) (allowing statutory presumption to be rebutted where the presumptively most adequate plaintiff is "subject to unique defenses that render such plaintiff incapable of adequarely representing the class").

#### b.  Adequacy

In determining adequacy, the court must consider whether the movant has the ability and incentive to represent the claims of the class vigorously, whether it has obtained adequate counsel, and whether there is a conflict between the movant's claims and those asserted on behalf of the class. *In re Cendant*, 264 F.3d at 265.

### B.    Arguments

Remaining before the Court are several motions for appointment as lead plaintiff. Plaintiff New York Funds seeks to be appointed as lead plaintiff of the consolidated case.

1   Saratoga Advantage Trust contends that it should be appointed as co-lead plaintiff with New
2   York Funds, though it concedes that New York Funds' losses "far exceed" their own in this
    matter.
3
4       Plaintiff McBride seeks appointment as lead plaintiff for claims involving preferred stock
    purchasers, and Argent seeks appointment as lead plaintiff for claims involving purchasers of the
5   private debentures at issue in that case.
6

7       **C.    Analysis**
8           1.  Notice
9           The movants expend significant energy debating the time-bar effect of the various public
10  notices provided by plaintiffs and others in the several cases.  The court declines to rule on these
    issues, except to find that the Aug. 14, 2007 notice published by Scott and Scott LLP in *Prime*
11  *Newswire* and the Sept. 20, 2007 notice published by Wolf Hadenstein Adler Freeman & Herz
12  LLP in *Business Wire* meet the requirements of the PSLRA in announcing the pendency of the
13  public securities cases.  The notices were published in widely-distributed news services and
14  properly inform class members of their right to move for appointment as lead plaintiff.
15          Further, the notices that were filed do not explicitly or implicitly cover private placement
16  securities as are at issue in *Argent* and therefore do not bar Argent's later filed motion for
17  appointment as lead plaintiff.  Argent's counsel provided notice of the pendency of the *Argent*
18  action pursuant to the PSLRA in *Business Wire* on Oct. 31, 2007.  The notice adequately
19  informed debenture purchasers of their right to file motion for appointment as lead plaintiff.
20  Thus, the notice requirement of the PSLRA is met for Argent as well.
21

22          2.  The *Argent* Case
23          Because the time period for movants to file motions for appointment as lead plaintiff has
    not yet expired, the Court declines to appoint a lead plaintiff for the *Argent* case at this time.
24

25          3.  The Public Securities Cases
26          New York Funds, with a LIFO loss of over $40 million and a FIFO loss of over $100
27  million, clearly has the largest financial stake of any movant in the consolidated case under the
28  four factors used by the Third Circuit, and likely under any other rational accounting method.

1   New York Funds also has made a prima facie showing of typicality and adequacy.

2   Typical of plaintiffs in all the cases, New York Funds purchased public securities in

3   Countrywide at prices it alleges were inflated by false and misleading statements by defendants,
    and damages were incurred by alleged violations of federal securities laws.

4       The party meets the adequacy requirement as well.  As a group of large institutional

5   investors who have conducted numerous large securities actions, New York Funds has

6   considerable experience in such cases, and has retained competent counsel also with the

7   necessary experience.  The Court accepts the party's statement that it intends to vigorously

8   protect the interests of all plaintiffs.  Accordingly, New York Funds is the presumptive lead

9   plaintiff of the consolidated case.

10      As discussed in Section III, McBride challenges the typicality and adequacy of New York

11  Funds as a lead plaintiff of the preferred stock claims because New York Funds does not purport

12  to hold preferred stock.  Here, the preferred stock claims under the 1933 Act are sufficiently
    similar to the allegations in other cases to convince the Court that New York Funds allegations

13  *are* typical of the cases.  The typicality requirement is satisfied when the plaintiff's claim arises

14  from the same event or course of conduct that gives rise to the claims of other members and is

15  based on the same legal theory, *In re Enron Corp., Securities Litigation*, 206 F.R.D. at 445

16  (internal citations omitted), and the striking similarity in allegations is evident here despite the

17  different causes of action and securities involved.  *See, e.g.,* DECLARATION OF RUSSEL N.

18  JACOBSON IN SUPPORT OF NEW YORK FUNDS' REPLY MEMORANDUM OF POINTS AND

19  AUTHORITIES, Ex. H (chart comparing the similarity of the *Norfolk* and *McBride* complaints,

20  including the use of identical language to describe how Countrywide misled investors).

21      Moreover, McBride's argument that the common stockholders "*cannot* be adequate

22  plaintiffs because they have no financial interest in the relief sought by the class" is without

23  merit.  That New York Funds has not purchased preferred stock does not bar consolidation nor
    does it bar their appointment as lead plaintiff for all claims involving public securities.  *See*

24  *Tanne v. Autobytel*, 226 F.R.D. 659, 669 (C.D. Cal. 2005).  It is inevitable that, in some cases,

25  the lead plaintiff will not have standing to sue on every claim.  *Id.*  The Court is persuaded that a

26  single, large, institutional investor in public Countrywide securities can quite fairly handle claims

27  under the different causes of action that may be asserted by the various plaintiffs such as

28  McBride and Brahn.

-17-

1   Saratoga Advantage Trust has submitted a brief arguing that it should be appointed co-

2   lead plaintiff with New York Funds because the New York Funds is a "single aggregation of

3   politically influenced parties" and Saratoga would serve as a balance in the leadership and a

4   "check" of the litigation process.  Under the case law, there is no question that the Court has the

5   authority to appoint co-lead plaintiffs where such appointment "will enhance, rather than reduce,

6   the efficiency of the litigation." *In re. Amer. Bus. Fin. Serv. Cit.*, No. 04-0265, 2004 U.S. Dist.

7   LEXIS 10200 (E.D. Pa Jun. 3, 2004).  In the situation here, there is also no question that New

8   York Funds is a grouping of <u>public</u> pension funds.  However, Saratoga Advantage Trust is

9   merely speculating and has not shown that these vague "political" considerations will have any

10  impact whatsoever on New York Funds ability to represent the Plaintiffs as lead on its own.  In

11  fact, New York Funds has done so in prior cases with considerable success.  Absent a more fact-

12  based or specific attack on New York Funds ability to represent the class as a sole lead plaintiff,

13  the motion to appoint Saratoga Advantage Trust as co-lead plaintiff is denied.

## V.

### APPOINTMENT OF LEAD COUNSEL

Once chosen, the lead plaintiff is responsible for choosing the lead counsel in the case.
*See* 15 U.S.C. §78u-4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to the approval of
the court, select and retain counsel to represent the class.").  The lead plaintiff's discretion is not
absolute, because the court retains the power and the duty to supervise this process.  *In re
Cendant,* 264 F.3d at 273.  However, the court's role is confined to deciding whether to approve
the choice of the lead plaintiff.  *Id.*

Here, the Court approves New York Funds' choice of Labaton Sucharow LLP as counsel.
The firm has extensive experience in large securities fraud cases and in particular, in managing
class actions involving public securities purchasers.  At this time, the Court is confident that
counsel will be able to properly represent the plaintiffs in the consolidated case.

## VI.

### CONCLUSION

In accordance with this Order, New York Funds and its counsel of Labaton Sucharow
LLP is appointed lead plaintiff and lead counsel, respectively, for a consolidated case comprising

-18-

1   the claims in *Pappas*, *Norfolk*, *Saratoga*, *McBride*, and *Brahn*. All subsequent filings in any of

2   these five cases should reflect the case number CV-07-05295-MRP.

3

4       IT IS SO ORDERED.

5   DATED: November 28, 2007

6                                       Hon. Mariana R. Pfaelzer
7                                       United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-19-